**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| UNIVERSITY OF TENNESSEE RESEARCH FOUNDATION, | ) | Case No. 3:19-cv-508 |
| *Plaintiff*, | ) | Judge Atchley |
| v. | ) | Magistrate Judge Guyton |
| CAELUM BIOSCIENCES, INC., | ) | |
| *Defendant*. | ) | |

---

**MEMORANDUM OPINION AND ORDER**

---

Amyloidosis is a rare sometimes fatal disease with no known cure. Dr. Alan Solomon of the University of Tennessee developed the 11-1F4 antibody, a possible treatment for Amyloidosis. This case concerns whether Defendant Caelum Biosciences, Inc. wrongfully used or otherwise interfered with the property rights, know-how, and trade secrets held by Plaintiff University of Tennessee Foundation ("UTRF") concerning the 11-1F4 antibody. But to determine that question the Court must consider the rights of another absent third party, Columbia University. UTRF claims it owns all property associated with the 11-1F4 antibody and that Caelum violated a contract and committed tortious acts by claiming it validly holds those rights. Caelum claims it holds a valid license to commercialize the 11-1F4 antibody from Columbia. UTRF responds that Columbia gave away rights it did not have.

Before the Court is Caelum's Motion to Dismiss the Amended Complaint. [Doc. 35]. Caelum argues that: (1) the Court lacks personal jurisdiction over it; (2) the case should be dismissed because Columbia is an indispensable party; and (3) UTRF failed to make any claim on

which relief can be granted. For the following reasons, Caelum's Motion to Dismiss the Amended Complaint [Doc. 35] is **GRANTED IN PART** and **DENIED IN PART**. The Court holds that it has personal jurisdiction over Caelum. It further holds that Columbia is a necessary party who may be feasibly joined, so UTRF is given **LEAVE TO AMEND** its complaint to add Columbia as a party. Finally, the Court **DEFERS** any ruling on the arguments raised under 12(b)(6) because the complaint will be amended.

## I. BACKGROUND

This case primarily concerns the ownership and development of the 11-1F4 antibody. [Doc. 30 at 3]. Dr. Solomon developed the antibody while at the University of Tennessee. [*Id.* at 1]. The 11-1F4 antibody has the potential to treat Amyloidosis—a rare disease that causes Amyloids (a type of protein) to build up in vital organs. [*Id.* at 14–15].

UTRF is a nonprofit headquartered in Tennessee that commercializes the developments from faculty at the University of Tennessee on behalf of the University. [*Id.* at 4–5]. UTRF pursues patents, license agreements, and other methods to profit off the inventions of University of Tennessee professors. [*Id.* at 6]. Caelum is a corporation headquartered in New York and incorporated in Delaware that was created to commercialize the 11-1F4 antibody. [*Id.* at 5].

After developing the antibody, Dr. Solomon and his colleagues successfully applied for a patent that covered "certain methods of amyloid removal using anti-amyloid antibodies." [*Id.* at 16]. UTRF (then called the University of Tennessee Research Corporation)[1] took control of the patent as well as "the 11-1F4 property rights and all know-how relating to synthesizing and the

[1] The University of Tennessee Research Corporation was reorganized into UTRF. All relevant property interests transferred to UTRF. *Id.*

use of the antibody." [*Id.*][2] In 2009, Dr. Solomon successfully applied for Orphan Drug Designations for "two indications of the 11-1F4 antibody[:]" designation requests #09-2937 and #09-2903. [*Id.* at 17]. These designations provide benefits to their holders such as tax benefits and market exclusivity. [*Id.*] UTRF claims that it owns the 11-1F4 Orphan Drug Designations. [*Id.*]

