UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNIVERSITY OF TENNESSEE RESEARCH FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>CAELUM BIOSCIENCES, INC. AND THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,<br><br>Defendants. | Case No. 3:19-CV-00508 (CEA)(JEM) |

**CAELUM BIOSCIENCES, INC.'S REPLY
IN SUPPORT OF ITS MOTION TO COMPEL**

**I.      INTRODUCTION**

In its motion to compel, Caelum asked this court to order UTRF to supplement its response to Caelum's interrogatory to provide a sufficient list and description of the trade secrets it contends are at issue in this case. (*See* Caelum Mot. to Compel Mem., ECF No. 142 at 10-16.) Caelum also moved to compel UTRF to produce all documents response to Caelum's Requests for Production Nos. 1 and 2 requesting "[a]ll Documents and Communications sufficient to identify [UTRF's] trade secrets that [UTRF] contend[s] Caelum wrongfully acquired and/or misappropriated" and "[a]ll Documents and Communications referenced in the Complaint." (Strongosky Decl., ECF No. 142-1, Ex. B.). In opposition, UTRF argues that the Court should deny Caelum's motion claiming that UTRF's interrogatory answers are minimally sufficient under the law and that it has produced all non-email documents responsive to Caelum's requests. (*See generally* UTRF's Opp.

1

ECF No. 151.)

For the reasons set forth below, Caelum disagrees. Caelum respectfully requests that the Court compel UTRF to amend its interrogatory response to sufficiently identify its trade secrets, and, if UTRF cannot, order UTRF to certify that it has identified all facts regarding its trade secrets and documents constituting its trade secrets that it possesses or knows of. Similarly, this Court should order UTRF to produce all documents that Caelum has demanded, and, if UTRF does not have such documents (as it appears to admit) then the Court should require it to certify in writing that it does not possess the documents now or when UTRF filed its complaint.

## II.     ARGUMENT

### A.     This Court Should Order UTRF to Amend Its Interrogatory Responses Within 30 Days to Set Forth All Claimed Trade Secrets Encompassed By the "Know-How," "Data," or Other Categories Generally Described by UTRF

As set forth in Caelum's Motion to Compel, federal law requires UTRF, as the plaintiff asserting a misappropriation of trade secrets claim, to specifically answer an interrogatory that seeks identification of the purported trade secrets at issue. (Caelum Mot. to Compel Mem., ECF No. 147 at 10 (citing, *inter alia, Yoe v. Crescent Sock Company*, 2017 WL 11479991, at *3 (E.D.Tenn., 2017); *Dura Global, Technologies, Inc. v. Magna Donnelly Corp.*, 2008 WL 2064516, at *1 (E.D.Mich., 2008)).) UTRF's interrogatory answer should list such trade secrets and sufficiently explain the trade secret so that Caelum—as the defendant, accused of misappropriating UTRF's trade secrets—is on notice of what is in dispute, and therefore, may appropriately defend itself. (*See id.*; *see also Dura Global*, 2008 WL 2064516, at *2.) UTRF's interrogatory answer must also be particular enough as to separate UTRF's trade secret from matters of general knowledge in the trade or special knowledge of persons skilled in the trade. (*Id.* (citing *Phoenix Process Equip. Co. v. Cap. Equip. & Trading Corp.*, 2021 WL 1062553, at *16 (W.D. Ky. Mar.

2

19, 2021)).)

Caelum's motion demonstrated to the Court that UTRF's six page response does not satisfy UTRF's obligations. UTRF does not list its trade secrets with particularity, but instead proffers vague categories of information like "know-how," "research data," and "work product." (*See* Caelum Mot. to Compel Mem., ECF No. 147 at 10; UTRF's Rog Responses, Strongosky Decl., ECF No. 142-1, Ex. C at 5-8.) For example, UTRF alleges as a trade secret: "know-how associated with the development and use of 11-1F4." (*See* UTRF's Rog Responses, Strongosky Decl., ECF No. 142-1, Ex. C at 5-6.) But UTRF does not identify any "know-how" that could be readily separated from anyone else's "know-how" or "know-how" publicly available in the hundreds of publications made on 11-1F4. (*See id*.) Similarly, UTRF identifies in its response: "trade secret data and information relating to 11-1F4 generated by the National Cancer Institute" ("NCI"). (Id. at 6-7.) But UTRF does not explain what "data" it knows NCI (not Caelum) to have generated, or what studies NCI conducted to yield that data. (*See id*.) Lastly, UTRF alleges as a trade secret: "research data prepared by University of Tennessee researchers utilized in the Investigational New Drug application file." (*Id*. at 7-9.) But, again, UTRF does not describe what "research data" the University of Tennessee researchers prepared or, of that, what was included in the IND application. (*See id*.) Given that Caelum did not receive any of this information directly from UTRF or anyone at the University of Tennessee, Caelum cannot possibly be on fair notice of what "data" and "know-how," if any, UTRF might claim ownership over.

