| | | |
|---|---|---|
| UNIVERSITY OF TENNESSEE RESEARCH FOUNDATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 3:19-CV-508-CEA-DCP |
| CAELUM BIOSCIENCES, INC., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Plaintiff's *Daubert* Motion to Exclude the Testimony of Sean Sheridan, Ph.D. [Doc. 332]. Defendant responded in opposition to the motion [Doc. 392], and Plaintiff filed a reply [Doc. 437]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a). For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** the motion [**Doc. 332**].

## I.    BACKGROUND

"This case largely concerns the ownership and development of the 11-1F antibody and related research materials" [Doc. 259 pp. 2–3 (citing Doc. 61 p. 1)]. According to the allegations in the Second Amended Complaint ("Amended Complaint"), Dr. Alan Solomon ("Dr. Solomon") with the University of Tennessee ("UT") developed the 11-1F antibody ("Antibody"), and the "ownership of the [A]ntibody materials and associated materials are held by [Plaintiff]" [Doc. 61 ¶ 1]. The Antibody is effective in treating amyloidosis [*Id.* ¶ 3]. "In 2009, Dr. Solomon applied

for and received two different orphan drug designations for two indications of the 11-1F4 [A]ntibody ('the 11-1F4 Orphan Drug Designations')" [*Id.* ¶ 72].

According to the allegations, Defendant Caelum Biosciences, Inc. ("Defendant" or "Caelum") "was founded to advance the clinical development research from [Dr.] Solomon" [*Id.* ¶ 1]. Plaintiff University of Tennessee Research Foundation ("Plaintiff" or "UTRF") alleges that Defendant's "sole focus and mission . . . is to commercialize the [Antibody] technology, which it has renamed to CAEL-101" [*Id.* ¶ 31]. The parties and other non-parties have entered into several agreements relating to the Antibody [*Id.* ¶ 28]. "In 2011, [UT] and the National Cancer Institute ('NCI') entered into a Material Transfer Agreement pursuant to the NCI's Experimental Therapeutics Program ("NExT")" [*Id.* ¶ 79]. The Material Transfer Agreement ("MTA") allowed "Dr. Solomon and his colleagues [to] sen[d] to NCI murine versions of the [Antibody] along with data from their research" but also "confirmed that the original murine version of the [Antibody] as well as the chimeric version generated by NCI and any data and know-how regarding NCI's work on the [Antibody] would remain property of [UT]" [*Id.*].[1] "To the extent any of the 11-1F4 property rights and/or know-how utilized by [Defendant] were directly or indirectly supplied by NCI," Plaintiff alleges that Defendant's "receipt and use of that material was unauthorized by both [it] and NCI" [*Id.* ¶ 81].

In 2013, Plaintiff entered an Inter-Institutional Agreement ("IIA") with former party, The Trustees of Columbia University in the City of New York ("Columbia" or "Columbia University"), allowing it to work on clinical trials with respect to the Antibody [*Id.* ¶¶ 47–48]. According to

---

[1] The Amended Complaint states, "[UT's] rights in the 11-1F4 property rights and know-how were transferred to and are owned by [Plaintiff]" [Doc. 61 ¶ 79]. Plaintiff explains that the "know-how" is the "the physical antibody materials, protein sequences, or research data regarding the 11-1F4 antibodies" [*Id.* ¶ 86].

Plaintiff, the IIA provided Columbia "a license [to] (and the ability to sublicense) only the patent rights covering the 11-1F4 technology" [*Id*. ¶ 85]. The IIA did not (1) "provide Columbia University with the ability to sublicense or outlicense any of the 11-1F4 property rights or know-how" (2) assign any Investigational New Drug Applications relating to 11-1F4, []or the 11-1F4 Orphan Drug Designations[,]" or (3) provide "any license to the know-how related to the 11-1F4 antibody held by [Plaintiff]" [*Id*. ¶ 86].

In late 2015, Columbia reported to Plaintiff that a company—an unnamed potential licensee (i.e., Defendant)—wanted to license the Antibody's rights and know-how and requested that the parties amend the IIA to include the know-how [*Id*. ¶¶ 94, 98]. Plaintiff alleges that Defendant "was informed of the status of the negotiations between [Plaintiff] and Columbia . . . relating to the potential amendment of the IIA[,]" but this proposed amendment to the IIA was never executed [*Id*. ¶¶ 100–01].

Later, on March 14, 2017, Defendant "entered into a Confidentiality Agreement with [Plaintiff] and [UT] so that the parties could exchange information in connection with a potential sponsored research agreement involving [Plaintiff's] 11-1F4 technology [*Id*. ¶ 104]. Plaintiff states that the Confidentiality Agreement expressly states that Defendant "would not utilize the research materials and information received 'directly or indirectly' from [Plaintiff], even the information received prior to executing the March 14, 2017 Agreement" [*Id*. ¶ 110]. Plaintiff alleges that "[d]espite [Defendant] signing a Confidentiality Agreement agreeing not to utilize 11-1F4 property rights and know-how without written authorization from [Plaintiff], [it] has proceeded to utilize the 11-1F4 property rights and know-how in an effort to commercialize the technology" [*Id*. ¶ 112].

According to Plaintiff, in 2017, Defendant "began publishing press releases containing false statements regarding the ownership of the 11-1F4 technology, [made] false disclosures on its website, and . . . [made] false disclosures with the U.S. Food and Drug Administration claiming that it had licensed the 11-14F4 technology from Columbia University and that [Defendant] was now the owner of the 11-14F4 Orphan Drug Designations" [*Id*. ¶ 102]. Plaintiff concludes:

> On information and belief, [Defendant] has used and continues to utilize 11-1F4 materials that are the property of [Plaintiff], including but not limited to: murine 11-1F4 materials; chimeric 11-1F4 materials; cell clones utilized in the production of chimeric 11-1F4 antibodies, and ELISA reagents. On information and belief, [Defendant] has also used and continues to utilize [Plaintiff's] research data, clinical trial and laboratory testing protocols, and documentation incorporated into the Investigational New Drug applications for therapies incorporating the 11-1F4 monoclonal antibody. [Defendant's] use of the 11-1F4 property rights and know-how is without written authorization from [Plaintiff] and [Defendant] has not compensated [Plaintiff] for its use of these materials.

