UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNIVERSITY OF TENNESSEE RESEARCH FOUNDATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 3:19-CV-508-CEA-DCP ) |
| CAELUM BIOSCIENCES, INC., | ) ) ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Plaintiff's *Daubert* Motion to Exclude the Testimony of Kurt R. Gehlsen [Doc. 339]. Defendant responded in opposition to the motion [Doc. 395], and Plaintiff filed a reply [Doc. 480-2]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a). For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** the motion [**Doc. 339**].

I.  **BACKGROUND**

"This case largely concerns the ownership and development of the 11-1F4 antibody and related research materials" [Doc. 259 pp. 2–3 (citing Doc. 61 p. 1)]. According to the allegations in the Second Amended Complaint ("Amended Complaint"), Dr. Alan Solomon ("Dr. Solomon") with the University of Tennessee ("UT") developed the 11-1F4 antibody ("Antibody"), and the "ownership of the [A]ntibody materials and associated materials are held by [Plaintiff]" [Doc. 61 ¶ 1]. The Antibody is effective in treating amyloidosis [*Id.* ¶ 3]. "In 2009, Dr. Solomon applied for and received two different orphan drug designations for two indications of the 11-1F4

[A]ntibody ('the 11-1F4 Orphan Drug Designations')" [*Id.* ¶ 72]. According to the allegations, Defendant Caelum Biosciences, Inc. ("Defendant" or "Caelum") "was founded to advance the clinical development research from [Dr.] Solomon" [*Id.* ¶ 1]. Plaintiff University of Tennessee Research Foundation ("Plaintiff" or "UTRF") alleges that Defendant's "sole focus and mission . . . is to commercialize the [Antibody] technology, which it has renamed to CAEL-101" [*Id.* ¶ 31].

Plaintiff entered into several different agreements relating to the Antibody [*Id.* ¶ 28]. "In 2011, [UT] and the National Cancer Institute ('NCI') entered into a Material Transfer Agreement pursuant to the NCI's Experimental Therapeutics Program ("NExT")" [*Id.* ¶ 79]. In 2013, Plaintiff entered an Inter-Institutional Agreement ("IIA") with former party, The Trustees of Columbia University in the City of New York ("Columbia" or "Columbia University"), allowing it to work on clinical trials with respect to the Antibody [*Id.* ¶¶ 47–48, 85–86]. On March 14, 2017, Defendant "entered into a Confidentiality Agreement with [Plaintiff] and [UT] so that the parties could exchange information in connection with a potential sponsored research agreement involving [Plaintiff's] 11-1F4 technology" [*Id.* ¶ 104]. These agreements, Plaintiff alleges, did not transfer certain rights, including the know-how of the Antibody [*Id.* ¶¶ 79, 86, 110].[1]

According to Plaintiff, in 2017, Defendant "began publishing press releases containing false statements regarding the ownership of the 11-1F4 technology, [made] false disclosures on its website, and . . . [made] false disclosures with the U.S. Food and Drug Administration claiming that it had licensed the 11-14F4 technology from Columbia University and that [Defendant] was now the owner of the 11-14F4 Orphan Drug Designations" [*Id.* ¶ 102]. Plaintiff concludes:

> On information and belief, [Defendant] has used and continues to utilize 11-1F4 materials that are the property of [Plaintiff], including but not limited to: murine 11-1F4 materials; chimeric 11-1F4 materials; cell clones utilized in the production of chimeric 11-1F4

---

[1] Plaintiff explains that the "know-how" is the "the physical antibody materials, protein sequences, or research data regarding the 11-1F4 antibodies" [Doc. 61 ¶ 86].

> antibodies, and ELISA reagents. On information and belief, [Defendant] has also used and continues to utilize [Plaintiff's] research data, clinical trial and laboratory testing protocols, and documentation incorporated into the Investigational New Drug applications for therapies incorporating the 11-1F4 monoclonal antibody. [Defendant's] use of the 11-1F4 property rights and know-how is without written authorization from [Plaintiff][,] and [Defendant] has not compensated [Plaintiff] for its use of these materials.