Dr. Solomon began collaborating with Dr. Suzanne Lentzsch of Columbia to assist with the development of 11-1F4 technology. [*Id.* at 19]. UTRF negotiated with Columbia Technology Ventures ("CTV") and created an Inter-Institutional Agreement between UTRF and Columbia. UTRF gave Columbia a license and the ability to sublicense "only the patent rights covering 11-1F4" technology. [*Id.*] UTRF argues that this does not include the "property rights or know-how (*e.g.* the physical antibody materials, protein sequences, or research data regarding the 11-1F4 antibodies) or . . . the 11-14F Orphan Drug Designations." *Id.* at 19–20.[3]

After the first contract, UTRF began negotiating with CTV to amend and expand the Inter-Institutional Agreement. [*Id.* at 20]. The proposed amendment would give Columbia the right to license the property rights and know-how associated with the 11-14F antibody. [*Id.* at 21]. During

[2] More specifically, UTRF claims "property rights and know-how" includes:

> [A]ll 11-1F4 antibody products (including all non-human, chimeric, humanized, and human versions, as well as analogs, variants, fragments of such versions), formulations, and conjugates thereof; the chimeric 11-1F4 antibody; cell clones utilized in the production of the chimeric 11-1F4 antibody; all know-how associated with the development and use of the antibody products, including the results, data, information and materials relating to antigens, antibodies, and cell lines necessary or useful for development or commercialization of the 11-1F4 antibody products; research data utilized in the Investigational New Drug application file submitted with the U.S. Food and Drug Administration in connection with an approval request for 11-1F4 therapies (including IND No. 117,316 entitled, "Chimeric Monoclonal Antibody 11-1F4"); and the Orphan Drug Designations for 11-1F4 issued by the U.S. Food and Drug Administration.

[*Id.* at 16].

[3] Prior to contracting with Columbia, UTRF entered into a contract with the National Cancer Institute ("NCI"). Dr. Solomon and his colleagues sent murine versions of the 11-1F4 antibody and data from their research to NCI. [*Id.* at 18]. NCI sent back a chimeric version of the 11-1F4 antibody. [*Id.*] The murine version of the antibody, the data and know-how relating to 11-1F4, and the chimeric version of the antibody remained the property of UTRF. [*Id.*] NCI did have permission to use the materials for nonprofit research. [*Id.* at 19]. NCI could also send the chimeric version of the antibody to other non-profits conducting nonprofit research. [*Id.*]

negotiations, Columbia disclosed that another party, Caelum, was interested in the property rights and know-how of the 11-1F4 antibody. *Id.* UTRF and Columbia never amended the contract, but Caelum began to represent that it had the relevant rights and information from Columbia. [*Id.*]

Caelum also entered into a confidentiality agreement with UTRF. [*Id.* at 22]. Under the agreement, Caelum agreed not to "undertake research, development, or trials with respect to, tangible property relating to the acceleration of amyloid removal by anti-amyloid monoclonal antibodies" without first receiving written consent from UTRF. [*Id.*] (emphasis omitted). In reaching this agreement, Caelum's officers attended meetings at the University of Tennessee. [Doc. 42-1 at 3–12].[4] Caelum communicated repeatedly with UTRF and the University of Tennessee through emails and phone calls. [*Id.* at 11–12]. Caelum has an ongoing research agreement with University of Tennessee professors. [*Id.* at 11]. Furthermore, Caelum hired Dr. Solomon, a University of Tennessee professor emeritus, as an advisor. [Doc. 30 at 14]. Caelum also acknowledges that the 11-1F4 antibody was developed in Tennessee. [*Id.* at 24].

Currently, Caelum is researching the 11-14F antibody. [*Id.* at 27]. Caelum also represents itself as the owner of the Orphan Drug Designations. [*Id.* at 33]. UTRF argues that these actions breached their confidentiality agreement. [*Id.* at 26]. UTRF also sued Caelum alleging the following torts: (1) conversion; (2) slander of title; (3) tortious interference of business relationships; (4) unjust enrichment; and (5) misappropriation of trade secrets. [*Id.* at 30–45]. Caelum responds that this case should be dismissed because: (1) the Court lacks personal jurisdiction; (2) Columbia is an indispensable party that cannot be feasibly joined; and (3) various other grounds under Rule 12(b)(6). [Doc. 35].