In opposition, UTRF makes a number of arguments: (1) that the sufficiency of UTRF's interrogatory responses was already ruled upon and approved by Judge Guyton, which is entirely untrue, (2) that UTRF has sufficiently identified its trade secrets, which is legally incorrect, and (3) that Caelum is attempting to argue the merits of whether UTRF's current answers constitute

3

trade secrets, which is not true (rather, Caelum simply is seeking to learn what alleged trade secrets are at issue).

UTRF's arguments fail. UTRF has asserted general categories of information, none of which specifically identify the trade secrets at issue—but within such categories apparently lie the trade secret, as UTRF argues in sum. Caelum asks this Court to order that UTRF identify with particularity the specific trade secrets it contends Caelum misappropriated or amend its interrogatory responses to state that UTRF is unable to provide any more specific facts supporting the alleged trade secrets at issue.

### 1. This Court Has Not Ruled on the Sufficiency of UTRF's Trade Secret Identification

UTRF argues that Judge Guyton's December 22, 2021 Order "necessarily overruled Caelum's arguments regarding UTRF's alleged failure to identify its trade secrets with particularity. . ." and that Caelum was "recycling the very same arguments that Court already rejected." (UTRF Opp., ECF No. 151 at 4.) UTRF's grossly mischaracterizes Judge Guyton's order.

Caelum had objected to producing documents responsive to UTRF's discovery requests based upon court decisions requiring that a plaintiff *first* identify its trade secrets with particularity before defendant's would be forced to comply with plaintiff's discovery requests seeking documents containing a defendant's own trade secrets. (*See* Caelum's Opp. to UTRF's Mot. to Compel, ECF No. 100 at 9-12.)

Judge Guyton's order, however, did not discuss or even make reference to the adequacy (or timing) of UTRF's trade secret identification. (*See* ECF No. 128 at 14-15.) The *only* analysis of the parties' arguments was a single sentence: "The Court grants Plaintiff's Motion to Compel as to Request for Production Nos. 1 & 4 as they are relevant, and the motion is well-taken." (*Id.*

4

at 16.) At most, Judge Guyton's impliedly rejected Caelum's arguments that UTRF must identify its trade secrets first, before Caelum would be required to disclose its own. There was no ruling on the sufficiency of UTRF's interrogatory responses.

> 2. **Caelum Is Not Seeking a Merits-Based Ruling on the Sufficiency of UTRF's Trade Secrets, Only a List Identifying the Trade Secrets With a Basic Factual Description**

In opposition, UTRF repeatedly argues that Caelum's motion to compel raises "premature, merits arguments" about whether the information UTRF identifies as its trade secrets in fact qualifies as a trade secret. UTRF misses the point. As explained in Caelum's motion to compel, plaintiffs' identification in trade secret cases "must be particular enough as to separate the trade secret from matters of general knowledge in the trade or special knowledge of persons skilled in the trade." (Caelum Mot. to Compel Mem., ECF No. 147 at 10 (citing *Babcock Power, Inc. v. Kapsalis*, 2015 WL 9257759, at *3 (W.D.Ky., 2015)).) The points UTRF complains to be "merits arguments" (*e.g.*, the extensive universe of publications on 11-1F4 research and study data) are submitted by Caelum to show that UTRF has not fulfilled its obligation to identify its trade secrets with sufficient particularity such that Caelum can determine which data or information, in the broad categories enumerated by UTRF, is trade secret and which is general knowledge. Caelum is not suggesting that the entire categories of information identified by UTRF could not possibly contain a protectable trade secret. Rather, Caelum's motion seeks what its interrogatory requested: a list of UTRF's trade secrets described with particularity.