[*Id*. ¶ 116].

Based on the above, Plaintiff alleges that Defendant breached the Confidentiality Agreement [*id*. at ¶¶ 125–37]; converted Plaintiff's property [*id*. ¶¶ 138–60]; committed slander of title [*id*. ¶¶ 161–86];[2] interfered with its business relationship with Columbia [*id*. ¶¶ 187–207]; interfered with its business relationship with industry partners [*id*. ¶¶ 208–27]; became unjustly enriched [*id*. ¶¶ 228–37]; and misappropriated trade secrets under the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1701 *et seq*. [*id*. ¶¶ 238–53].

Plaintiff also seeks declaratory judgments. First, it seeks a declaratory judgment that it owns "all right, title, and interest in [certain] tangible materials, know-how, and confidential

---

[2]    Plaintiff defines the slandered property as "(1) the chimeric 11-1F4 antibody, (2) cell clones utilized in production of the chimeric 11-1F4 antibody, and (3) the 11-1F4 Orphan Drug Designations (collectively, the '11-1F4 Slandered Property')" [Doc. 61 ¶ 162].

research data originating or obtained from a laboratory of [UT]" [*Id.* ¶ 255]. In addition, Plaintiff seeks a declaration that it "owns the exclusive rights to utilize for commercial, for-profit purposes [certain] materials and information generated by the [NCI]" [*Id.* ¶ 262]. Further, it seeks a declaratory judgment that it owns the 11-1F4 Orphan Drug Designations [*Id.* ¶¶ 270–77].

Relevant to the instant matter, Defendant retained Sean Sheridan, Ph.D. ("Dr. Sheridan") to rebut Plaintiff's experts, David L. Day ("Mr. Day") and Ashley J. Stevens ("Dr. Stevens") [Doc. 333-2 ¶ 7]. Dr. Sheridan is the "Vice President in the Intellectual Property practice at Charles River Associates ('CRA')" [*Id.* ¶ 1]. He describes CRA as follows:

> CRA is an international business consulting firm focusing on, among other things, intellectual property matters in the context of strategy, licensing, valuation, and litigation consulting. In litigation matters, CRA provides expert testimony on compensatory damages, commercial success, and other areas requiring accounting, financial, and economic expertise. Outside of litigation, CRA performs valuations for transactional, business decision-making, and regulatory purposes. CRA also provides strategic consulting services to help companies align their intellectual property strategy and investments with overall business strategy.

[*Id.* ¶ 2]. Dr. Sheridan's "consulting work has been primarily related to the valuation and strategic management of intellectual property assets[,]" [*id.* ¶ 3] and his "work on litigation matters has involved the quantification of economic damages, the evaluation of commercial success, and the assessment of domestic industry" [*Id.* ¶ 4]. He summarizes his seven opinions in this case as follows:

> (1)     There is no basis to support the [Dr.] Stevens Report's assumption that [UT] . . . automatically owned the murine form of 11-1F4 ("m11-1F4") from the moment of its creation. Indeed, UTRF failed to attempt to secure ownership rights to the antibody until 2018, approximately 26 years after it was first disclosed. If anything, UTRF's behavior demonstrates that UTRF was not diligently pursuing commercialization of the antibody.

5

(2)     The UT-NExT MTA did not grant UT or UTRF an exclusive license
        or ownership of the chimeric form of 11-1F4 ("Ch11-1F4") and UT
        and UTRF failed to obtain exclusive rights to the antibody.

(3)     Ch11-1F4 was developed by AERES nearly a decade before the UT-
        NExT MTA and the NCI's subcontract with AERES indicates that
        AERES had rights to Ch11-1F4.  Columbia obtained rights to Ch11-
        1F4 directly from MRCT, a major shareholder of AERES.

(4)     Maintaining inventions and data as trade secrets is contrary to the
        academic mission of a university.  Universities, including UT, do
        not typically have policies or agreements that would prevent a
        faculty member from publicly disclosing the results of their
        research.

(5)     A technology transfer office that was diligently pursuing
        commercialization of a technology that required the use of
        confidential information or trade secrets would inform the inventors
        of this fact and would inform its commercialization partner at the
        time the parties begin working together.  UTRF failed to take either
        of these steps with respect to the alleged trade secrets at issue in this
        case.

(6)     The UT-Columbia IIA granted Columbia the rights necessary to
        fulfill its obligation to negotiate and enter into one or more license
        agreements for the subject invention.  A diligent technology transfer
        office would have amended the UT-Columbia IIA if it believed the
        agreement failed to grant the rights necessary for Columbia to fulfill
        its obligation to negotiate and enter into such license agreements.

(7)     UTRF failed to diligently pursue commercialization of the m11-1F4
        antibody developed by Dr. Solomon or the Ch11-1F4 antibody
        developed by NCI and AERES.

[*Id.* ¶ 10].[3]

Plaintiff seeks to exclude Dr. Sheridan's opinions in their entirety [Doc. 332].[4]  First,

Plaintiff asserts that "Dr. Sheridan's regurgitation of facts would be unhelpful to the jury" [Doc.

---

[3]     The Court will refer to these opinions as First Opinion, Second Opinion, and so forth.