[*Id.* ¶ 116].

Based on the above, Plaintiff alleges that Defendant breached the Confidentiality Agreement [*id.* at ¶¶ 125–37]; converted Plaintiff's property [*id.* ¶¶ 138–60]; committed slander of title [*id.* ¶¶ 161–86];[2] interfered with its business relationship with Columbia [*id.* ¶¶ 187–207]; interfered with its business relationship with industry partners [*id.* ¶¶ 208–27]; became unjustly enriched [*id.* ¶¶ 228–37]; and misappropriated trade secrets under the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1701 *et seq.* [*id.* ¶¶ 238–53].

Plaintiff also seeks declaratory judgments. First, it seeks a declaratory judgment that it owns "all right, title, and interest in [certain] tangible materials, know-how, and confidential research data originating or obtained from a laboratory of [UT]" [*Id.* ¶ 255]. In addition, Plaintiff seeks a declaration that it "owns the exclusive rights to utilize for commercial, for-profit purposes [certain] materials and information generated by the [NCI]" [*Id.* ¶ 262]. Further, it seeks a declaratory judgment that it owns the 11-1F4 Orphan Drug Designations [*Id.* ¶¶ 270–77].

Relevant to the instant matter, Defendant retained Kurt R. Gehlsen, Ph.D. ("Dr. Gehlsen") as an expert in this matter [Doc. 340-2 ¶ 1]. Specifically, Defendant retained him to provide an opinion on "(1) whether [Plaintiff's] Purported Trade Secrets are generally known in the industry

---

[2] Plaintiff defines the slandered property as "(1) the chimeric 11-1F4 antibody, (2) cell clones utilized in production of the chimeric 11-1F4 antibody, and (3) the 11-1F4 Orphan Drug Designations (collectively, the '11-1F4 Slandered Property')" [Doc. 61 ¶ 162].

3

or readily ascertainable by proper means; and (2) whether [Plaintiff] made reasonable efforts consistent with industry standards to keep its Purported Trade Secrets confidential" [*Id.* ¶ 4]. Dr. Gehlsen outlines his opinions as follows:

> 16. The material, information, and/or data alleged by UTRF to constitute "trade secrets" are generally known in the industry and/or are readily ascertainable from publications, presentations, ATCC deposits, patents, and/or other proper means such that no real economic value would be obtained from their disclosure.
>
> 17. UTRF failed to undertake reasonable efforts to keep any of UTRF's claimed "trade secrets" confidential and, instead, their actions or omissions reflect that they understood at the time that such information was not proprietary.
>
> 18. Dr. Solomon's transfer of the IND effectively transferred all rights to access, use, and rely on all previous submissions to the FDA in connection with IND 117,316.
>
> 19. Mr. Day's opinion that it was consistent with customary practices in the technology transfer industry for Dr. Solomon to transfer all his ownership, rights, and interest in the IND to Dr. Lentzsch without any agreement in place containing restrictions or confidentiality protections is wrong. In my 35 years in this industry, I have never seen such an IND transfer, or transfer of any proprietary information without a predecessor agreement in place.
>
> 20. Dr. Stevens' opinion that Michael Spector failed to conduct adequate due diligence on ch11-1F4 prior to executing the Columbia License Agreement is not consistent with industry practice. Even by Dr. Stevens' own standards, Caelum conducted adequate diligence in its negotiations with Columbia. Dr. Stevens' report ignores AERES' rights in its own invention, ch11-1F4, and the subsequent assignment of those rights to Columbia separate and apart from any rights UT or UTRF may or may not have had. Dr. Stevens' suggestion that Caelum was supposed to conduct full due diligence through the UT transfer office is baseless.
>
> 21. Relatedly, Caelum had no reason to believe that: (1) Columbia or NCI acquired the Licensed Materials by improper means; (2) Columbia or NCI owed a duty of

4

Case 3:19-cv-00508-CEA-DCP   Document 530   Filed 07/01/24   Page 4 of 17   PageID #: 31422

confidentiality to any third party relating to the Licensed Materials; or (3) it's receipt and/or use of the Licensed Materials would be subject to any limitations or restrictions outside of the express provisions of the License Agreement.