---

[4] While generally the Court is limited to the pleadings in a motion to dismiss, it can consider evidence outside the pleadings when the defendant challenges personal jurisdiction. *Malone v. Stanley Black & Decker*, 965 F.3d 499, 505 (6th Cir. 2020).

## II. PERSONAL JURISDICTION

### A. Standard of Review

Where there has not been an evidentiary hearing, the Plaintiff bears the burden of making a prima facie showing of jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). The Court does not weigh evidence; it considers the pleadings and affidavits in the light most favorable to the nonmovant. *Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 504 (6th Cir. 2014). For the Court to have personal jurisdiction over a defendant, its exercise of jurisdiction must comport both with Tennessee's long-arm statute and the Due Process Clause. *Neal v. Janssen*, 270 F.3d 328, 331 (6th Cir. 2001). Tennessee's long-arm statute is coextensive with the Due Process Clause, so the Court needs to determine only if exercising jurisdiction over Caelum offends due process. *Id.*

The Sixth Circuit follows a three-part test when determining if a court can exercise specific personal jurisdiction over a defendant:[5]

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1294, 1299–30 (6th Cir. 1991) (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 410 F.2d 374, 381 (6th Cir. 1968)). The Court will analyze each element in turn.

### B. Purposeful Availment

To purposefully avail itself to the laws of Tennessee, Caelum must have "acted or caused a consequence in [Tennessee] such that [it] invoked the benefits and protections of [Tennessee]

[5] No party argues that Caelum is subject to general jurisdiction in Tennessee.

law." *MAG IAS Holdings Inc., v. Schmückle*, 854 F.3d 894, 900 (6th Cir. 2017). This is shown when a defendant "engaged in significant activities within a State" or "created 'continuing obligations' between himself and residents of the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985).

It is clear that Caelum purposefully availed itself to Tennessee Law. Caelum negotiated a contract with a corporation headquartered in Tennessee. [Doc. 42-1 at 11–13]. Those negotiations included visits to Tennessee and frequent communication with that Tennessee corporation. [*Id.*] The evidence shows that besides the contract at issue in this case, Caelum continues to participate in a joint research venture with the University of Tennessee. [Doc. 46-2]. In fact, not only does Caelum have a sustained business interest in Tennessee; its business interest is with the University of Tennessee—a governmental entity of Tennessee. These contacts are far from "'random,' 'fortuitous' or 'attenuated'" events. *MAG IAS*, 854 F.3d at 900 (quoting *Rudzewicz*, 471 U.S. at 475). They represent a concentrated and successful effort to create lasting relationships with Tennessee entities. Therefore, Caelum could "reasonably anticipate being haled into court" in Tennessee. *LAK, Inc.*, 885 F.2d at 1300 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)) (internal quotation marks omitted).

Caelum argues that the mere existence of a contract with an in-state entity is not sufficient to establish purposeful availment. [Doc. 36 at 8]. Indeed, when there is a one-time transaction with one party within a state, a defendant has not purposefully availed themselves to that state's laws. *Cf. Kerry Steel*, *Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 151 (6th Cir. 1997) (holding that defendant did not avail itself to Michigan law when defendant had not visited Michigan and the contract was a one-time purchase of materials). But Caelum's interactions were not a one-and-done purchase of goods. Its dealings created "continuing obligations" between itself and the state

of Tennessee. *See Rudzewicz*, 471 U.S. at 476. The contract between Caelum and UTRF provides that to work on some aspects if the 11-1F4 antibody, Caelum must seek the permission of Tennessee company. [Doc. 30 at 22]. Even if the contract was the only relevant contact, this case is much closer to the franchise agreement at issue in *Rudzewicz* than the one-time purchase of goods in *Kerry Steel*. This continuing obligation with Tennessee, gave more than the required "clear notice" that Caelum is subject to suit here. *World-Wide Volkswagen*, 444 U.S. at 297 (1980).