For instance, UTRF argues that Caelum's references to two published articles regarding 11-1F4 means that Cealum is asking the Court to make a merits-based decision regarding its interrogatory answer. (UTRF Opp., ECF No. 151 at 11-12.) That is not true. Caelum references the studies to explain why UTRF's general, vague references to 11-1F4 "know-how," "research

5

data," and "work product" do not sufficiently describe UTRF's trade secrets in light of the numerous articles regarding 11-1F4 published by University of Tennessee researchers.[1]

As currently expressed, no part of UTRF's interrogatory answer sufficiently identify its trade secrets. Instead, UTRF provides general categories that may or may not constitute trade secret. Caelum is requesting that the Court order UTRF to identify its trade secrets with the requisite particularity, not to determine whether the information UTRF lists is entitled to trade secret protection.

---

[1] UTRF also takes issue with Caelum's reference to only two publications. UTRF's complaint is disingenuous. University of Tennessee researchers have authored or co-authored countless publications regarding 11-1F4. *See* Rudi Hrncic, et al., *Antibody-Mediated Resolution of Light Chain-Associated Amyloid Deposits*, 157 AM J OF PATHOLOGY 4 (2000); Alan Solomon, et al., *Therapeutic Potential of Chimeric Amyloid-reactive Monoclonal Antibody 11-1F4*, 1 CLINICAL CANCER RESEARCH 9 (2003); Alan Solomon, et al., *Immunotherapy in Systemic Primary (AL) Amyloidosis Using Amyloid-Reactive Monoclonal Antibodies*, 18 CANCER BIOTHERAPY & RADIOPHARMACEUTICALS 6 (2004); Brian O'Nuallain, et al., *The Amyloid-Reactive Monoclonal Antibody 11-1F4 Binds a Cryptic Epitope on Fibrils and Partially Denatured Immunoglobulin Light Chains and Inhibits Fibrillogenesis*, in AMYLOID AND AMYLOIDOSIS (1st ed. 2004); Jonathan S. Wall, et al., *Radioimaging of Light Chain Amyloid with a Fibril-Reactive Monoclonal Antibody*, 47 J NUCL MED 12 (2006); Jonathan S. Wall, et al., *Micro-Imaging of Amyloid in Mice*, 412 METHODS IN ENZYMOLOGY (2006); Brian O'Nuallain, et al., *Localization of a conformational epitope common to non-native and fibrillar immunoglobulin light chains*, 46 BIOCHEMISTRY 5 (2007); Brian O'Nuallain, et al., *Phage display and peptide mapping of an immunoglobulin light chain fibril-related conformational epitope*, 46 BIOCHEMISTRY 45 (2007); Jonathan S. Wall, et al., *Quantitative analysis of amyloid mass by segmentation of microPET and CT images*, in 2009 FIRST ANNUAL ORNL BIOMEDICAL SCIENCE AND ENGINEERING CONFERENCE (2009); Karen Wells, et al., *Biodistribution of a novel radiolabeled fibril-reactive monoclonal antibody in patients with systemic light chain (AL) amyloidosis*, 51 J NUCL MED sup. 1 (2010); Jonathan S. Wall, et al., *Radioimmunodetection of amyloid deposits in patients with AL amyloidosis*, 116 BLOOD 13 (2010); Jonathan S. Wall, et al., *Development and evaluation of agents for targeting visceral amyloid*, 33 TIJDSCHR NUCL GENEESKD 4 (2011); Karen Wells, et al., *Radioimmunoimaging of cardiac amyloid deposits in AL amyloidosis patients*, 52 J NUCL MED sup. 1 (2011); Karen Wells, et al., *Radioimmunoimaging of amyloid deposits in AL amyloidosis*, 53 J NUCL MED sup. 1 (2012); Arielle L. Langer, et al., *Results of Phase 1 Study of Chimeric Fibril-Reactive Monoclonal Antibody 11-1F4 in Patients with AL Amyloidosis*, 126 BLOOD 23 (2015); Camile V. Edwards, et al., *Analysis of the Phase 1a/b Study of Chimeric Fibril-Reactive Monoclonal Antibody 11-1F4 in Patients with AL Amyloidosis*, 128 Blood 22 (2016); Camille V. Edwards, et al., *Interim analysis of the phase 1a/b study of chimeric fibril reactive monoclonal antibody 11-1F4 in patients with AL amyloidosis*, 24 AMYLOID sup.1: PROCEEDINGS OF THE XVTH INTERNATIONAL SYMPOSIUM ON AMYLOIDOSIS (2017); Camille V. Edwards, et al., *Final Analysis of the Phase 1a/b Study of Chimeric Fibril-Reactive Monoclonal Antibody 11-1F4 in Patients with Relapsed or Refractory AL Amyloidosis*, 13 BLOOD sup.1 (2017); Jonathan S. Wall, et al., *Pretargeting immunotherapy: a novel treatment approach for systemic amyloidosis*, 6 PHARMACEUTICAL PATENT ANALYST 5 (2017); Jonathan S. Wall, et al., *Bifunctional amyloid-reactive peptide promotes binding of antibody 11-1F4 to diverse amyloid types and enhances therapeutic efficacy*, 115 PNAS 45 (2018); Camille V. Edwards, et al., *One year follow up analysis of the phase 1a/b study of chimeric fibril-reactive monoclonal antibody 11-1F4 in patients with AL amyloidosis*, 26 AMYLOID sup.1: PROCEEDINGS OF THE XVI INTERNATIONAL SYMPOSIUM ON AMYLOIDOSIS (2019); Jonathan Wall, et al., *Characterization and in vivo target engagement studies of a novel, performed, amyloid-reactive peptope-antibody complex*, 61 J NUCL MED sup. 1 (2020).