[4]     Specifically, Plaintiff seeks an order precluding Dr. Sheridan from testifying at trial, stating
that "[o]nce all of these improper opinions are excluded, there is nothing left for Dr. Sheridan to
testify about" [Doc. 333 p. 5].  But Plaintiff has not moved to exclude all of his opinions (e.g., the
Fourth Opinion).  The Court further notes that while Plaintiff does not move to exclude the First

333 pp. 5–10 (emphasis omitted)].  Second, Plaintiff argues that Dr. Sheridan offers impermissible

legal conclusions [*Id*. at 10–15].  Third, Plaintiff submits that "Dr. Sheridan's opinions predicated

on the parties' supposed beliefs or understanding should be excluded" [*Id*. at 15–17].

Defendant responds that Dr. Sheridan's opinions will be helpful to the jury [Doc. 392 pp.

8–12].  It denies that Dr. Sheridan's submitted any legal conclusions [*Id*. at 12–16].  Defendant

also asserts that Dr. Sheridan does not improperly opine on the parties' state of mind [*Id*. at 16–

21].

In its reply, Plaintiff argues that Dr. Sheridan's "one-sided narration of facts" is not helpful

to the jury [Doc. 437 p. 6].  Plaintiff maintains that Dr. Sheridan provides improper legal

conclusions and state of mind testimony that warrant exclusion [*Id*. at 10–17].

## II.    STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or

evidence admitted is relevant and reliable."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,

147 (1999) (quoting *Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579, 589 (1993)).  Rule 702

provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and

---

Opinion, it is similar to the Seventh Opinion in that they both state that Plaintiff failed to diligently
commercialize the Antibody.

(d)      the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[5]  The Supreme Court of the United States stated in *Daubert* that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589.

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cnty.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138–39).  "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002), *aff'd*, 89 F. App'x 927 (6th Cir. 2003) (quoting *Daubert*, 509 U.S. at 593–94).  The party offering the expert has the burden of proving admissibility.  *Daubert*, 509 U.S. at 592 n.10.

## III.    ANALYSIS

After considering the parties' arguments, the Court finds Dr. Sheridan's Third[6] and Seventh Opinions not helpful to the jury, but the Court will not exclude Dr. Sheridan from

---

[5]      Rule 702 was amended on December 1, 2023, but the changes to the rule are not substantive. *Nash-Perry v. City of Bakersfield*, No. 118CV01512, 2023 WL 8261305, at *13 (E.D. Cal. Nov. 29, 2023).  Rather, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." Fed. R. Evid. 702 advisory committee's note to 2023 amendments.

[6]      There are two parts to the Third Opinion: (1) "Ch11-1F4 was developed by AERES nearly a decade before the UT-NExT MTA[,]" and (2) "the NCI's subcontract with AERES indicates that AERES had rights to Ch11-1F4.  Columbia obtained rights to Ch11-1F4 directly from MRCT, a major shareholder of AERES" [Doc. 333-2 ¶ 10].  As explained below, the former opinion is not

8

testifying to his Fifth Opinion. The Court finds that Dr. Sheridan's Second, Third (the latter opinion, *see supra* n.6), and Sixth Opinions constitute improper legal conclusions. The Court also finds that certain portions of his opinions, explained below, constitute improper state-of-mind testimony.[7]

### A.    Whether Dr. Sheridan's Opinions Assist the Jury

Plaintiff argues numerous paragraphs in Dr. Sheridan's report "are nothing more than a regurgitated summary of various documents produced in this case that Dr. Sheridan states he reviewed" [Doc. 333 p. 7 (citing Doc. 333-2 ¶¶ 15–89)]. Plaintiff states that he cuts and pastes several provisions of certain contracts and then "presents a one-sided regurgitation of facts" [*Id.* at 7, 8]. According to Plaintiff, "[n]owhere in the report does Dr. Sheridan, who has no firsthand knowledge of any facts relevant to this case, explain how his supposed expertise, specialized skill, or knowledge 'renders his interpretation of these documents [and deposition testimony] any more persuasive than a lay person's interpretation" [*Id.* at 9 (citation omitted and alternation in original)]. Plaintiff notes that "the testimonial evidence improperly summarized by Dr. Sheridan in his report can and will be presented to the jury directly by percipient witnesses who have firsthand knowledge of the actual facts in this case" [*Id.* (citation omitted)]. It concludes that "Dr. Sheridan should not be permitted to provide the jury with his own biased interpretation of the facts" [*Id.* (citation omitted)].

---

helpful to the jury because the jury can weigh the evidence on this point, and the latter opinion is a legal conclusion, which is also not helpful to the jury.

[7]    Defendant argues that "[t]o the extent [Plaintiff] attempts to seek exclusion of testimony beyond the particular opinions it has identified in its Motion, the Court should deny [it] as overbroad" [Doc. 392 p. 8 n.4 (citation omitted)]. Plaintiff has identified several opinions it seeks to exclude [*See, e.g.*, Doc. 333 p. 7 (citing to Doc. 333-2 ¶¶ 15–89); Doc. 333 p. 8 (citing to Doc. 333-2 ¶¶ 128–34); Doc. 333 p. 15 (citing Doc. 333-2 ¶¶ 10 (second, third, and sixth bullet points), 91–95, 97, 98, 100–02, 106–07, 110, 113, 117, 125, and 126)]. The Court will address these below.