22, Dr. Stevens' opinion that the "know-how" considered in the negotiation between The University of Tennessee ("UT") and Columbia for amendment to the IIA was "critical" is flawed. UT and UTRF could not identify any critical know-how that would be required by Columbia or Caelum to develop or commercialize CAEL-101. Columbia and Caelum did not use or need any know-how from UT and/or UTRF to pursue commercialization of the final form of CAEL-101.

23. Mr. Day's opinion that UT was diligent in the development of 11-1F4 over the 10-years leading to the IND transfer to Columbia is inaccurate; however, it is also irrelevant. It would not have taken Caelum "*at least 10 years, and potentially up to 15 years,*" to reach the same stage of development that 11-1F4 was in by the time of the January 1, 2017 Caelum-Columbia License Agreement.

[*Id*. ¶¶ 16–23].

Plaintiff seeks an order precluding Dr. Gehlsen from testifying as follows: (1) "that the information [Plaintiff] alleges [Defendant] misappropriated is not 'trade secret' information; (2) . . . that the information [Plaintiff] alleges [Defendant] misappropriated is either 'readily ascertainable by proper means' or 'generally known'; and/or (3) proffering other improper legal conclusion opinions regarding contracts at issue in this litigation and/or the Parties' ownership of, or rights with respect to, intellectual property at issue in this litigation" [Doc. 340 p. 5]. For grounds, Plaintiff states that Dr. Gehlsen's opinions constitute impermissible legal conclusions [*Id*. at 6–11]. Plaintiff also identifies other purported legal conclusion opinions, arguing that Dr. Gehlsen impermissibly opines on "contractual issues and intellectual property rights" [*Id*. at 11].

Defendant responds that "[t]he overwhelming weight of authority, including Sixth Circuit precedent, fully permits expert testimony in trade secret cases on the issue of whether or not alleged

5

trade secret information is in fact a trade secret" [Doc. 395 p. 9 (citation omitted)]. Defendant denies that Dr. Gehlsen has rendered other legal conclusions in his report [*Id*. at 13–17].

Plaintiff filed a reply, maintaining that Dr. Gehlsen has rendered impermissible legal conclusions [Doc. 480-2 pp. 5–15]. It states that Dr. Gehlsen has rendered other legal conclusions "on contractual issues and intellectual property rights" [*Id*. at 15].

## II. STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579, 589 (1993)). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[3] The Supreme Court of the United States stated in *Daubert* that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any

---

[3] Rule 702 was amended on December 1, 2023, but the changes to the rule are not substantive. *Nash-Perry v. City of Bakersfield*, No. 118CV01512JLTCDB, 2023 WL 8261305, at *13 (E.D. Cal. Nov. 29, 2023). Rather, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts

6

and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589.

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cnty.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138–39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002), *aff'd*, 89 F. App'x 927 (6th Cir. 2003) (quoting *Daubert*, 509 U.S. at 593–94). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n.10.

"District courts generally have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Madej v. Maiden*, 951 F.3d 364, 374 (6th Cir. 2020) (quoting *Kumho Tire*, 526 U.S. at 152). Decisions by the district court are thus reviewed for an abuse of discretion. *See id.* (citing *Kumho Tire*, 526 U.S. at 142). "This deferential standard makes sense because *Daubert* establishes a 'flexible' test that considers many indicia of reliability[,]" and relevance will depend "on the particular science and the particular scientist before the court." *Id.* (citing *Kumho Tire*, 526 U.S. at 150).

### III. ANALYSIS

To the extent that Dr. Gehlsen opines that Plaintiff's purported trade secrets are generally known and readily ascertainable, as those terms are used in the statutory definition, the Court finds

---

have incorrectly determined to be governed by the more permissive Rule 104(b) standard." Fed. R. Evid. 702 advisory committee's note to 2023 amendments.