Caelum also argues it must purposefully avail itself as to each claim. [Doc. 36 at 8]. That argument is incorrect. For this proposition, Caelum cites *Board of Forensic Document Examiners, Inc. v. American Bar Association*, No. 16-cv-2641, 2017 WL 549301 at *3 (W.D. Tenn. Feb. 9, 2017). Yet, the court in *Board of Forensic Examiners* stated only that the Court needs personal jurisdiction as to each claim. 2017 WL 549301, at *3. When one has purposefully availed itself to the state, the Court need only consider if each claim satisfies the "arising from" prong. *See Bristol-Meyers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 137 S. Ct. 1773, 1780–81 (2017); *Preferred RX Inc. v. American Prescription Plan, Inc.* 46 F.3d 535, 551 (6th Cir. 1995). Because these contacts establish that Caelum purposefully availed itself to Tennessee law, the Court does not need any other evidence of this prong.

But even if the Court was required to hold that Caelum purposefully availed itself as to every claim, it would. The torts claimed by UTRF are all intentional torts, and while there is debate in briefing as to whether there is a separate "effects test," *Calder v. Jones*, 465 U.S. 783 (1984) remains an important touchstone. *See MAG IAS,* 854 F.3d at 900.[6] The Supreme Court has

[6] Caelum's citation to *MAG IAS* and argument that *Calder* is vacated does not counsel otherwise. Caelum stated that the Court of Appeals recognized that *Calder*'s holding was "limited but 'not clearly' overruled." [Doc. 41 at 6]. Yet that language is taken out of context as the court was relaying the plaintiff's argument. *MAG IAS*, 854 F.3d at 901. The court then rejected that argument:

cautioned that a tortfeasor does not purposefully avail himself to a state's law merely because he could reasonably foresee harm arising in that state. *Walden*, 571 U.S. at 288–90. Instead, there needs to be a more substantial relationship with the state such as continuous contact or a preexisting relationship. *See Blessing v. Chandrasekhar*, 988 F.3d 889, 904 (6th Cir. 2021); *Neal*, 270 F.3d at 333.

Here, it was foreseeable that the "brunt of the harm" from the allegedly tortious conduct would be felt in Tennessee. *See Calder*, 465 U.S. at 783. And the relationship between Caelum and Tennessee was already significant. The holding in this case is dictated by the Sixth Circuit's holding in *Neal*. 270 F.3d at 333. In *Neal*, the court found that the defendant purposefully availed itself by committing fraud in Tennessee related to the sale of a horse. The court recognized that one act on its own may not be enough, but it stated jurisdiction was proper because of the sustained relationship between the parties—such as their frequent communications—before the allegedly fraudulent transfer. *Neal*, 270 F.3d at 332–33. In this case, not only did Caelum allegedly direct tortious activity to Tennessee, it did so after engaging in a substantial business relationship in Tennessee. Furthermore, that business relationship is still ongoing. That is sufficient to establish purposeful availment.

---

> Plaintiffs argue that "causing consequences" in Michigan is still sufficient to establish purposeful availment because *Walden* limited, but did not clearly overrule, the Court's prior decision in *Calder*. Neither party is entirely correct. *Walden* simply holds that an out-of-state injury to a forum resident, standing alone, cannot constitute purposeful availment.

*Id.* Thus, the Sixth Circuit did not adopt the reasoning argued by Caelum. It expressly rejected it. *Id.*

Furthermore, *Maxitrate Tratamento Termico E Controles v. Super Systems, Inc.*, 617 F. App'x 406 (6th Cir. 2015) does not call *Calder*'s holding into question. It simply stated that *Calder* did not hold that knowing that harm may arise in a state is sufficient to establish personal jurisdiction. *Id.* at 408. The Supreme Court recognized as such in *Walden v. Fiore*, 571 U.S. 277 (2014). *Walden* provides additional explanation as to *Calder*'s scope; *Walden* did not overrule *Calder*.