6

### 3. The Law Requires UTRF To Identify Its Trade Secrets With Reasonable Particularity In Response to Caelum's Interrogatory, But It Has Not Done So

UTRF makes no attempt to tailor its overbroad interrogatory response and, instead maintains that it has "provided Caelum ample notice of the essential details of UTRF's trade secret claim" and that "[n]othing more is required." (UTRF Opp., ECF No. 151 at 8.) In fact, much more is required. Caelum's motion to compel outlines for the Court a bevy of other requirements propounded by district courts in the Sixth Circuit applicable to UTRF's interrogatory response including (1) a requirement that UTRF create a list of its trade secrets rather than a document in the style of a brief; (2) a requirement that UTRF's trade secrets be identified clearly, unambiguously, and with specificity; (3) a requirement that UTRF's identification must be particular enough as to separate trade secret from matters of general knowledge in the trade or special knowledge of persons skilled in the trade; and (4) a requirement that UTRF identify which specific documents constitute its trade secrets. (*See* Caelum Mot. to Compel Mem., ECF No. 147 at 10-12 (citing *Dura Global*, 2008 WL 2064516, at *1; *Phoenix Process*, 2021 WL 1062553, at *16; *Babcock Power*, 2015 WL 9244487, at *6).)

Moreover, whether or not UTRF's response to Caelum's interrogatory provides ample notice, UTRF must also comply with the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(e)(1)(A) ("A party…who has responded to an interrogatory…must supplement or corrects its disclosure or response: in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect. . ."); 33(a)(2) ("An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact. . ."); 33(b)(3) ("Each interrogatory must, to the extent it is not objected

7

to, be answered separately and fully in writing under oath."); 37(a)(4) ("an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond."); *see also Caudill Seed and Warehouse Company, Inc. v. Jarrow Formulas, Inc.*, 2017 WL 4799815, at *2-4 (W.D.Ky., 2017) (granting a motion to compel plaintiff to supplement its interrogatory response identifying its trade secrets under Fed. R. Civ. P. 26(e)).

Caelum's motion to compel makes clear that UTRF's deficient trade secret identification does not provide Caelum notice of the essential details of UTRF's trade secret claims—let alone meets the additional requirements that UTRF ignores.

### a. UTRF Must Produce a List, Not a Brief, Specifically Identifying Its Trade Secrets

As Caelum briefed in its opening papers, UTRF is required to identify its trade secrets in list form. (Caelum Mot. to Compel Mem., ECF No. 147 at 10 (citing *Dura Global*, 2008 WL 2064516, at *3).) In opposition, UTRF dismisses Caelum's argument as "form-over-substance." (UTRF Opp., ECF No. 151 at 8.) UTRF is wrong. Listing the trade secrets should be an easy task for UTRF and will enable Caelum to understand, and appropriately mount a defense against, each specific trade secret that UTRF claims is at issue.