Defendant responds that "[e]xpert testimony regarding historical facts is admissible where the expert relies on [his] knowledge and experience to contextualize, analyze, and interpret the historical facts" [Doc. 392 pp. 8–9 (citation omitted)].[8]  Defendant states that experts rarely have personal knowledge and that Dr. Sheridan is simply rebutting what Dr. Stevens and Mr. Day opined in their reports [*Id*. at 10–11].  Specifically, Defendant states that "[Plaintiff] cannot have its experts summarize legal agreements and the record in this case and then cry foul when [Defendant's] experts rebut with an identical approach.  Plaintiff's experts have opined X, and Dr. Sheridan has opined 'Y' or 'not-X,' and Dr. Sheridan will point to facts that support these opinions [*Id*. at 11].  Because the record is voluminous, Defendant states that "it is . . . helpful to the jury for the parties' experts to identify the documents and testimony that are relevant to their opinions" [*Id*. at 11–12].  "[Defendant] stipulates that an expert is not permitted to take the stand at trial and simply narrate facts as a proxy for missing witnesses, missing documents, . . . or as a storyteller" [*Id*. at 12 (emphasis omitted)].  It asserts that it "has not used and does not intend to use Dr. Sheridan in this manner" [*Id*.].

---

[8]     Defendant also states that "challenges to narrative testimony are 'not properly the subject of the Court's gatekeeping function under *Daubert*" [Doc. 392 p. 9 (citations omitted)].  In support of its argument, Defendant relies on *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig.*, No. 3:11-MD-2244-K, 2014 WL 3557345, at *8 (N.D. Tex. July 18, 2014), wherein the court stated, "The admission of [the expert's] alleged speculation and narrative testimony, however, is not properly the subject of this [c]ourt's gatekeeping function under *Daubert*.  It implicates this [c]ourt's discretion over the presentation of evidence at trial and should be taken up there."  The Court notes, however, that "Rule 702 requires a district court to satisfy itself that the proposed expert testimony will assist the jury, before permitting the jury to assess such testimony."  *United States v. Norwood*, 16 F. Supp. 3d 848, 852 (E.D. Mich. 2014) (citing *Kumho Tire Co.*, 526 U.S. 148–49).  While courts may exercise their discretion and defer evidentiary matters until trial, *see In re Welding Fume Prod. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, at *18 (N.D. Ohio Aug. 8, 2005) ("reserv[ing] fully [the court's] authority to sustain at trial objection to [the expert's] testimony"), the Court declines to do so here given that it has sufficient information to make a determination.  Further, the operative Scheduling Order directed the parties to file "[a]ll motions to exclude expert testimony pursuant to Federal Rule of Evidence Rule 702 . . . as soon as possible but no later than September 26, 2023" [Doc. 289 p. 4 (emphasis omitted)].

Plaintiff replies that during Dr. Sheridan's deposition, he acknowledged that many of the paragraphs in his report "are nothing more than a summary of various documents" [Doc. 437 p. 6]. With respect to Defendant's arguments relating to Mr. Day and Dr. Stevens, Plaintiff asserts that Defendant "did not file any *Daubert* motions challenging Dr. Steven's or Mr. Day's testimony" and therefore, "[i]t would be inherently unfair and prejudicial to [Plaintiff] to make any pre-trial rulings regarding Dr. Steven's or Mr. Day's expert opinions based on vague arguments made without proper notice in the context of [Defendant's] opposition" [*Id.* at 7]. Plaintiff asserts that "Regardless, Dr. Steven's and Mr. Day's testimony is different in kind than Dr. Sheridan's testimony" [*Id.*].

Rule 26 requires that expert reports contain "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i)—(ii). Even so, "[e]xpert testimony which 'merely regurgitates factual information that is better presented directly to the jury rather than through the testimony of an expert witness' should be excluded." *Burton v. Ethicon Inc.*, No. CV 5:20-280, 2020 WL 5809992, at *5 (E.D. Ky. Sept. 29, 2020) (quoting *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 608 (S.D. W. Va. 2013)). "A history without any expert analysis or other application of the expert's expertise is simply a factual narrative that 'should be presented to the jury directly.'" *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, 546 F. Supp. 3d 666, 677 (S.D. Ohio 2021) (quoting *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010)). "Expert testimony that relies on expert knowledge and experience to contextualize, analyze, and interpret historical facts is admissible, however." *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, No. 2:18-CV-01509, 2021 WL 3617152, at *6 (S.D. Ohio Aug. 16, 2021) (citation omitted).

Plaintiff specifically points the Court to paragraphs 15–89, 116, 128–134 in Dr. Sheridan's report and Dr. Sheridan's Third, Fifth, and Seventh Opinions [Doc. 333 p. 10]. As noted above, the Third, Fifth, and Seventh Opinions provide:

> (3)    Ch11-1F4 was developed by AERES nearly a decade before the UT-NExT MTA and the NCI's subcontract with AERES indicates that AERES had rights to Ch11-1F4. Columbia obtained rights to Ch11-1F4 directly from MRCT, a major shareholder of AERES.
>
> (5)    A technology transfer office that was diligently pursuing commercialization of a technology that required the use of confidential information or trade secrets would inform the inventors of this fact and would inform its commercialization partner at the time the parties begin working together. UTRF failed to take either of these steps with respect to the alleged trade secrets at issue in this case.
>
> (7)    UTRF failed to diligently pursue commercialization of the m11-1F4 antibody developed by Dr. Solomon or the Ch11-1F4 antibody developed by NCI and AERES.

[Doc. 333–2 ¶ 10]. In paragraphs 15–89, Dr. Sheridan provides an overview of the 2000 Basic Agreement; the lease agreement that UT entered into with the NCI; the MTA between NCI and UT; Dr. Solomon's IND transfer to Dr. Lentzsch; the UT-Columbia IIA; the Plaintiff/UT and Columbia Confidentiality Agreement; the Columbia-NCI MTA; Dr. Solomon's orphan drug designations transfer; an assignment between Medical Research Counsel Technology and Columbia; Defendant's license agreement with Columbia; the parties' confidentiality agreement; Dr. Solomon's basic agreement with Plaintiff; the sponsored research agreement between Columbia and Defendant; the research agreement between UT and Defendant; and a summary of the dispute between the parties [*Id*. ¶¶ 15–89]. During his deposition, he acknowledged that these paragraphs provide summaries of information [Doc. 437-2 pp. 8–23].