7

such opinions constitute legal conclusions.[4] In addition, the Court will preclude Dr. Gehlsen from rendering other legal conclusions as further explained below.

Pursuant to Federal Rule of Evidence 704, "An opinion is not objectionable just because it embraces an ultimate issue." But an expert may not render legal conclusions. *United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016) (explaining that "[a]n expert offers a legal conclusion when he defines the governing legal standard or applies the standard to the facts of the case" (citations omitted)); *see also Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 317 (6th Cir. 2019) (finding that the expert did not state a legal conclusion because she did not "frame[] her opinion in the 'specialized' language of disability discrimination law" and did not "even use the words 'pretext' or 'discrimination' in her report"); *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (explaining in the context of expert testimony that "[w]e would not allow a fingerprint expert in a criminal case to opine that a defendant was guilty (a legal conclusion), even though we would allow him to opine that the defendant's fingerprint was the only one on the murder weapon (a fact)[, because] . . . [t]he distinction, although subtle, is nonetheless important"); *Torres v. Cnty. of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985) ("The best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate." (citation omitted)). A legal conclusion is not helpful to the jury because it merely instructs the jury in what verdict to reach. *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997); *see also Torres*, 758 F.2d at 150 ("The problem with testimony containing a legal

---

[4] Defendant argues that "[t]o the extent [Plaintiff] attempts to seek exclusion of testimony beyond the particular opinions it has identified in its Motion, the Court should deny [it] as overbroad" [Doc. 395 p. 17 n.6 (citation omitted)]. Plaintiff has identified the specific parts that it seeks to exclude [*See* Doc. 340 pp. 7–10 (citing Doc. 340-2 ¶¶ 16, 89, 90, 117, 124, 130, 136, 141, 150, 158, 168, 183, 187, 195, 241, 247, 252, 255, 260, 264, and 367)].

conclusion is in conveying the witness's unexpressed, and perhaps erroneous, legal standards to the jury.").

As mentioned above, Plaintiff seeks to preclude Dr. Gehlsen from testifying that the information Defendant allegedly misappropriated is not a trade secret and that the information is "readily ascertainable by proper means" or "generally known" [Doc. 340 p. 5]. In addition, Plaintiff states that Dr. Gehlsen improperly opines on the parties' contractual rights [*Id*.].

### A. Dr. Gehlsen's Opinions Regarding Purported Trade Secrets

Plaintiff argues that "an expert opining that an item is or is not a 'trade secret' is impermissible as it states a legal conclusion" [*Id*. at 6 (citation omitted)]. According to Plaintiff, "Dr. Gehlsen purports to proffer multiple opinions, in the form of conclusions, that the information [Plaintiff] alleges [Defendant] misappropriated is not 'trade secret' information and that it is either 'readily ascertainable by proper means' or 'generally known'" [*Id*. at 7]. Plaintiff argues that terms such as "'trade secret[,]' 'readily ascertainable by proper means,' and or 'generally known' are legal terms of art set forth and defined in the Tennessee Uniform Trade Secrets Act" [*Id*. (citation omitted)]. It argues that "Dr. Gehlsen's opinions using these statutory terms are exactly the sort of improper legal conclusion opinions that courts routinely preclude experts from offering at trial" [*Id*.]. Plaintiff alleges the following paragraphs in Dr. Gehlsen's report are impermissible: ¶¶ 16, 89, 90, 111, 117, 124, 130, 136, 141, 150, 158, 168, 183, 187, 195, 247, 252, 255, 260, 264, and 367 [*Id*. at 7–10].

Relying on caselaw, Defendant argues that "Dr. Gehlsen's opinions are precisely of the type these courts have allowed" [Doc. 395 p. 10]. According to Defendant, the Sixth Circuit permits an expert "to use specific phrasing of a relevant statute in his testimony" [*Id*. at 9].