### C. “Arise From”

The next issue is whether the claims “arise from” Caelum’s contacts with the forum. *LAK Inc.*, 885 F.2d at 1293 (quoting *Mohasco Indus.*, 401 F.2d at 381)). The Supreme Court has defined “arise from” to mean that “[t]he cause of action must derive from, or connect to, the relevant claims.” *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780. The Sixth Circuit has cautioned that this standard is “lenient” and the action “need not ‘formally’ arise from” the relevant contacts. *Air Prods Controls, Inc. v. Safetech Intern., Inc.*, 503 F.3d 544, 553 (6th Cir. 2007).

The Sixth Circuit has also held “more than mere but-for causation is required to support a finding of personal jurisdiction. To the contrary, the plaintiff's cause of action must be proximately caused by the defendant's contacts with the forum state.” *Beydoun*, 768 F.3d at 508. But the Supreme Court recently clarified that a court can find that it has personal jurisdiction without finding that the defendant’s contacts with the forum caused the suit. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021). The Court explained that “[n]one of our precedents has suggested that only a strict causal relationship between the defendant’s in-state activity will do. . . . *[S]ome relationships will support jurisdiction without a causal showing*.” *Id.* (emphasis added). Instead the Court emphasized that the proper formulation of this requirement is that the suit must “arise out of *or relate to* the defendant’s contacts with the forum.” *Id.* (quoting *Bristol-Myers*, 137 S. Ct. at 1779–80) (internal quotation marks omitted). Therefore, the Supreme Court’s decision in *Ford Motor* has abrogated the Sixth Circuit’s interpretation that “arise from” requires defendant’s contacts to proximately cause the plaintiff’s claim.

*Ford Motor*, however, does not open the floodgates to any cause of action against any corporation that does business in the forum. The Court cautioned that “the phrase ‘relate to’ incorporates real limits, as it must adequately protect defendants foreign to the forum.” *Id.* at 1026.

Instead, the Court found that jurisdiction was appropriate because Ford advertised in Montana and Minnesota, sold cars there, "[t]he company's dealers . . . regularly maintain[ed] and repair[ed] Ford cars" in those states, Ford sent replacement parts to those states, and all of those activities made Ford money. *Id.* at 1028. The fact that the cars at issue in this case were not sold in Montana or Minnesota did not deprive the Court of jurisdiction. *Id.* at 1029. The Court also distinguished *Bristol-Myers* with several key facts: the plaintiffs were residents of the forum states, they used the defective products in the forum states, and they suffered injury in the forum states. *Id.* at 1031.

Proceeding under the proper standard, UTRF's causes of action clearly "relate to" Caelum's contacts with Tennessee. First, Caelum's continued contacts with Tennessee relate to the contract that was allegedly breached. Indeed, its communications were specifically intended to create that contract with UTRF. Second, Caelum's tort claims all relate to their contacts with Tennessee. Any contact Caelum had with Tennessee was in service of advancing the commercialization of the 11-14F antibody. The causes of action alleged by UTRF all center around the alleged interference of its rights in the 11-14F antibody. Caelum's continued presence in the state, its agreement with the University of Tennessee and UTRF regarding the 11-14F antibody, also relates to the current dispute as it involves the same subject matter. Furthermore, UTRF is a resident of Tennessee and it suffered injury in Tennessee. All of these contacts demonstrate that Caelum's contacts relate to UTRF's causes of action.