### b. UTRF Authorities Supporting Its Insufficient Interrogatory Response Are Inapposite

Caelum's motion to compel makes clear UTRF's response to Caelum's interrogatory was legally insufficient. Rather than provide so much as an example of a specific trade secret held or used by Caelum—despite UTRF's possession of Caelum's entire regulatory file since February 2022—UTRF instead points to a handful of distinguishable cases to argue that its overbroad response to Interrogatory No. 1 is sufficient in this case to put Caelum on fair notice of what trade secrets it is alleged to have misappropriated. Not so.

UTRF principally relies on *Knox Trailers, Inc. v. Clark*, 2022 WL 163696 (E.D. Tenn. Jan. 18, 2022), but the case is inapposite. First, the *Knox Trailers* court repeatedly noted the "unique procedural posture" of the motion to compel in that the court had already litigated a preliminary injunction with respect to the trade secret claim where the court concluded that the databases at issue were "likely protectable trade secrets." *Id.* at *4. In addition, the plaintiff in *Knox Trailers* identified its trade secrets as "customized" databases containing "specific customer contacts, contact information, pricing information, information about expected customer needs, prior orders/service requests, [and] buying preferences. . ." *Id*. at *3. The plaintiff alleged that the defendant had stolen the databases themselves, but also supplemented their trade secret identification with an expert report identifying the "items stolen and used by defendant." *Id*. at *2-3.

Here, UTRF has not identified any specific database—let alone one already determined by the court to likely qualify for trade secret protection. Instead, UTRF identifies only broad categories of "data," "information," and "know-how." Additionally, UTRF's comparison of information relating to a widely-published-on genetically engineered monoclonal antibody being actively researched for the potential treatment of a rare disease to a list of a business's customer information is unconvincing and should be rejected. UTRF's claims will unquestionably involve exceedingly more complex technical analysis to determine trade secret status than those in *Knox Trailer*—UTRF's identification must be specific enough to allow Caelum to adequately defend itself. *See Del Monte Fresh Produce Co. v. Dole Food Co. Inc.*, 148 F.Supp.2d 1322, 1326 (S.D. Fla. 2001) ("Because the factual issues in this case are so complicated and the possibilities of trade secrets are so vast, [plaintiff] must list and reasonably describe the trade secrets it seeks to protect. . . [plaintiff] cannot expect [defendant] to embark upon a fishing expedition to ascertain what those

9

trade secrets are.").

The other cases on which UTRF relies are also readily distinguishable. *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192 (N.D. Cal. 2012) involves, again, simple customers lists and contact information. Indeed, the *Brocade* court implied that the only manner in which plaintiff could be more specific would be to list the individual customer names. *See id*. at 1215 ("In sum, although Brocade does not list individual customer names, Brocade has sufficiently described the subject matter of the trade secret with sufficient particularity. . .")

*Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*, 2011 WL 3652696 (S.D. Ohio Aug. 18, 2011) is also inapposite in that the court explicitly stated, "It is important to note that the issue raised by defendants' motion is neither whether the trade secrete claim advanced by plaintiff is overbroad or lacks merit, but simply whether it has been articulated in an understandable fashion." *Id* at *2. In addition, the *Kendall Holdings* court notes that from the outset the case had been "primarily, if not exclusively, about a certain set of drawings…which defendants concededly took with them without plaintiff's permission." *Id*. The court went on to hold that it was "abundantly clear" the information on the drawings was the information for which plaintiff claimed trade secret protection. *Id*. Here, there is no such obvious set of documents and UTRF has continually evaded Caelum's requests to identify concrete trade secrets and the documents that contain them.

Finally, UTRF relies on *Trek, Inc. v. ITR Am., LLC*, 2017 WL 11533311 (E.D. Mich. Nov. 9, 2017). *Trek*, again, involves simple sales and customer information. The trade secrets at issue here are simply not comparable to the garden-variety case like *Trek* where two former employees allegedly took sales and customer information from their previous employer.

UTRF does not and cannot cite any apposite authority support for its insufficient trade secret identification.