Paragraph 116 states:

> In order to develop and protect a trade secret, the inventor typically determines **at the outset** that she/he is going to do so, because maintaining the secrecy of the invention is critical. I am not aware of any evidence indicating that Dr. Solomon, UT, UTRC, or UTRF endeavored at the outset to maintain any trade secret status of m11-1F4 or Ch11-1F4. Indeed, quite the opposite is true; UTRF and Dr. Solomon pursued a **_disclosive_** strategy, specifically, the issuance of a patent and publications describing Dr. Solomon's research. This makes sense to me because, given the academic mission described above, it would be exceedingly unusual for a university to choose to protect its intellectual property as trade secrets. Furthermore, the fact that faculty are given academic freedom to publish the results of their research makes it very difficult for a university to maintain trade secrets, even if the university wished to do so. This is supported by the AUTM Technology Transfer Practice Manual which states that "[t]ypically, trade secret protection is not common in the university intellectual property context. The general goal of universities in publishing their technologies makes trade secret protection for a university-generated technology difficult to do."

[Doc. 333-2 ¶ 116 (footnote omitted)]. Further, in paragraphs 128–33, Dr. Sheridan offers examples that purportedly demonstrate Plaintiff's "failure to pursue commercialization of the m11-1F4 or the CH11-1F4 antibodies[,]" including letting its patents expire, transferring the IND to Dr. Lentzsch for clinical trials, not having a technology manager, and an individual's statements that the antibody was not being commercialized [*Id.* at ¶¶ 128–33]. He opines that "Dr. Solomon was diligent in pursuing commercialization of the technology" by transferring the IND to Dr. Lentzsch, but Plaintiff was not [*Id.* ¶¶ 133–34].

The Court shares Plaintiff's concerns that several of the challenged provisions in Dr. Sheridan's report are simply an exhaustive regurgitation of the agreements in this case, which renders such testimony unhelpful to the jury [*See, e.g.*, Doc. 333-2 ¶¶ 15–89]. *See Landis v. Hearthmark, LLC*, No. 2:11-CV-101, 2014 WL 794200, at *1 (N.D.W. Va. Feb. 26, 2014) ("With respect to the communications . . . the documents and testimony of the persons involved in the

13

communications are the appropriate evidence."); *Univ. of Pittsburgh v. Townsend*, No. 304-CV-291, 2007 WL 1002317, at *15 (E.D. Tenn. Mar. 30, 2007) ("Most of the documentary evidence reviewed and relied upon by [the expert] does not even appear to [be] scientific in nature, and the Court fails to see how [the expert's] specialized knowledge informs his interpretation of these documents."). Similarly, paragraphs 128–34 simply recite uncomplicated evidence to support Dr. Sheridan's opinion that Plaintiff was allegedly not diligent in pursuing commercialization. These are facts that the jury can weigh and consider as Dr. Sheridan has not applied any specialized knowledge to render this opinion. The Court therefore finds that such testimony will not assist the trier of fact.

But the Court finds that Dr. Sheridan has provided some testimony that will assist the trier of fact [Doc. 333-2 ¶ 116]. For example, Dr. Sheridan discusses what inventors typically do in order to develop and protect trade secrets, how Plaintiff's conduct fell short thereof, and how universities generally protect their trade secrets [*See id.*]. *See Stryker Corp. v. XL Ins. Am.*, No. 1:17-CV-66, 2020 WL 13443035, at *3 (W.D. Mich. July 22, 2020) ("[E]xperts may testify regarding custom and practice in an industry." (citation omitted)). Given that Plaintiff must show it has trade secrets to establish its claim for trade secret appropriation, *see* Tenn. Code Ann. § 47-25-1702(4), the Court finds this testimony will assist the trier of fact.[9]

---

[9] To the extent that Dr. Sheridan must rely on any narrative to support his Fifth Opinion, the undersigned reminds the parties that at trial, "the Court has broad discretion over the mode and order of examining witnesses and presenting evidence[.]" *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 3:09-MD-02100, 2011 WL 6302287, at *13 (S.D. Ill. Dec. 16, 2011) (citations omitted). "[T]here is nothing particularly unusual, or incorrect, in a procedure of letting a witness relate pertinent information in a narrative form as long as it stays with the bounds of pertinency and materiality." *Id.* (quoting *United States v. Garcia*, 625 F.2d 162, 169 (7th Cir. 1980)).

### B. Dr. Sheridan's Purported Legal Conclusion

Plaintiff states that Dr. Sheridan's legal opinions should be excluded [Doc. 333 p. 10]. It asserts that "Dr. Sheridan is not a lawyer and has no legal training and is therefore not qualified to opine on legal issues" [*Id*. at 13]. Even if he had such qualifications, Plaintiff asserts that his opinions are still impermissible legal conclusions [*Id*.].

Defendant acknowledges that experts cannot offer legal conclusions, but it denies Dr. Sheridan provided any [Doc. 392 p. 12]. It argues that "Dr. Sheridan's report and deposition testimony make clear that he was 'retained to respond to the opinions provided by Mr. Day and Dr. Stevens in this case'" [*Id*. (citation omitted)]. Defendant states that during his deposition, Dr. Sheridan denied that he was offering legal opinions, and he made it clear that he "is providing only his opinion as a technology transfer professional and not providing any legal conclusion" [*Id*. at 13]. Defendant cites examples of Dr. Sheridan's opinion where he is purportedly rebutting Mr. Day and Dr. Stevens in his capacity as a technology transfer professional [*Id*. at 13–14]. While Dr. Sheridan discusses the impact of a United States Supreme Court holding, Defendant argues that he did so because the Court's ruling "was significant within the technology transfer industry" [*Id*. at 15–16].[10]

Plaintiff replies that it is of no consequence that Dr. Sheridan testified at his deposition that he is not providing a legal opinion [Doc. 437 p. 11]. Although Defendant denies that it is offering Dr. Sheridan to testify about a Supreme Court case, Plaintiff argues that Dr. Sheridan does so [*Id*.