9

Defendant accuses Plaintiff of "cherry-pick[ing] conclusory sentences and headings from Dr. Gehlsen's report to make it appear like [he] is making barebones legal conclusions" [*Id.* at 10].

Throughout his report, Dr. Gehlsen opines that certain information that Plaintiff alleges are trade secrets are generally known or readily ascertainable [Doc. 340-2 ¶¶ 16, 89, 90, 111, 117, 124, 130, 136, 141, 150, 158, 168, 183, 187, 195, 247, 252, 255, 260, 264, and 367]. In Tennessee, "the elements for a misappropriation of trade secrets claim are: (1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff." *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 962 (M.D. Tenn. 2011) (citation omitted). Tennessee law defines "trade secret" to include information "that[] (A) [d]erives independent economic value, actual, or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (B) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Tenn. Code Ann. § 47-25-1702(4).

Opining that something is or is not a trade secret is a legal conclusion. *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, No. 3:13-CV-82, 2019 WL 1435934, at *4 (W.D. Ky. Mar. 29, 2019) ("In that vein, an expert opining that an item is or is not a 'trade secret' is impermissible, as it states a legal conclusion.") (citing *CDA of Am., Inc. v. Midland Life Ins. Co.*, No. 01-CV-837, 2006 WL 5349266, at *5 (S.D. Ohio March 27, 2006) (ordering counsel to ensure their expert's "testimony does not turn to the issue of whether or not [certain information] constituted a 'trade secret,' as that would, as a matter of law, encroach upon the province of the jury in breach of Federal Rule of Evidence 704[]"); *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-CV-7242, 2002 WL 1585551, at *2 (S.D. N.Y. July 16, 2002) (expert cannot opine that defendants "misappropriated trade secrets"); *FedEx Ground Package System, Inc. v. Applications Inter. Corp.*,

695 F. Supp. 2d 216, 221–22 (W.D. Penn. 2010) (expert opinion excluded when opining on what is "required under the law" and whether the parties "complied with the Act")). But Dr. Gehlsen does not explicitly opine that something is or is not a trade secret; instead, he asserts that certain information is generally known and readily ascertainable.

In *Caudill*, the Western District of Kentucky recently considered this same issue and found that the expert could not testify "in a legally conclusory fashion" that the "trade secrets are not 'generally known' or 'readily ascertainable.'" *Caudill Seed & Warehouse Co., Inc.*, 2019 WL 1435934, at *5. The court reasoned that "[e]xclusion is proper when an opinion 'tracks almost verbatim the language of the applicable statute' or utilizes a term that 'has a specialized meaning in the law and in lay use the term has a distinctly less precise meaning.'" *Id*. at *4 (quoting *Torres*, 758 F.2d at 151). And because such words "address[ed] the statutory terms of art[,]" the expert was not permitted to use them. *Id*. at *4–5. Given that Dr. Gehlsen's opines—in a legally conclusory fashion—that certain information Plaintiff alleges to be trade secrets is "generally known" or "readily ascertainable by proper means," thereby tracking the language of the applicable statute, the Court concludes such statements are impermissible. The specific phrasing of the statute should only be referenced "when necessary and only as used by laypersons." *Id*. at *4 ("[T]he expert should focus on facts and analysis, only referencing the specific phasing of the statute when necessary and only as used by laypersons." (citation omitted)).[5]

---

[5] Defendant argues that the Sixth Circuit allows an expert "to use the specific phrasing of a relevant statute in his testimony, when an expert does so 'in the way an ordinary layman would . . . to state his opinion on the ultimate fact, not to state a legal conclusion'" [Doc. 395 p. 9 (citing *Heflin v. Stewart Cnty., Tenn.*, 958 F.2d 709, 715 (6th Cir.), *on reconsideration*, 968 F.2d 1 (6th Cir. 1992))]. In that case, the court found that the district court did not commit an abuse of discretion by allowing the expert witness to testify that defendants were "deliberately indifferent." *Id*. at 715–16. But later, the Sixth Circuit noted, "Although *Heflin* indicates that district courts can exercise some discretion in determining whether the proffered testimony is helpful to the jury, *Berry* teaches that a district court abuses its discretion when it allows a witness to define legal terms, especially terms that carry a considerable amount of legal baggage."