### D. Reasonableness of Exercise of Jurisdiction

The Court presumes that exercising jurisdiction over a defendant is reasonable when the first two elements are met. *Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998). The Court should also weigh factors including, but not limited to, "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in

securing the most efficient resolution of the policy." *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 552 (6th Cir. 2016). When the first two elements of the test are met, "only the unusual case will not meet this third criterion." *Id.* (quoting *Theunissen*, 935 F.2d at 1461) (internal quotation marks omitted).

This case is not unusual, and the Court's exercise of jurisdiction over Caelum is reasonable. While Caelum is not located in Tennessee, its officers' frequent contact with Tennessee demonstrate that litigating here will not be too heavy a burden. *See Id.* at 552. Second, Tennessee has an interest in serving as a forum for its aggrieved corporations. And while New York may serve as a plausible alternative forum and have an interest in the litigation, the Court is not required to transfer the case to New York. Because there is nothing extraordinary about this case, and the first two elements are met, exercising jurisdiction over Caelum does not offend due process.

Caelum purposefully availed itself to Tennessee Law, and its frequent contacts caused the causes of action in this case; thus, the Court can exercise jurisdiction over these claims. Accordingly, Caelum's Motion to Dismiss [Doc. 35] is **DENIED IN PART**.

## III. RULE 19 JOINDER

### A. Standard of Review

The Sixth Circuit follows a three-part test in determining whether dismissal is appropriate under Rule 12(b)(7). "First, the Court must determine whether the [absent] person or entity is a necessary party under Rule 19(a)." *Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 666 (6th Cir. 2004). If the party is a necessary party, the Court must then decide if joinder is feasible. *See id.* Finally, if the Court determines that the absent party cannot not be feasibly joined, "the court must analyze the Rule 19(b) factors to determine whether the court should 'in equity and good

conscience' dismiss the case because the absentee is indispensable." *Id.* (quoting Fed. R. Civ. P. 19(b)).

Rule 19(a) states a party is necessary if:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or
> (2) the person claims an interest relating to the subject matter of the action and is so situated that the disposition of the action in the person's absence may
>> (i) as a practical matter impair or impede the person's ability to protect that interest or
>> (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a). Caelum argues Columbia is necessary under Rule 19(a)(2). [Doc. 36 at 12].

Furthermore, Rule 19 cannot be applied rigidly and formalistically; it requires a "pragmatic approach." *Boone v. Warren*, 166 F. App'x 818, 819 (6th Cir. 2006). The Court must balance the rights of each party and employ the rule to "promote full adjudication of disputes with a minimum of litigation effort." *Glancy*, 373 F.3d at 655 (quoting 7 Charles Alan Wright, *et al.*, *Federal Practice & Procedure* § 1602 (3d ed. 2001)) (internal quotation marks omitted).

**B. Application**

Here, the case involves three contracts: one between Caelum and UTRF; one between Caelum and Columbia, and one between Columbia and UTRF. It also involves property rights that may belong to UTRF or Columbia. Caelum argues that it has property rights in the 11-1F4 antibody because Columbia validly licensed those rights. UTRF argues that Caelum does not have the property rights because Columbia never had the rights, so any contract purporting to license those rights is void. Thus, to decide the validity of at least some of the tort claims, such as conversion

and slander of title,[7] the Court would have to interpret UTRF and Columbia's contract as well as Columbia and Caelum's contract.

"It is hornbook law that all parties to a contract are necessary in an action challenging its validity or interpretation." *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 303 (6th Cir. 2009) (Sutton, J., concurring); *see also Clinton v. Babbitt*, 180 F.3d 1081, 1088 (9th Cir. 2006) ("[A] district court cannot adjudicate an attack on the terms of a negotiated agreement without jurisdiction over the parties to that agreement.")[8] Here, UTRF is asking the Court to "adjudicate an attack on the terms" of the agreement between Caelum and Columbia. *Clinton*, 180 F.3d at 1088. Doing so could prejudice Columbia as it tries to exercise the rights it claims to own. Furthermore, it has a possibility of creating inconsistent obligations with Caelum. Columbia could sue Caelum alleging that Caelum breached its contract by not commercializing the 11-1F4 antibody, and the Court here could find that Caelum has no right to do so. Finally, with an eye towards judicial efficiency, the ownership rights and the effect of these coexistent agreements should be litigated with all interested parties present. Thus, Columbia should be joined as a party to this lawsuit.