### c. Caelum Agrees That the 11-1F4 "Know-How" Can Be a Trade Secret, But UTRF Must Identify Such Know-How With Particularity in Its Response to Interrogatory No. 1

The first paragraph of UTRF's interrogatory response focuses on the overbroad category of "non-public, confidential know-how associated with the development and use of 11-1F4 produced by employees of the University of Tennessee and provided to Columbia University." (UTRF's Rog Responses, Strongosky Decl., ECF No. 142-1, Ex. C at 5.) Caelum recognizes that such "know-how" could conceivably contain UTRF's trade secrets, but Caelum moves to compel UTRF to amend its response to state with particularity *what* "know-how" UTRF claims it has rights to because UTRF's response is overbroad and vague. (ECF No. 142, Mot. to Compel Mem. at 11-12 (citing, *inter alia*, *Dura Global Techs., Inc. v. Magna Donnelly Corp.*, 2008 WL 2064516 (E.D. Mich. 2008).) In opposition, UTRF misconstrues Caelum's argument as one on the merits of whether UTRF's supposedly proprietary information deserves trade secret protection. That is not the purpose of this motion.

Caelum's sole focus is, and always has been, the development of CAEL-101/11-1F4. *See About Us*, https://caelumbio.com/about-us/ (last visited June 1, 2022). Every single document in Caelum's possession containing any scientific information whatsoever will presumably contain "know-how associated with the development and use of 11-1F4." Not all "know-how associated with the development and use of 11-1F4" was created by or belongs to UTRF. UTRF's only specific qualification of the information it seeks is that it is whatever University of Tennessee employees provided to *Columbia*. (*See* UTRF's Rog Responses, Strongosky Decl., ECF No. 142-1 Ex. C at 5.) How is *Caelum* supposed to know what information the University of Tennessee provided to Columbia? In searching its own documents for ones subject to production in this case and in preparing its defense, how can Caelum possibly be on notice of what information UTRF

11

claims to have originated at the University of Tennessee versus what proprietary information was actually developed by Columbia before it was sent to Caelum? UTRF has neither identified any specific trade secret information that was allegedly transferred to Columbia nor has UTRF identified any documents it has produced that were allegedly transferred to Columbia.

If UTRF cannot provide a more specific identification of the "know-how" at issue, it should supplement its response to say as much. In *Caudill Seed*, the court explained the concern with vague trade secret identification and why a party must certify that it cannot provide further specificity:

> [I]f Caudill has truly provided all the knowledge about Trade Secret (1) in its possession, then its discovery obligations regarding it have obviously come to an end. After all, Caudill cannot be expected to produce information that it legitimately does not have. If this is the case, then Caudill shall affirmatively and explicitly state in a sworn supplemental response to the Interrogatory that it does not have more specific information in its possession. Caudill shall not continue to couch its interrogatory answers with overly general language which could lead—and in fact has led to—Jarrow concluding that Caudill has been withholding information.

*Caudill Seed*, 2017 WL 4799815, at *4. Caelum has indeed been led to believe that UTRF is withholding a proper identification of its trade secrets or, at least, avoiding alerting the parties and the Court to the fact that UTRF cannot provide any further specificity. If UTRF cannot produce any additional information regarding its trade secrets, it should explicitly state as much.

> **d. Caelum Agrees that the "Data" and "Information" Generated by the NCI Can Be a Trade Secret, But UTRF Must Identify Such Data or Information With Particularity In Its Response to Interrogatory No. 1**

The second paragraph of UTRF's interrogatory response spends over a page on "trade secret data and information relating to 11-1F4 generated by the National Cancer Institute (NCI) and its contractor(s) pursuant to a May 2011 Material Transfer Agreement between The University of Tennessee and the National Cancer Institute." (Strongosky Decl., ECF No. 142-1, Ex. C at 6.)

12

Caelum, again, recognizes that data and information generated by the NCI might constitute a trade secret of UTRF. However, Caelum moves to compel UTRF to amend its response to identify its alleged trade secrets with adequate particularity because UTRF's response is vague and overbroad in that the only "trade secrets" it lists are activities pulled directly from the language of the MTA—to which Caelum is not even a party. (Caelum Mot. to Compel Mem., ECF No. 147 at 13.)