---

[10] Defendant states that the Court should deny Plaintiff's request, but "to the extent the Court is inclined to grant [Plaintiff's m]otion on these grounds, it should exclude the parallel testimony by Dr. Stevens and Mr. Day" [Doc. 392 p. 16]. The Court, however, finds it improper to request exclusion of two experts in a response brief. As previously noted, the operative Scheduling Order directed the parties to file "[a]ll motions to exclude expert testimony pursuant to Federal Rule of Evidence Rule 702 . . . as soon as possible but no later than September 26, 2023" [Doc. 289 p. 4 (emphasis omitted)].

15

at 12]. Plaintiff states that Defendant "makes no attempt to affirmatively demonstrate why each opinion is admissible under *Daubert* even though it is [Defendant's] burden to do so here" [*Id.* (citation omitted)]. While Defendant claims that Plaintiff's experts offered legal conclusions, Plaintiff argues that Defendant failed to challenge those opinions [*Id.* at 13]. Plaintiff contends that "[r]egardless, Dr. Steven's and Mr. Day's testimony is proper" [*Id.*].

Plaintiff moves to exclude Dr. Sheridan's Second, Third,[11] and Sixth Opinions, which state:

> (2)    The UT-NExT MTA did not grant UT or UTRF an exclusive license or ownership of the chimeric form of 11-1F4 ("Ch11-1F4") and UT and UTRF failed to obtain exclusive rights to the antibody.

> (3)    Ch11-1F4 was developed by AERES nearly a decade before the UT-NExT MTA and the NCT's subcontract with AERES indicates that AERES had rights to Ch11-1F4. Columbia obtained rights to Ch11-1F4 directly from MRCT, a major shareholder of AERES.

> (6)    The UT-Columbia IIA granted Columbia the rights necessary to fulfill its obligation to negotiate and enter into one or more license agreements for the subject invention. A diligent technology transfer office would have amended the UT-Columbia IIA if it believed the agreement failed to grant the rights necessary for Columbia to fulfill its obligation to negotiate and enter into such license agreements.

[Doc. 333-2 ¶ 10]. It presents five categories of alleged improper conclusions, stating as follows:

> 1.    Opinions regarding UT/UTRF's alleged non-ownership of the 11-1F4 antibody, invented by Dr. Solomon, and Columbia/Caelum's purported ownership of the 11-1F4 antibody, including opinions that (i) "the language of the UT IP Policy does not indicate that inventions are automatically assigned to UT upon creation but that inventions are to be assigned to UT at some point after creation," Ex. 1 (Sheridan Report), ¶ 93; (ii) "UT and UTRF did not attempt

---

[11]    In this section, the Court only addresses the latter opinion in Opinion Three—that is, "the NCI's subcontract with AERES indicates that AERES had rights to CH11-1F4. Columbia obtained rights to Ch11-1F4 directly from MRCT, a major shareholder of AERES" [Doc. 333-2 ¶ 10].

to obtain any rights, interest, or ownership rights in m11-1F4 and related know-how prior to 2018," *id.* ¶ 94; (iii) "post-*Roche*, [one] would not assume that UT automatically owned m11-1F4 from the moment of its creation given the language of the UT IP Policy," *id.* ¶ 95; (iv) "the UT-NExT MTA does not grant UT or UTRF ownership rights or an exclusive license to data or know-how created after the May 2011 effective date of the UT- NExT MTA," *id.* ¶ 100; *see also id.* ¶ 10, second bullet point ("The UT-NExT MTA did not grant UT or UTRF an exclusive license or ownership of the chimeric form of 11-1F4 ('Ch11-1F4') ...."); (v) "UT and UTRF failed to obtain ownership of or exclusive rights to Ch11-1F4," *id.* ¶ 102; *see also id.* ¶ 10, second bullet point ("UT and UTRF failed to obtain exclusive rights to the antibody."); (vi) "[g]iven the Ch11-1F4 Assignment, ... Columbia had rights to Ch11-1F4 that it could grant to Caelum," *id.* ¶ 110; (vii) "there is no basis to assume that UT or UTRF had rights to either the IND or orphan drug designation transferred from Dr. Solomon to Dr. Lentzsch," *id.* ¶ 113; and (viii) "the UT-Columbia IIA granted Columbia all rights necessary to fulfill its obligation to negotiate and enter into one or more license agreements for the Invention subject to the agreement." *Id.* ¶ 125; *see also id.* ¶ 10, sixth bullet point ("The UT-Columbia IIA granted Columbia the rights necessary to fulfill its obligation to negotiate and enter into one or more license agreements for the subject invention."). These are impermissible legal conclusions offered by Dr. Sheridan which are based on, *inter alia*, the supposed application of a Supreme Court case involving patent law to the facts of this case, Dr. Sheridan's interpretation of UT's IP Policy, and Dr. Sheridan's interpretation of contracts at issue in this case. *See id.*, ¶¶ 91-95, 100-102, 107, 110, 113, 125.

2.  An opinion that the 2011 NeXT MTA between NCI and UT does not define UT's ownership/use rights with respect to the 11-1F4 antibody. *See id.* ¶ 97.