11

Defendant argues that "Plaintiff has misleadingly cherry-picked conclusory sentences and headings from Dr. Gehlsen's report to make it appear like Dr. Gehlsen is making the barebones legal conclusions that [Plaintiff's] 41 alleged trade secrets are 'generally known' or 'readily ascertainable'" [Doc. 395 p. 10]. It asserts that Dr. Gehlsen "provided the detailed factual reasons for his opinion as to each of the 41 purported trade secrets" [*Id.* at 10–11]. But Dr. Gehlsen is not precluded from providing any factual details for his opinion about the 41 purported trade secrets, including his opinion that they were derived from other outside sources. *Caudill Seed & Warehouse Co., Inc.*, 2019 WL 1435934, at *4 ("In contrast, an expert may provide facts and analysis which lead the jury toward that conclusion.") (citing *Allied Erecting and Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, No. 4:06-CV-114, 2009 WL 8592874, at *4 (N.D. Ohio Aug. 12, 2009), *aff'd*, 511 F. App'x 398, 412–413 (6th Cir. 2013) (exclusion of trade secret expert not warranted where the expert "offered opinions on certain subsidiary components of the overall issue" but did not opine whether the information was or was not a trade secret); *Raytheon Co. v. Indigo Sys. Corp.*, 598 F. Supp. 2d 817, 822 (E.D. Tex. 2009) (expert's "opinion that certain trade secrets consist merely of information that was in the public domain at the time of the alleged misappropriation is relevant and within his sphere of expertise"); *U.S. Gypsum Co. v. Lafarge North America Inc.*, 670 F. Supp. 2d 748, 756 (N.D. Ill. 2009) (permitting opinion testimony on "what information was generally available in the wallboard industry"); *Iofina, Inc. v. Igor Khalev*, No. CIV-14-1328, 2016 WL 6246730, at *3 (W.D. Okla. Oct. 25, 2016) ("Mr. Brix will not be testifying regarding the ultimate issue of whether any of plaintiffs' alleged trade secrets are, in fact, trade secrets. . . . Mr. Brix limits his opinions to whether certain matters are generally known or readily ascertainable by others engaged in the business of iodine extraction")). Ultimately,

---

*Woods*, 110 F.3d at 1220 (citing *Berry*, 25 F.3d at 1353 (explaining that an expert cannot testify that the defendant was deliberately indifferent)).

while the Court finds that Dr. Gehlsen cannot use legal terminology, "a more carefully phrased question could . . . elicit[] similar information and avoid[] the problem of testimony containing a legal conclusion." *Torres*, 758 F.2d at 151; *see Sierra v. Williamson*, No. 4:10-CV-00079, 2013 WL 228333, at *7 (W.D. Ky. Jan. 22, 2013) ("Whether an expert's testimony embraces an improper legal conclusion often turns on the phrasing of the question posed.")

Defendant argues that during Dr. Gehlsen's deposition, he testified that he researched the term "readily ascertainable" using Google, which means that "he was guided precisely by the layperson's definition of those words[,] and he was not using those words in offering a legal opinion regarding the [Tennessee Uniform Trade Secrets Act]" [Doc. 395 p. 11 (citation omitted)]. Even so, the Court finds that Dr. Gehlsen's choice of words "runs the risk of interfering with [the] district court's jury instructions[,]" *Woods*, 110 F.3d at 1221, and that, as previously noted, he should "only referenc[e] the specific phrasing of the statute when necessary and only as used by laypersons." *Caudill Seed & Warehouse Co.*, 2019 WL 1435934, at *4 (citation omitted).