The counterarguments raised by UTRF are unconvincing. UTRF argues that: (1) Columbia has been aware of the lawsuit and its refusal to join demonstrates that it does not claim an interest that will be prejudiced; (2) Caelum and Columbia have aligned interests in determining ownership;

---

[7] For example, to state a successful claim for conversion, a plaintiff must assert that the tortfeasor is exercising dominion over the property "in defiance of plaintiff's right." *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977) (quoting *Barger v. Webb*, 391 S.W.2d 664, 665 (Tenn. 1965)). To state a claim for slander of title, plaintiff needs to prove false statements about the title of property. *Brooks v. Lambert*, 15 S.W.3d 482, 484 (Tenn. Ct. App. 1999). Both of these would require a finding that Caelum has no property rights in the 11-14F antibody.

[8] Similarly, all parties to an agreement to transfer property are necessary parties. 7 Charles Alan Wright, *et al.*, *Federal Practice and Procedure*, § 1621 (3d ed. 2020) ("Disputes over the transfer of an interest in land generally necessitate joinder of all parties to the document of conveyance.").

(3) Caelum cannot be subject to inconsistent obligations because UTRF requests only monetary damages. [Doc. 42 at 10–14]. The court will address each argument in turn.

First, it is true that courts often give some deference to the absent party's view of its interest in litigation. *Century Bus. Servs., Inc. v. Bryant*, 69 F. App'x 306, 311 (6th Cir. 2003). But Caelum correctly points out that Columbia may believe it has a meritorious personal jurisdiction defense. [Doc. 41 at 7]. A party that believes the Court lacks jurisdiction over it faces two equally-objectionable outcomes: it can intervene pursuant to Federal Rule of Procedure 24 and waive its jurisdictional argument or it can sit on the sidelines while its interests are litigated in its absence. The Court cannot assume that Columbia has made a choice as to its interests in this lawsuit. In the cases UTRF relied upon, personal jurisdiction was not raised as an issue. *See e.g., Century Bus. Servs,* 69 F. App'x at 311 (discussing whether an intervenor, who would intervene on behalf of the plaintiff was necessary); *United States v. Sabine Shell, Inc.*, 674 F.2d 480, 483 (5th Cir. 1982) (considering an absent party's interest when the party owned the land at issue in the relevant state).[9]

Second, it is clear here that Columbia has an interest in the litigation even if they have not joined it. In support of its argument that Columbia is not a necessary party, UTRF cites *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 971–72 (9th Cir. 2008). Yet, the court in *Cachil Dehe* held that several tribes were not necessary because they lacked a legally protected interest—such as one that comes from the terms of a bargained for contract. *Id.* Here, Columbia has a legally protected interest; its interest in the terms of its contracts and its property rights in the 11-14F antibody. *See also* Caleb Nelson, *Intervention*, 106 Va. L.

---

[9] And even if there was a lurking personal jurisdiction argument, the courts did not acknowledge it. *See Cooper Indus., Inc. v. Availl Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)) (internal quotation marks omitted).

Rev. 271, 334 (2020) ("[M]ost courts have understood the word 'interest' [in Rule 19(a)(2)] to refer to legally protected interests of the sort that might form the basis of the lawsuit . . ..") Thus, even if Columbia has not joined this lawsuit it has an "interest" in the litigation as it has legally protected rights.