In its opposition, UTRF ignores the fact it regurgitated language from the MTA. Instead, UTRF again shifts to an attempt to mischaracterize Caelum's motion as an argument on the merits of whether any of UTRF's supposed trade secrets are protected under the law, but, in reality, the catalyst for this motion is that Caelum still does not know what those specific "trade secrets" are to be able to start that fight.

UTRF's overbroad identification of data and information generated by the NCI is worthless. What data and information did the NCI, in fact, generate? UTRF's response does not say. How exactly is *Caelum* supposed to determine if a particular piece of data and information was generated by the NCI pursuant to the MTA as opposed to any other source? UTRF does not explain. What documents memorialize the data and information generated by the NCI? Again, UTRF leaves Caelum in the dark. UTRF has not identified any of the documents it produced as containing data or information generated by the NCI.

UTRF's only clue is that "certain of the NCI generated trade secret information 'is incorporated into the 'Chemistry, Good Manufacturing and Control Information or CH11-1F4 Final Vialed Product' report and appendices to that report.'" (UTRF Opp., ECF No. 151 at 13.) Not only has UTRF conceded that it does not have the report in its possession, but Caelum's motion to compel makes clear that the identification of this example report is insufficient to satisfy UTRF's discovery obligations. *See Yoe*, 2017 WL 11479991, at *8 ("[Plaintiff] shall omit the

13

disclosure of 'examples' of certain information alleged to be disclosed as a trade secret and instead make a comprehensive disclose [sic] of the information itself.").

UTRF also argues here that it need not "tie each of its trade secrets to a specific document." (UTRF Opp., ECF No. 151 at 13.) That is incorrect. There is ample case law requiring plaintiffs to identify the specific documents constituting its trade secrets. *See Phoenix Process*, 2021 WL 1062553 at *17 (requiring plaintiff to "identify by bates-label numbers which documents previously produced constitute its identified trade secrets"); *Babcock Power*, 2015 WL 9257759 at *4 (requiring plaintiff to "identify which documents produced constitute [plaintiff's] trade secrets"); *Dura Global, Technologies, Inc. v. Magna Donnelly Corp.*, 2008 WL 2064516, at *2 (E.D. Mich. 2008) (requiring plaintiff to provide "specific references to concrete documents").

### e. Caelum Agrees that the "Research Data" Utilized In the IND File Can Be a Trade Secret, But UTRF Must Identify Such Research Data With Particularity In Its Response to Interrogatory No. 1

The third nearly two-page long paragraph of UTRF's interrogatory response focuses on "research data prepared by the University of Tennessee researchers utilized in the Investigational New Drug application file submitted with the U.S. Food and Drug Administration in connection with an approval request for 11-1F4 therapies (including IND No. 117,316 entitled, 'Chimeric Monoclonal Antibody 11-1F4')." (UTRF's Rog Responses, Strongosky Decl., ECF No. 142-1, Ex. C at 7-8.) Once again, Caelum agrees that the IND file might contain UTRF's trade secret data. But, Caelum moved to compel UTRF to amend its interrogatory response to be more specific because an identification of the entire IND application, as a whole, is insufficient given that the application necessarily included a substantial amount of public or non-proprietary information that would not qualify as a UTRF trade secret. (*See* ECF No. 147, Caelum's Mot. to Compel Mem. at 15-16.) It would be impossible for Caelum to parse what UTRF currently claims is its trade secret

14

in the IND Application file from information of general knowledge in the field or special knowledge of persons skilled in the field due to the large body of publicly available technical information regarding 11-1F4.

In its opposition, UTRF focuses only on whether the IND application (which UTRF somehow does not have possession of) is entitled to trade secret protection as a whole because it is a unique combination of both protected and unprotected materials. (ECF No. 151, UTRF's Opp. at 15.) UTRF suggests that Caelum's "premature[]" arguments to the contrary somehow demonstrate that Caelum "fully understands what UTRF has identified as its trade secrets." (ECF No. 151, UTRF's Opp. at 15.) UTRF's argument is nonsensical. UTRF has identified as its trade secret data "utilized" in the IND application file. However, UTRF cites *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398 (6th Cir. 2006) in its answer to Caelum's interrogatory in support of the choice to not identify the specific trade secret data it asserts is contained in the IND application. (*See* UTRF's Rog Responses, Strongosky Decl., ECF No. 142-1, Ex. C at 8.)