3.  An opinion that "AERES could elect to retain rights to inventions it developed under its contract with NCI," such that "UT therefore did not have any commercial rights to grant to NCI under the UT-NExT MTA," based on Dr. Sheridan's interpretation of a contract and related documents. *See id.* ¶¶ 98, 106. *See also id.* ¶ 10, third bullet point ("[T]he NCI's subcontract with AERES indicates that AERES had rights to Ch11-1F4.").

4.  An opinion that there is no "UT or UTRF policy or agreement that would have restricted the ability of Drs. Solomon, Hrncic, and Wall, or any other UT researchers working with them, to publish or

otherwise publicly disclose information, data, or know-how that they may have developed at UT." *Id.* ¶ 117.

5. An opinion regarding the supposed application of patent law to this case. *See id.* ¶ 126 (opining that "the information contained in a patent 'must be sufficient to inform those skilled in the relevant art how to both make and use the claimed invention.' Thus, … access to UT Know-How would not be necessary for a person skilled in the relevant art to make and use the Invention subject to the UT-Columbia IIA.").

[Doc. 333 pp. 13–15].

Rule 704 of the Federal Rules of Evidence provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. But experts may not render legal conclusions. *United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016) (explaining that "[a]n expert offers a legal conclusion when he defines the governing legal standard or applies the standard to the facts of the case" (citation omitted)); *see also Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 317 (6th Cir. 2019) (finding that the expert did not state a legal conclusion because she did not "frame[] her opinion in the 'specialized' language of disability discrimination law" and did not "even use the words 'pretext' or 'discrimination' in her report"); *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (explaining in the context of expert testimony that "[w]e would not allow a fingerprint expert in a criminal case to opine that a defendant was guilty (a legal conclusion), even though we would allow him to opine that the defendant's fingerprint was the only one on the murder weapon (a fact)[, because] . . . [t]he distinction, although subtle, is nonetheless important"); *Torres v. Cnty. of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985) ("The best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate." (citation omitted)). A legal conclusion is not helpful to the

jury because it merely instructs the jury what verdict to reach. *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997).

"Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible." *North Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997) (quoting *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 549 (6th Cir. 1981)). And here, the Court finds that Dr. Sheridan's Second, Third, and Sixth Opinions constitute legal conclusions as he is simply stating what certain agreements did or did not provide [*See* Doc. 333-2 ¶ 10]. *See Waite, Schneider, Bayless & Chesley Co., L.P.A. v. Davis*, 253 F. Supp. 3d 997, 1012 (S.D. Ohio 2015) (finding that the expert's testimony that the plaintiff "is entitled to collect a contingency fee is merely his own interpretation of the evidence" and "is[] essentially, an instruction on how to interpret the fee agreement"); *Drips Holdings, LLC v. Teledrip LLC*, No. 5:19-CV-02789, 2022 WL 17718291, at *5 (N.D. Ohio Aug. 30, 2022) ("This Court agrees that it is improper for [the expert] to opine as to the legal ramifications or make legal interpretations of the agreements. The Sixth Circuit has stated that experts may opine to contracts only when there is a 'need to clarify or define terms of art, science, or trade.'" (quoting *Lucio v. Edw. C. Levy Co.*, No. 15-CV-613, 2017 WL 1928058, at *4 (N.D. Ohio May 10, 2017)). Furthermore, Plaintiff has identified other legal conclusions in Dr. Sheridan's report, such as "the language of the UT IP Policy does not indicate that inventions are automatically assigned to UT upon creation but that inventions are to be assigned to UT at some point after creation" [Doc. 333-2 ¶ 93]. While Dr. Sheridan is couching his opinion in terms of what "[a] technology transfer professional would understand[,]" he is merely reading the UT IP Policy [*Id.*]. He provides similar legal conclusions elsewhere in his report [*See, e.g., id.* ¶¶ 91–92, 94–95, 97, 98, 100–02, 106–07, 110, 113, 117, 125, 126].

Defendant argues that "Dr. Sheridan discusses the impact of the U.S. Supreme Court holding in *Bd. Of Trustees of Leland Standard Junior Univ. v. Roche Molecular, Sys. Inc.*, 563 U.S. 776, 786 (2011)" because this case "made clear that where a university policy prospectively requires its researchers to affirmatively assign their intellectual property to their employer, such rights are retained by the researcher until such an assignment is made, even when the researcher previously promised, prospectively, to assign such rights" [Doc. 392 p. 15]. Defendant therefore claims that "[t]he holding in *Roche* was significant within the technology transfer industry" [*Id.*]. Even so, Dr. Sheridan's conclusion is based on his interpretation of the UT IP Policy that such rights to inventions "shall be assigned[,]" stating as follows: "A technology transfer professional would understand that the language of the UT IP Policy does not indicate that inventions are automatically assigned to UT upon creation but that inventions are to be assigned to UT at some point after creation" [Doc. 333-2 ¶ 93]. *See also Mastripolito v. Jefferson Health-New Jersey*, 583 F. Supp. 3d 622, 627 (D.N.J. 2022) ("Here, [the expert's] report does contain several pages detailing recitation of caselaw and the relevant legal standard. This portion of [the expert's] report is not admissible.").[12]

As Plaintiff has stated, "Reviewing federal policies, statutes, contracts and university IP policies and then applying them to certain facts to determine ownership of and/or commercial rights to the 11-1F4 antibody at issue in this case is quintessentially legal analysis" [Doc. 333 p. 15]. The Court finds Plaintiff's objections well taken on this ground.

### C.    Dr. Sheridan's Purported State of Mind Testimony

---

[12]       In its response, Defendant argues that Dr. Sheridan is only rebutting Plaintiff's experts' opinions [Doc. 392 pp. 13–15]. But it cites no authority that an expert may provide improper legal conclusions simply because the expert is rebutting another witness.