In addition, Defendant argues that Plaintiff's expert also opines on whether trade secrets are generally known or readily ascertainable [Doc. 395 pp. 12–13]. Plaintiff replies that Defendant has mischaracterized its expert's testimony, but regardless, Defendant did not challenge its expert's opinion [Doc. 480-2 pp. 14–15]. The Court finds Defendant's argument not well taken. Defendant has not challenged Plaintiff's expert's opinion, and the Court declines to allow inadmissible evidence simply because Defendant asserts other experts engaged in similar testimony.[6]

---

[6] Defendant states that "courts may consider the extent to which the opposing party has attempted to introduce similar expert testimony in opposition" [Doc. 395 p. 12 (citing *Allied Erecting & Dismantling Co.*, 2009 WL 8592874, at *4 (citation omitted)]. In *Allied*, the court addressed the defendants' challenge that the plaintiff's expert's opinions constituted legal conclusions. *Id.* The court noted that the "[d]efendants' expert has done no less in opposition." *Id.* (citing *United States v. Aggarwal,* 17 F.3d 737, 743 (5th Cir.1994) (considering, in evaluating

13

### B. Dr. Gehlsen's Other Purported Legal Conclusions

Plaintiff also seeks to exclude Dr. Gehlsen's statements made in ¶¶ 18, 36, 38, 41, 244, and 348 of his report [Doc. 340 p. 15]. It argues that the statements contained therein constitute impermissible legal conclusions. Specifically, Plaintiff objects to the following opinions:

> 18. Dr. Solomon's transfer of the IND effectively transferred all rights to access, use, and rely on all previous submissions to the FDA in connection with IND 117,316.
>
> 36. Generally, an applicant-contractor participating in the RAID/NExT Program retains title to any materials *provided to* NCI. The applicant-contractor does not, though, necessarily receive title to work *generated by* NCI or its contractors under the Program. In exchange for taking on the risk and millions of dollars in cost of conducting the development work, NCI typically retains title to those materials, data, and reports generated by NCI, and grants a license or other rights to use the materials and/or data to the applicant-contractor.
>
> 38. Where NCI grants a license or other commercial use rights in the materials and/or data generated under the RAID/NExT Program to the applicant-contractor, NCI still retains in all cases a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced the invention. NCI also retains what are known as "march-in rights." If the applicant-contractor does not attempt to develop and commercialize

---

admissibility of expert testimony, the extent to which the opposing party has attempted to introduce similar expert testimony). But in *Allied*, the court found that the expert's opinions were not legal conclusions. *Id*.

Further, in *Aggarwal*, the defendant appealed his conviction after the jury found him guilty of conspiracy and wire fraud. *Aggarwal*, 17 F.3d at 739. The defendant argued that the government's witness violated Rule 704 "by using terms like 'scam,' 'fraudulent,' and 'fraud.'" *Id*. at 743. The court noted, however, that "the government . . . point[ed] out (1) its witnesses used these words mostly to describe the area of expertise . . .; (2) the defense expert used the 'offending words' even more than the government experts; (3) the government experts never commented directly on [the defendant's] state of mind; and (4) Rule 704(a)" allowed such testimony. *Id*. The court further noted that "because the defendant did object to these words during trial," reversing the defendant's conviction required a finding of plain error, which was not present. *Id*. The Court does not find *Aggarwal* applicable to the present circumstances.

14

the invention, or if necessary to "alleviate health or safety needs" that the applicant is not reasonably satisfying, NCI may "march-in" and take control of the invention, including the authority to grant nonexclusive, partially exclusive, or exclusive licenses to the invention in any field of use.

41. The SOA makes clear that AERES acted as an independent contractor for the production of cell clones producing chimeric 11-1F4 ("ch11-1F4"). The terms prohibit AERES from using the research materials provided by Dr. Solomon and/or NCI "for any for-profit or not-for-profit venture" (i.e. the hybridoma cell clones, the murine sequences, and purified m11-1F4 reference standard sample). However, the SOA makes no mention of any rights acquired by Dr. Solomon, UT, or UTRF in the materials and reports generated by AERES under the contract. Instead, the SOA incorporated the following Federal Acquisition Regulations relating to AERES' rights under the SOA:

    a) 52.227-11 Patent Rights—Retention by Contractor. This regulation provides the contractor (i.e., AERES) the right to "retain ownership of each subject invention." To the extent NCI obtains title to any invention, the contract retains "a nonexclusive royalty-free license throughout the world in each subject invention." The license expressly "extends to any domestic subsidiaries and affiliates within the corporate structure of which the Contractor is a part." This section also provides for NCI's March-In Rights, in parallel to the Bayle-Dole Act.