The second argument also fails. Caelum and Columbia have aligned interests; they both want Columbia to be declared the owner of the relevant property rights. Yet, the Court can also consider the intensity of each parties' interest. *Glancy*, 373 F.3d at 675. Here, Columbia may believe that it owns all of the property rights in the 11-1F4 antibody while Caelum owns only a license. [Doc. 41 at 9]. To rule in favor of UTRF may temporarily deprive Caelum of a license, but it would require a finding that Columbia is permanently deprived of a property right. That difference in intensity means Caelum may be a poor substitute for Columbia's interest.

The third argument similarly fails to persuade. Admittedly, Columbia will not be bound or precluded by a judgment rendered in its absence.[10] Furthermore, there will not be an injunction at the end of this case which requires performance or non-performance by Caelum. But, a judgment in this case will be final as to Caelum. If Columbia sues Caelum for failing to use best efforts on its royalty contract, Caelum may be forced to commercialize the 11-1F4 property. UTRF could sue in court and have a final judgment that states Caelum does not have a right to do so. That is enough of a possible inconsistent obligation to warrant joinder under 19(a)(2)(ii).

This argument also fundamentally misunderstands the flexibility of Rule 19. An absent party will *never* be bound by a judgment, but that does not prevent the Court from relying on Rule 19. If a party had to be bound by a final judgment to be necessary, Rule 19 would be vestigial.

[10] Both claim and issue preclusion would require Columbia to be present in this litigation. *See Bragg v. Flint Bd. of Educ.*, 570 F.3d 775, 776 (6th Cir. 2009); *Sanders Confectionary Prods, Inc. v. Heller Fin., Inc.*, 973 F.3d 474, 480 (6th Cir. 1992).

Furthermore, no court has held that Rule 19 is limited to cases where a party has requested equitable relief. Rule 19 encourages judicial economy: to interpret these agreements where Columbia is a party without Columbia is grossly inefficient.

The next step is to determine if Columbia can be feasibly joined. *Glancy*, 373 F.3d at 666. Caelum argues that Columbia cannot be joined because the Court lacks personal jurisdiction over Columbia. [Doc. 36 at 12]. But there has been inadequate briefing on that fact, and Columbia could always decide to waive personal jurisdiction. *See Gerber v. Riordan*, 649 F.3d 514, 520 (6th Cir. 2011). Thus, unlike subject-matter jurisdiction, which is non-waivable, the Court should not proceed to the third inquiry. Instead, Columbia should be joined as a party.

Thus, UTRF is given **LEAVE TO AMEND** its complaint to name Columbia as a defendant. If Columbia raises a successful personal-jurisdiction defense (or some other jurisdictional defect), then the Court will determine if it is an indispensable party.

## IV. REMAINING 12(b)(6) ARGUMENTS

Because an amended complaint completely supersedes the current complaint, *Glass v. The Kellogg Co.*, 252 F.R.D. 367, 368 (W.D. Mich. 2008), the Court's opinion on the remaining 12(b)(6) issues would be premature. If Caelum was successful in any of its challenges, for example that there is insufficient factual matter pled on its breach of contract claim, UTRF could add more factual detail in its amended complaint. *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000) (stating that leave to amend after a full opinion and order on 12(b)(6) is akin to the court issuing an "advisory opinion"). Therefore, the Court **DEFERS** its rulings on any remaining objections raised by Caelum. Caelum can reraise them after UTRF files its third amended complaint.

## V. CONCLUSION

For the reasons stated, Caelum's Motion to Dismiss the Amended Complaint [Doc. 35] is **GRANTED IN PART** and **DENIED IN PART**. The Court has personal jurisdiction over Caelum. It further holds that Columbia is a necessary party who may be feasibly joined, UTRF is given **LEAVE TO AMEND** its complaint to add Columbia as a party. The amended complaint **SHALL** be filed on or before **May 28, 2021**. Finally, the Court **DEFERS** any ruling on the arguments raised under 12(b)(6) because the complaint will be amended.

**SO ORDERED.**

**/s/ *Charles E. Atchley, Jr.***
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**