UTRF cannot now call foul because Caelum addressed the weakness of that argument in its motion. UTRF's invocation of *Mike's Train* was clearly made to preempt any argument that UTRF should have to specifically identify the trade secrets it asserts are contained in the IND application file. UTRF cannot use *Mike's Train* to avoid specifically identifying the trade secrets at issue and simultaneously argue that Caelum is precluded from disputing that argument in a motion seeking to compel the same.

### B. This Court Should Order UTRF to Certify In Writing That It Does Not Possess The Very Documents It Pointed To as Containing UTRF's Trade Secrets And Documents Referenced in the Complaint

Caelum moved to compel UTRF to produce documents responsive to its RFP Nos. 1 & 2 requesting "[a]ll Documents and Communications sufficient to identify [UTRF's] trade secrets

15

that [UTRF] contend[s] Caelum wrongfully acquired and/or misappropriated" and "[a]ll Documents and Communications referenced in the Complaint." (Strongosky Decl., ECF No. 142-1, Ex. B.) Caelum specifically listed (1) the IND Application No. 117, 316 file; and (2) the "Chemistry, Good Manufacturing and Control Information for CH11-1F4 Final Vialed Product" report as documents UTRF claims contain its trade secrets, but that UTRF had not produced. (*See* ECF No. 142, Mot. to Compel Mem. at 17.) Caelum further moved to compel the application files and all-related documents for the two different orphan drug designations relating to 11-1F4 applied for and received by Dr. Alan Solomon in December 2009 pursuant to requests #09-2937 and #09-2903 made to the FDA which were repeatedly referenced in UTRF's complaint. (*See id.*)

In opposition, UTRF's counsel has averred that UTRF's production of non-email documents responsive to Caelum's requests is now completed. (*See* Hipskind Decl., ECF No. 151-1, ¶ 4.) But, UTRF has still not produced nearly any of the documents in the three categories Caelum highlighted. Caelum is left with the conclusion that the documents are not in UTRF's possession, custody, or control.

This conclusion is surprising given these documents' apparent importance to UTRF's claims, and in particular, because UTRF asserts these documents contain its trade secrets. Accordingly, if UTRF does not have possession, custody, or control of these documents or did not have possession, custody, or control of these documents when it submitted its interrogatory response referencing these documents or when it filed its complaint, Caelum requests that the Court order UTRF to specifically certify as much in writing.

### III. CONCLUSION

For the foregoing reasons, Caelum respectfully requests that the Court compel UTRF to supplement its responses to adequately identify and describe its trade secrets with particularity. In

16

addition, Caelum respectfully requests that the Court order UTRF to certify that it does not and/or did not at the time UTRF filed its complaint possess any other documents responsive to Caelum's RFP Nos. 1 and 2 including specifically (1) the IND Application No. 117, 316 file; (2) the "Chemistry, Good Manufacturing and Control Information for CH11-1F4 Final Vialed Product" report; and (3) the application files and all-related documents regarding the two different orphan drug designations relating to 11-1F4 applied for and received by Dr. Alan Solomon in December 2009 pursuant to requests #09-2937 and #09-2903.

Dated: June 1, 2022					Respectfully Submitted,

**DLA PIPER LLP (US)**

Christopher M. Strongosky (*pro hac vice*)
Michael D. Hynes (*pro hac vice*)
Leeanne S. Mancari (*pro hac vice*)
Anna K. Finger (*pro hac vice*)
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
(212) 335-4500
christopher.strongosky@us.dlapiper.com
michael.hynes@us.dlapiper.com
leeanne.mancari@us.dlapiper.com
anna.finger@us.dlapiper.com

**PAINE TARWATER & BICKERS LLP**

By: */s/ John W. Elder*
John W. Elder (BPR #022775)
Lindsey M. Collins (BPR #033426)
Thomas H. Jarvis (BPR #036835)
900 South Gay Street, Suite 2200
Knoxville, TN 37902
(865) 525-0880
jwe@painetarwater.com
lmc@painetarwater.com
thj@painetarwater.com

*Attorneys for Caelum Biosciences, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st Day of June 2022, I have electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

*/s/ John W. Elder*_____