Plaintiff claims that "[e]xpert testimony purporting to opine that an individual or entity was aware of certain facts or had a certain state of mind is impermissible" [Doc. 333 p. 15]. According to Plaintiff, "Dr. Sheridan makes improper unfounded assumptions regarding what the [p]arties and relevant third parties like the NCI understood or believed" [*Id*. at 15–16].

"[A]n expert cannot offer an opinion on the 'intent, motives or states of mind of corporations' because these opinions 'have no basis in any relevant body of knowledge or expertise.'" *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, 546 F. Supp. 3d at 677 (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D. N.Y. 2004)). Further, such testimony is not helpful because the jury can competently understand such evidence. *In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 348 F. Supp. 3d 698, 718 (S.D. Ohio 2016) (citation omitted).

Specifically, Plaintiff seeks to exclude statements in paragraphs 109, 114, and 120–124 in Dr. Sheridan's report [Doc. 333 p. 17]. Paragraph 109 states, "Additionally, by the July 2014 effective date of the Columbia-NExT MTA, Dr. Solomon had already transferred ownership of the IND to Dr. Lentzsch and both **UT and NCI understood** that NCI had created the Project Materials and Project Data under the UT-NExT MTA . . ." [Doc. 333-2 ¶ 109 (emphasis added)]. Defendant claims that a large portion of this paragraph is simply a quotation of the NExT MTA and that "[Plaintiff's] witnesses may testify at trial that they did not understand the agreement they entered, but it is fair for Dr. Sheridan to base an opinion on his assumption that the signed contract reflects the understanding of the parties at the time" [Doc. 392 p. 18]. The Court finds Dr. Sheridan's testimony that "UT and NCI understood" is improper state-of-mind testimony. *In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 348 F. Supp. 3d 698, 718 (S.D. Ohio 2016) ("Courts have

typically barred expert opinions or testimony concerning a corporation's state of mind, subjective motivation, or intent.").

Plaintiff also challenges statements in paragraph 114, arguing that "Dr. Sheridan sets forth Dr. Wall's supposed understanding of UT's IP Policy based solely on Dr. Sheridan's reading of Dr. Wall's deposition testimony" [Doc. 333 p. 16 (citation omitted)]. Plaintiff argues that only Dr. Wall can tell the jury about his understanding [*Id*.]. But Dr. Sheridan does not offer any state-of-mind testimony in this paragraph [Doc. 333-2 ¶ 114]. Instead, he quotes from Dr. Wall's deposition testimony to support his opinion that "one of the central missions of a university is to disseminate the results of university research and other scholarly activity conducted by university faculty" [*Id*.]. The Court finds no improper testimony here.

With respect to paragraph 120, Dr. Sheridan states, "Based on email communications between the parties, it appears the parties entered into the UTRF/UT-Columbia Confidentiality Agreement **with the expectation** that UT would send to Columbia specific information relating to additional materials under an MTA between UTRF/UT and Columbia" and that "both Dr. Patterson and Dr. Wall testified that **they did not know** whether [Plaintiff] ever shared any information under the UTRF/UT-Columbia Confidentiality Agreement" [Doc. 333-2 ¶ 120 (emphasis added)]. And in paragraph 121, Dr. Sheridan writes, "I would expect the UT-Columbia IIA and the UTRF/UT-Columbia Confidentiality Agreement to reference the IND **given that the parties were aware** of that ownership of the IND had already been transferred to Dr. Lentzsch" [*Id*. ¶ 121 (emphasis added)]. The Court finds Dr. Sheridan's statements that certain parties entered into an agreement "with the expectation" [*Id*. ¶ 120] and that "the parties were aware" [*Id*. ¶ 121] are impermissible as state-of-mind testimony but that the challenged statement "they did

not know" [*Id.* ¶ 120] is not, given that Dr. Sheridan was specifically referencing Dr. Patterson's and Dr. Wall's testimonies.

In paragraph 122, Dr. Sheridan states, "[Plaintiff's] failure to take such steps suggests that [Plaintiff] **did not consider** the IND to contain UT's confidential information on trade secrets" [*Id.* ¶ 122 (footnote omitted and emphasis added)]. Plaintiff argues that this paragraph also contains "improper opinions telling the jury the ultimate result it should reach" [Doc. 333 p. 16]. Defendant responds that this paragraph is a rebuttal to "Mr. Day's opinion that it is 'customary' to 'proceed with the exchange of confidential information' before formal agreements are in place" [Doc. 392 p. 18 (footnote omitted)]. The Court finds Dr. Sheridan's testimony that "[Plaintiff] did not consider" improper state-of-mind testimony.

In paragraph 123, Dr. Sheridan states, "To the extent that [Plaintiff] **considered** the data and information contained in the IND to be confidential information or trade secrets necessary for the commercialization of the intellectual property subject to the UT-Columbia IIA, it would have included know-how under the agreement" [Doc. 333-2 ¶ 123 (emphasis added)]. The Court does not find that this statement constitutes improper state-of-mind testimony as Dr. Sheridan is speaking in a hypothetical as opposed to concluding that Plaintiff did consider the data and information. But the Court finds the statement in paragraph 124, "UT's decision not to grant rights to know-how under the UT-Columbia IIA implies that UT **did not believe** that know-how was necessary for commercialization of the invention" [Doc. 333-2 ¶ 124 (emphasis added)] constitutes improper state-of-mind-testimony.

## IV.    CONCLUSION

For the reasons explained above, Court **GRANTS IN PART AND DENIES IN PART**

Plaintiff's *Daubert* Motion to Exclude the Testimony of Sean Sheridan, Ph.D. [**Doc. 332**].

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge

24