    b) 522.227-14 Rights in Data—General. This regulation provides the contractor (i.e., AERES) the right to use, release to others, reproduce, distribute, or publish any data first produced or specifically used by AERES Contractor in the performance of the SOA. In other words, AERES did not owe any obligation to keep its inventions, data, or reports, confidential.

244. Nothing in the report suggests that UTRF, UT, or Drs. Solomon or Wall retained any exclusive right to access or use the resulting data or the report itself.

348. There is nothing in the record to suggest that UT or UTRF held exclusive rights in any of these materials but for the two

15

> hybridoma clones, which UT supplied to NCI and was ultimately provided to AERES.

[Doc. 340 pp. 13–15 (citations omitted)].

Defendant counters that "[a]n expert's mere mention of a contract or statute does not constitute an impermissible legal conclusion" [Doc. 395 p. 13 (citation omitted)]. Instead, Defendant asserts that "[c]ourts have allowed experts to opine on contractual and statutory obligations where the relevant industry is particularly intertwined with the law or of such complexity that is beyond the ken of a lay person" [*Id.* (citation omitted)]. And here, Defendant states that "[i]t cannot be seriously disputed that the factual story of 11-1F4's development is both complex and inextricably intertwined with the applicable statutory law and a web of contractual agreements" [*Id.* at 14]. Defendant provides a table of the challenged opinions, explaining why they should not be excluded [*Id.* at 14–17].

After reviewing the challenged opinions, the Court finds the opinions rendered in paragraphs 18, 41, 244, and 348 are legal conclusions. In these opinions, Dr. Gehlsen is simply rendering his opinion on what the contracts do or do not provide. *Builders Mut. Ins. Co. v. GCC Constr., LLC*, No. 1:22-CV-208, 2024 WL 71715, at *10 (E.D. Tenn. Jan. 5, 2024) (excluding expert's opinions because they "impermissibly interpret[ed] the contract at issue"); *see also University of Pittsburgh v. Townsend*, No. 304-CV-291, 2007 WL 1002317, at *7 (E.D. Tenn. Mar. 30, 2007) ("Thus, to the extent that [the expert] proffers legal conclusions regarding the University's ownership interest or the parties' rights and obligations under the Bayh-Dole Act or University policies, his opinions will be excluded" (citation omitted)). The jury can read the contracts and determine what rights each party gained therefrom. But the Court finds Dr. Gehlsen's opinions in paragraphs 36 and 38 are not legal conclusions. Instead, Dr. Gehlsen discusses general practices in the industry. *Cook v. Erie Ins. Co.*, No. 2:18-CV-00282, 2022 WL

16

2467528, at *3 (S.D. Ohio July 6, 2022) (stating that the expert was permitted to reference the workers compensation lien and probate statutes because she was testifying as to standard industry practices and her experience with handling both); *Univ. of Pittsburgh*, 2007 WL 1002317, at *9 (finding that the expert could not testify as to "the applicability of the Bayh-Dole Act and/or its impact on these particular parties' rights and obligations" but that he could "testify as to the general customs and practices of university technology transfer offices under the Bayh-Dole Act[,]" including explaining terminology, how the law impacts the relationships of universities subject to the Act (in terms of general rights and obligations), and the procedural issues arising therefrom").

## IV. CONCLUSION

For the reasons explained above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's *Daubert* Motion to Exclude the Testimony of Kurt R. Gehlsen [**Doc. 339**].

**IT IS SO ORDERED.**

ENTER:

*Debra C. Poplin*
Debra C. Poplin
United States Magistrate Judge