UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNIVERSITY OF TENNESSEE RESEARCH FOUNDATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | No. 3:19-CV-508-CEA-DCP |
| | ) | |
| CAELUM BIOSCIENCES, INC., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Defendant's Motion to Exclude the Expert Testimony of Dr. DeForest McDuff [Doc. 331]. Plaintiff responded in opposition to the motion [Doc. 401], and Defendant filed a reply [Doc. 438]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a). For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** the motion [**Doc. 331**].

## I.    BACKGROUND

"This case largely concerns the ownership and development of the 11-1F4 antibody and related research materials" [Doc. 259 pp. 2–3 (citing Doc. 61 p. 1)]. According to the allegations in the Second Amended Complaint ("Amended Complaint"), Dr. Alan Solomon ("Dr. Solomon") with the University of Tennessee ("UT") developed the 11-1F4 antibody ("Antibody"), and the "ownership of the [A]ntibody materials and associated materials are held by [Plaintiff]" [Doc. 61 ¶ 1]. The Antibody is effective in treating amyloidosis [*Id.* ¶ 3]. "In 2009, Dr. Solomon applied for and received two different orphan drug designations for two indications of the 11-1F4

[A]ntibody ('the 11-1F4 Orphan Drug Designations')" [*Id*. ¶ 72]. According to the allegations, Defendant Caelum Biosciences, Inc., ("Defendant" or "Caelum") "was founded to advance the clinical development research from [Dr.] Solomon" [*Id*. ¶ 1]. Plaintiff University of Tennessee Research Foundation ("Plaintiff" or "UTRF") alleges that Defendant's "sole focus and mission . . . is to commercialize the [Antibody] technology, which it has renamed to CAEL-101" [*Id*. ¶ 31].

Plaintiff entered into several different agreements relating to the Antibody [*Id*. ¶ 28]. "In 2011, [UT] and the National Cancer Institute ('NCI') entered into a Material Transfer Agreement pursuant to the NCI's Experimental Therapeutics Program ("NExT")" [*Id*. ¶ 79]. In 2013, Plaintiff entered an Inter-Institutional Agreement ("IIA") with former party, The Trustees of Columbia University in the City of New York ("Columbia" or "Columbia University"), allowing it to work on clinical trials with respect to the Antibody [*Id*. ¶¶ 47–48, 85–86]. According to Defendant, it entered into a January 1, 2017 Exclusive Licensing Agreement with Columbia ("2017 Columbia/Caelum Agreement"), "which provided [Defendant] with materials, research, and rights to assist its development effort" [Doc. 331-1 p. 5 (footnote omitted)]. Later, on March 14, 2017, Defendant "entered into a Confidentiality Agreement with [Plaintiff] and [UT] so that the parties could exchange information in connection with a potential sponsored research agreement involving [Plaintiff's] 11-1F4 technology" [Doc. 61 ¶ 104]. Plaintiff alleges that it did not transfer certain rights, including the know-how of the Antibody [*Id*. ¶¶ 79, 86, 110].[1]

According to Plaintiff, in 2017, Defendant "began publishing press releases containing false statements regarding the ownership of the 11-1F4 technology, [made] false disclosures on its website, and . . . [made] false disclosures with the U.S. Food and Drug Administration claiming

---

[1]     Plaintiff explains that the "know-how" is the "the physical antibody materials, protein sequences, or research data regarding the 11-1F4 antibodies" [Doc. 61 ¶ 86].

that it had licensed the 11-14F4 technology from Columbia University and that [Defendant] was now the owner of the 11-14F4 Orphan Drug Designations" [*Id*. ¶ 102]. Plaintiff concludes:

> On information and belief, [Defendant] has used and continues to utilize 11-1F4 materials that are the property of [Plaintiff], including but not limited to: murine 11-1F4 materials; chimeric 11-1F4 materials; cell clones utilized in the production of chimeric 11-1F4 antibodies, and ELISA reagents. On information and belief, [Defendant] has also used and continues to utilize [Plaintiff's] research data, clinical trial and laboratory testing protocols, and documentation incorporated into the Investigational New Drug applications for therapies incorporating the 11-1F4 monoclonal antibody. [Defendant's] use of the 11-1F4 property rights and know-how is without written authorization from [Plaintiff] and [Defendant] has not compensated [Plaintiff] for its use of these materials.

[*Id*. ¶ 116].

Based on the above, Plaintiff alleges that Defendant breached the Confidentiality Agreement [*id*. at ¶¶ 125–37]; converted Plaintiff's property [*id*. ¶¶ 138–60]; committed slander of title [*id*. ¶¶ 161–86];[2] interfered with its business relationship with Columbia [*id*. ¶¶ 187–207]; interfered with its business relationship with industry partners [*id*. ¶¶ 208–27]; became unjustly enriched [*id*. ¶¶ 228–37]; and misappropriated trade secrets under the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1701 *et seq*. [*id*. ¶¶ 238–53]. Plaintiff also seeks declaratory judgments [*Id*. ¶¶ 255, 262, 270–77].

Relevant to the instant matter, Plaintiff retained DeForest McDuff, Ph.D. ("Dr. McDuff"), an economist, as an expert in this case. Plaintiff retained Dr. McDuff to provide an opinion on its alleged damages [*See* Doc. 335-1]. He defines his scope of work as quantifying damages in the following causes of action:

---

[2] Plaintiff defines the slandered property as "(1) the chimeric 11-1F4 antibody, (2) cell clones utilized in production of the chimeric 11-1F4 antibody, and (3) the 11-1F4 Orphan Drug Designations (collectively, the '11-1F4 Slandered Property')" [Doc. 61 ¶ 162].

- Count I: [Defendant's] breach of the March 14, 2017 Agreement between [Plaintiff], UT, and [Defendant] concerning [Plaintiff's] "tangible materials;"

- Count II: [Defendant's] conversion of the "tangible materials" and the 11-1F4 orphan drug designations;[3]

- Count III: [Defendant's] slander of title concerning the "tangible materials" and the orphan drug designations;

- Count IV: [Defendant's] tortious interference with the business relationship between [Plaintiff] and Columbia;

- Count V: [Defendant's] tortious interference with [Plaintiff's] business relationship with other industry partners interested in commercializing 11-1F4 technology;

- Count VI: [Defendant's] unjust enrichment attributable to its possession and use of the 11-1F4 property rights, know-how, and the 11-1F4 orphan drug designations; and[4]

- Count VII: [Defendant's] misappropriation of [Plaintiff's] trade secrets.

[*Id*. ¶ 7].[5] Plaintiff asked that he analyze, but not quantify, damages related to its slander of title claim and tortious interference claim [*Id*. ¶ 21].

Pursuant to his discussion with Dr. Wall, "[Dr. McDuff] understand[s] [Defendant] materially benefitted from the use of [Plaintiff's] tangible materials, trade secrets[,] and orphan drug designations (collectively, the 'UTRF Assets') related to 11-1F4 technology by reducing the

---

[3]    On March 31, 2023, United States District Judge Charles E. Atchley dismissed Plaintiff's conversion (Count II) claim and unjust enrichment (Count VI) claim [Doc. 259], finding Plaintiff's unjust enrichment claim related to the alleged misappropriation of trade secrets and thus, preempted by TUTSA [*Id*. p. 14].

[4]    *See supra* n.3.

[5]    Dr. McDuff defines "Tangible Materials" as "the chimeric 11-1F4 antibody and . . . [the] cell clones utilized in the production of the chimeric 11-1F4 antibody" [Doc. 335-1 p. 5 n.1 (citing Doc. 62 ¶¶ 125–253)].

time to market and avoided expenses that would have otherwise been required to redevelop the UTRF Assets themselves" [*Id.* ¶ 17].[6]  He also explains that Defendant received an investment from Alexion Pharmaceuticals, Inc. ("Alexion") in 2019, and later, in 2021, Alexion acquired Defendant's remaining shares [*Id.* ¶ 18].  According to Dr. McDuff, as part of its investment and later acquisition of Defendant, Alexion performed financial forecasts of Defendant's CAEL-101 program in January 2019, December 2019, and September 2021 [*Id.*].  In arriving at his opinions, Dr. McDuff relied on Alexion's forecasts [*Id.* ¶¶ 76–79].  Dr. McDuff also considered Alexion's discounted cash flow model (as of December 31, 2019) ("Alexion's DCF Model") [*Id.* ¶ 76].

## A.    Dr. McDuff's Damages Opinion on the Misappropriation of Trade Secrets

Dr. McDuff states that "under the Tennessee Uniform Trade Secrets Act, [Plaintiff] may be awarded damages based upon its actual loss, [Defendant's] unjust enrichment, or a reasonable royalty" [*Id.* ¶ 120].  According to Dr. McDuff, "[o]ne generally accepted method for measuring unjust enrichment is the 'head start' method, which measures the value to [Defendant] of bringing its product to market faster (i.e., reduced time to market)—while incurring fewer expenses—than it could have absent the trade secret misappropriation" [*Id.* ¶ 123 (citation omitted)].  Dr. McDuff explains that "[r]ather than selecting a specific time duration, [he] has been instructed by [c]ounsel for Plaintiff to provide calculations based on 1[–]year increments from 1 year to 5 years, for a total of 5 possible delay periods" [*Id.* ¶ 126].  "[He] relied upon Alexion's September 2021 Forecast . . . to value [Defendant's] reduced time to market due to its misappropriation of the UTRF Trade Secrets" [*Id.* ¶ 127].  His calculations do not include any saved expenses, which according to Dr. Wall, would have been approximately $1 to $5 million [*Id.* ¶ 129].  "To assist the trier of fact,"

---

[6]     Dr. McDuff states that the UTRF Assets include "at least" the confidential know-how and the research data [Doc. 335-1 ¶ 43].

Dr. McDuff "provided values for total avoided expenses of $1, $3, and $5 million based on Dr. Walls' assessment of avoided expenses" [*Id*.].

As an alternative form of damages related to Defendant being unjustly enriched, Dr. McDuff "measured [Defendant's] unjust enrichment by reference to the increase in the value of the CAEL-101 program that has resulted from [Defendant's] avoidance of paying royalties for the UTRF Trade Secrets" [*Id*. ¶ 130]. According to Dr. McDuff, "the 2017 Columbia/Caelum Agreement—when appropriately apportioned—provides an alternative value of what [Defendant] would have been willing to pay to license the UTRF Trade Secrets" [*Id*.]. In order to arrive at his calculation, he took the total value of the compensation received by Columbia under the 2017 Columbia/Caelum Agreement as applied to the September 2021 Forecast sales and discounted to January 1, 2023 [*Id*. ¶ 132]. "[He] also calculated the effective royalty rate of Columbia's total compensation" using "the present value revenues from the September 2021 Forecast" [*Id*. ¶ 133]. Using the compensation terms from the 2017 Columbia/Caelum Agreement, Dr. McDuff assigns a certain percentage, stating that it "is the lowest royalty rate that [Defendant] would have paid pursuant to the 2017 Columbia/Caelum Agreement" [*Id*. ¶ 134]. After adjusting the royalty percentage due to the third-party clause, he arrives at a "reasonable value of a royalty for only the UTRF Trade Secrets—rather than for the UTRF Assets as a whole" [*Id*. ¶ 135]. He concludes that "the 2017 Columbia/Caelum Agreement provides a reliable alternative value of what [Defendant] would have been willing to pay to license [the] UTRF Assets" [*Id*. ¶ 136].

### B.    Mr. McDuff's Opinion on Breach of Contract Damages

With respect to Plaintiff's breach of contract claim, Dr. McDuff stated, "I have been informed by [c]ounsel for Plaintiff that [Plaintiff's] expectation damages can be measured as the royalties that it reasonably would have expected [Defendant] to pay for the use of the UTRF

6

Tangible Materials" [*Id*. ¶ 147]. In order to assess damages starting with the date the breach occurred—January 1, 2020—Dr. McDuff utilized two methodologies: the cost approach and the market approach [*Id*. ¶ 149]. First, Dr. McDuff assessed damages under the cost approach [*Id*. ¶¶ 150–58]. "Using the cost approach, one derives an indicator for the value of the asset—or a percent of revenue rate—by reference to the economic cost of replacing that asset" [*Id*. ¶ 150]. Dr. McDuff states that according to Dr. Wall, "the primary cost of replacing UTRF Tangible Materials would be the time duration delay necessary to do so, along with certain additional expenses" [*Id*.]. In order "[t]o assess the cost of the delay required to recreate the UTRF Tangible Materials as of January 1, 2020," Dr. McDuff relied on Alexion's December 2019 Forecast as well as its DCF Model [*Id*.]. Using Alexion's information, Dr. McDuff calculated the forecast of revenue, costs, operating profit, and pre-tax net present value [*Id*. ¶ 152]. He then considered the reduced time to enter the market and avoided expenses [*Id*. ¶¶ 156–57]. With respect to the reduced time to market, "[r]ather than selecting a specific time duration," Dr. McDuff was "instructed by [c]ounsel for Plaintiff to provide calculations based on 1[–]year increments from 1 year to 5 years, for a total of 5 possible delay periods" [*Id*. ¶ 156]. With respect to avoided expenses, according to Dr. Wall, the saved expenses for the redevelopment of the UTRF Tangible Materials "would have been approximately $10 to $20 million" [*Id*. ¶ 158]. Dr. McDuff performed his calculations with and without the saved expenses, noting that the "saved expenses [will be] determined by the trier of fact" [*Id*.].

Dr. McDuff also used the market approach [*Id*. ¶¶ 159–68]. Under this approach, "one derives an indicator for the values [of] an asset by reference to what has been paid for other, comparable assets" [*Id*. ¶ 159]. Here, Dr. McDuff states that the 2017 Columbia/Caelum Agreement "provides an alternative value of what [Defendant] would have been willing to pay to

license the UTRF Tangible Materials" [*Id.*]. He outlines the compensation that Columbia was to receive under the 2017 Columbia/Caelum Agreement [*Id.* ¶ 160]. Dr. McDuff states that Michael Spector, Defendant's former Chief Executive Officer, testified that the royalty terms and structure in the 2017 Columbia/Caelum Agreement "were consistent with the university license agreements[,]" and Ofra Weinberger, Columbia's Technology Ventures' Director of Commercialization and Licensing, testified that the terms were standard [*Id.* ¶ 161 (citation omitted)]. Dr. McDuff noted that "[t]he 2017 Columbia/Caelum Agreement also included a royalty adjustment that allowed [Defendant] to deduct [a certain percentage] of the royalties paid to a third party from any payments to Columbia under the running royalties" [*Id.* ¶ 162]. "[Dr. McDuff] conservatively applied this adjustment in [his] analysis" [*Id.*]. He states that Plaintiff and Columbia negotiated to amend the 2013 IIA to include Plaintiff's know-how and tangible materials and that such negotiations included a 50/50 split, meaning that "the royalties that [Defendant] agreed to pay Columbia are a reasonable proxy for the royalties they would have agreed to pay [Plaintiff]" [*Id.* ¶ 163]. "[He] also calculated the effective royalty rate of Columbia's total compensation . . . when applied to the present value revenue from the December 2019 Forecast" [*Id.* ¶ 165]. Based on the 2017 Columbia/Caelum Agreement and what those parties agreed to with respect to the running royalty, he opines that a certain percentage "is the lowest royalty rate that [Defendant] would have paid pursuant to the 2017 Columbia/Caelum Agreement" [*Id.* ¶ 166].

Defendant now seeks to exclude Dr. McDuff's opinions in their entirety [Doc. 331], asserting that "[his] opinions and calculations are not based on reliable principles and methods, are not supported by sufficient facts and data, and result in wholly speculative damages ranges" [*Id.* at 1]. As such, Defendant maintains that Dr. McDuff's opinions will not be helpful to the jury in understanding the evidence or determining any fact at issue [*Id.* at 2]. Plaintiff opposes the

motion [Doc. 401], contending McDuff's damages opinions are reliable and well supported. In Defendant's reply [Doc. 438], it reiterates that Dr. McDuff's opinions are unreliable and speculative and not helpful to the jury.

## II.    STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579, 589 (1993)). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[7] The Supreme Court of the United States stated in *Daubert* that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any

---

[7]    Rule 702 was amended on December 1, 2023, but the changes to the rule are not substantive. *Nash-Perry v. City of Bakersfield*, No. 118CV01512JLTCDB, 2023 WL 8261305, at *13 (E.D. Cal. Nov. 29, 2023). Rather, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000--requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." Fed. R. Evid. 702 advisory committee's note to 2023 amendments.

9

and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589.

The factors relevant in evaluating the reliability of the testimony include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593–94), *aff'd*, 89 F. App'x 927 (6th Cir. 2003). The inquiry is "a flexible one," and these factors do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 138–39 (citing *Daubert*, 509 U.S. at 593); *see also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999) (explaining that these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted").

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cnty.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138–39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey*, 187 F. Supp. 2d at 70–71 (quoting *Daubert*, 509 U.S. at 593–94). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n.10.

"District courts generally have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Madej v. Maiden*, 951 F.3d 364, 374 (6th Cir. 2020) (quoting *Kumho Tire*, 526 U.S. at 152). Decisions by the district court are thus reviewed for an abuse of discretion. *See id.* (citing *Kumho Tire*, 526 U.S. at 142).

10

"This deferential standard makes sense because *Daubert* establishes a 'flexible' test that considers many indicia of reliability[,]" and relevance will depend "on the particular science and the particular scientist before the court." *Id.* (citing *Kumho Tire*, 526 U.S. at 150).

## III.    ANALYSIS

For the reasons explained below, the Court declines to preclude Dr. McDuff from testifying about his calculations on Plaintiff's purported damages. The Court, however, will preclude Dr. McDuff's opinions regarding slander of title and tortious interference.

Primarily at issue here is Dr. McDuff's method of calculating damages for Plaintiff's trade secret misappropriation and breach of contract claims. With respect to trade secrets, Tennessee Code Annotated § 47-25-1704 provides that the damages for misappropriation "can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Tenn. Code Ann. § 47-25-1704(a). Unjust enrichment takes into consideration the "benefit to the defendant—not the loss to the plaintiff[.]" *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1130 (7th Cir. 2020). "[And] there is no single way to measure the benefit conferred on a defendant; the measurement is context dependent." *Id.*; *see also Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974) (explaining that the general approach to damages is to measure "not what plaintiff lost but rather the benefits, profits, or advantages gained by the defendant in the use of the trade secret" but that "[t]he cases reveal . . . many variations in the way this benefit to the defendant can be measured" (internal citation omitted)). Some courts have recognized the head-start method, which is a calculation that recognizes the defendant is "further along than it otherwise would have been in developing and commercializing its product and services." *Sabre GLBL, Inc v. Shan*, 779 F. App'x 843, 851 (3d Cir. 2019); *see also Epic Sys. Corp.*, 980 F.3d at 1130 ("We have noted at

11

least one way a plaintiff may prove the amount of benefit conferred on the defendant when the case involved misappropriation of trade secrets," which is to show the defendant "gain[ed] 'a significant head start in [its] operation.'" (citation omitted)).  Courts have also found a reasonable royalty rate to be a permissible measurement of damages for the misappropriation of trade secrets. *See Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 487 (6th Cir. 2002) (relying on a reasonable royalty as a damages model).

"The measure of damages for a breach of contract is the nonbreaching party's expectation interest, measured by "(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform." *White v. Parker*, No. 1:11-CV-294, 2018 WL 1279545, at *4 (E.D. Tenn. Feb. 20, 2018) (quoting *BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 136 (Tenn. 2001), *report and recommendation adopted*, No. 1:11-CV-294, 2018 WL 1278420 (E.D. Tenn. Mar. 12, 2018)).

With the above background in mind, the Court turns to Defendant's challenges. Specifically, Defendant presents six primary challenges to Dr. McDuff's opinions [Doc. 331-1]. First, Defendant argues that his opinions are too speculative to assist the jury [*Id.* at 12–16]. Second, Defendant asserts that Dr. McDuff fails to apportion damages [*Id.* at 16–19].  Third, Defendant states that Dr. McDuff's hypothetical licensing method of calculating damages is not reliable [*Id.* at 19– 22].  Fourth, Defendant claims that Dr. McDuff's head-start model is based on unreliable assumptions [*Id.* at 22–25].  Fifth, Defendant submits that Dr. McDuff fails to use proper dates in calculating damages [*Id.* at 25–28].  Sixth, Defendant argues that Dr. McDuff does not offer any opinion that would assist the jury in assessing damages for slander of title or tortious interference [*Id.* at 28–29].  The Court will address these objections separately.

### A.  Alleged Speculation

Defendant argues that Dr. McDuff's opinions are speculative because he (1) relies on Alexion's financial projections, and (2) his vast damages ranges will confuse, not assist, the jury.

### 1.  Reliance on Alexion's Financial Projections

Defendant asserts that Dr. McDuff overly relied "on Alexion's hypothetical and highly speculative financial projections" [Doc. 331-1 p. 12 (emphasis omitted)].  It argues that the forecasts "were prepared for resource planning purposes in 2019 and 2021" [*Id*.].  According to Defendant, Dr. McDuff used the 2019 and the 2021 financial forecasts "in two critical ways" [*Id*.].  First, he used the forecasts to create his head start model of damages [*Id*.].  Second, Defendant asserts, "Dr. McDuff uses the projections to calculate the net present value of the royalty [Defendant] would have paid to [Plaintiff] under a hypothetical agreement for the Tangible Materials and/or the 'trade secrets' ([i.e.,] 'the hypothetical license model')" [*Id*. at 12–13].  It states that "CAEL-101 is still in clinical trials and could fail at any time for a multitude of reasons" [*Id*. at 14].  Defendant subscribes two flaws to Dr. McDuff's calculations: (1) "they are derived from Dr. McDuff's view of the net present value of the entire CAEL-101 program—not the individual Tangible Materials or 'trade secrets' that are the subject of [Plaintiff's] claims[,]" and (2) "he determine[d] the net present value of the entire program by accepting as true 2019 and 2021 projections that go as far out as 2038[,]" but they "are not based on any historical sales" [*Id*.].

Plaintiff responds that Dr. McDuff's use of the head start damages model is appropriate and endorsed by caselaw [Doc. 401 pp. 7–9].  While Dr. McDuff relied on Alexion's forecasts, Plaintiff argues that he "thoroughly examined the September 2021 Forecast" and "determined that it is 'comprehensive'" and that the appropriate deductions and adjustments had been applied [*Id*. at 11].  Plaintiff states that "Dr. McDuff's head start damages model further provides flexibility

for the trier of fact by presenting the damages as both lump sum values and running royalty rates" [*Id.* at 13 (citation omitted)].  Plaintiff asserts that Defendant has not elaborated or cited to any authority for its argument "that Dr. McDuff's head start damages model is speculative because it 'is derived from Dr. McDuff's view of the net present value of the entire CAEL-101 program— not the individual Tangible Materials or 'trade secrets' that are the subject of [Plaintiff's] claims" [*Id.* at 19 (citation omitted)].  Plaintiff argues that "[r]egardless, [Defendant's] vague argument fundamentally misunderstands Dr. McDuff's head start damages model" [*Id.*].  Here, Plaintiff argues that "Dr. McDuff 'considered the difference between the [net present value] with no time delay and the [net present value] with between 1 to 5 years of time delay" [*Id.* (citation omitted)]. He, however, does not offer an opinion on the actual duration of the delay [*Id.*].  With respect to Defendant's arguments regarding Dr. McDuff's opinions on the breach of contract claim, Plaintiff asserts they fail for the same reasons as above [*Id.* at 20–22].

Defendant replies that the "Alexion Projections are not a proper basis from which to derive [Plaintiff's] damages because they purport to value the best-case scenario of the entire CAEL-101 program—not strictly the "trade secret' and/or 'assets' in dispute, or any value conferred on [Defendant] specifically because of its use of the 'trade secrets' and/or 'assets'" [Doc. 438 p. 11 (citation and emphasis omitted)].  Further, Defendant states that "it is well-established that the relevant question for the jury is the value of the trade secret at the time of misappropriation" [*id.* at 11 (citation and emphasis omitted)] but asserts the Alexion Projections were created in 2019 and 2021, which means that they "do not reflect the value of anything at the time of the misappropriation or breach" [*id.* at 12].[8]

---

[8]        The Court will address this argument in Section III.E.2.

The Court has carefully considered Defendant's challenges but finds that they are not fatal to Dr. McDuff's opinions. First, Defendant argues that Dr. McDuff did not verify the Alexion projections [Doc. 331-1 p. 13]. "In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012); *see also In re Blood Reagents Antitrust Litig.*, No. 09-MD-2081, 2017 WL 3096168, at *6 (E.D. Pa. July 19, 2017) ("Experts frequently use business plans in calculating damages." (citation omitted)). When an expert uses a business plan to calculate damages, "[t]he Court 'must perform a case-by-case inquiry to determine whether the expert's reliance on the business plan . . . is reasonable.'" *In re Blood Reagents Antitrust Litig.*, 2017 WL 3096168, at *6 (quoting *ZF Meritor, LLC*, 696 F.3d at 292).

Here, Dr. McDuff did not blindly accept the projections without scrutiny, and he explained his basis for concluding the projections were reliable. For example, with respect to Alexion's DCF Model, Dr. McDuff states that it "discloses all the assumptions and methodologies used by Alexion to determine the [the net present value] of CAEL-101 as of December 31, 2019" [Doc. 335-1 ¶ 79 (footnote omitted)]. He describes the September 2021 forecast as "comprehensive" noting that it included "appropriation deductions . . . and adjustments" [*Id*. ¶ 90]. He further noted that Matthew Strout, the Head of Business Development of Alexion, testified that "Alexion recognized that it is 'always important to make these models' and that the groups that provide input for the revenue forecasts were experienced'" [*Id*. ¶ 79 (footnote omitted)]. In his rebuttal report, Dr. McDuff states, "As an economist, I find these forecasts highly reliable for the simple reason that sophisticated businesses were using them to inform very significant business decisions" [Doc. 503-5 ¶ 54]. During his deposition, when asked about his reliance on Alexion's forecasts, he testified,

"I did scrutinize their projections. I spent a lot of time examining the projections in the surrounding context and the deposition testimony, so I have scrutinized them. I think some amount of scrutiny is warranted" [Doc. 428-19 p. 34]. He explains:

> But I did accept the projections as reliable based on what I reviewed. These projections were created for financial audits, these projections were created for a major acquisition and option exercise. Over $500 million was committed based on these projections of a real market opportunity. They were created by sophisticated entities using standard practices in the surrounding documents, modeling the market and the patient population and the market share in exactly the same way I see sophisticated pharmaceutical companies doing all the time. It's like every single factor pointed to these projections being as reliable as possible.
>
> Nevertheless, I recognize that they are projections, which is why I account for the uncertainty with a discount rate, which is what economists do.

[*Id.* at 34–35].

In light of Dr. McDuff's testimony, the Court finds his reliance on the financial projections in this case to be reasonable. *See In re Blood Reagents Antitrust Litig.*, 2017 WL 3096168, at *7 ("[The expert's] selection, after careful scrutiny, of the [defendant's pricing strategy] as a benchmark reflects the recognition that the [pricing strategy] was 'the product of deliberation by experienced businessmen [within defendant's company] charting their future course" and that the expert's damages model was based on his "scrutiny of the [pricing strategy] and its foundation." (citation omitted)); *cf. Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 349 (5th Cir. 2020) (excluding the expert's lost profits calculations because they were based on the defendant's projections that the expert did not verify).

Second, Defendant argues that the Alexion projections, as they are used by Dr. McDuff in his head start damages model, are speculative because they relate to the net present value of the entire CAEL-101 program, not just the individual Tangible Materials or trade secrets at issue.

16

Plaintiff maintains that Defendant's argument "fundamentally misunderstands Dr. McDuff's head start damages model" [Doc. 401 p. 13].

Challenges to the credibility and accuracy of an expert's opinion generally go to the weight of the opinion. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (calling the defendant's argument "unpersuasive because it fundamentally confuses the *credibility and accuracy* of [the expert's] opinion with its *reliability*"). In that case, the defendant "challeng[ed] the reliability of [the expert's] testimony specifically because of his use of the inaccurate [scrap price bulletin] price index and his alterations to the [scrap price bulletin's] prices. *Id.* In other words, the defendant argued "that [the expert] used erroneous data and necessarily produced an erroneous conclusion; in sum, 'garbage in, garbage out.'" *Id.* The Sixth Circuit declined to exclude the expert on this ground, explaining, "[A] determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion." *Id.* Instead, "[t]he task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529–30.

In his deposition, Dr. McDuff testified that "[his] analysis can incorporate the role and impact of individual trade secrets" once the appropriate determinations have been made by the trier of fact [Doc. 428-19 p. 30]. He explained, "[W]hatever the trier of fact determines for the length of time duration and the saved expense amount, I will take those and explain to the jury how those inputs result in a damages number. And that's how the damages amount that the jury can award can consider individual or groups of trade secrets, whatever those are" [*Id.* at 28–29]. Further explanation is found in Dr. McDuff's rebuttal report where he states, "[T]he analysis in my Opening Report to determine the [net present value] of the CAEL-101 program using the

17

Alexion's forecasts properly accounts for both the actual and projected expenses that Caelum and Alexion contributed to the development of CAEL-101" [Doc. 503-5 ¶ 81]. He details:

> I am not opining that [Plaintiff] is entitled to the full [net present value]. Instead, I have considered the difference between the [net present value] with no time delay and the [net present value] with between 1 to 5 years of time delay. In doing so, my analysis provides [Plaintiff] with its share of value for its contributions (a share of value that necessarily increases as the length of avoided delay increases) while implying that [Defendant] and its parent companies will receive the rest of that share of value from the CAEL-101 program.

[*Id.* ¶ 82].

The Court therefore finds Defendant's challenge is not grounds for exclusion, but instead, goes to the weight of Dr. McDuff's testimony. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 ("[T]he requirement that an expert's testimony be reliable means that it must be 'supported by appropriate validation—i.e., "good grounds," based on what is known.'" (quoting *Daubert*, 509 U.S. at 590)); *see also Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1343–44 (11th Cir. 2003) (finding the appellant's challenges that the expert used incorrect data or was missing data to run the computation fluid dynamics study and used the wrong equations to run the analysis were not grounds for excluding the expert's opinion); *Navarro v. Procter & Gamble Co.*, No. 1:17-CV-406, 2021 WL 868586, at *5 (S.D. Ohio Mar. 8, 2021) (rejecting the defendant's argument that the expert relied on "erroneous assumptions and biased data[,]" finding that this argument "blurs the distinction between 'correctness' and 'reliability'").

Further, Defendant argues that Dr. McDuff's reliance on Alexion projections is speculative because they were made for resource planning rather than valuation purposes, they presented a best-case scenario, and CAEL-101 is still in clinical trials and may not be approved [Doc. 331-1 p. 14]. These challenges are more appropriately directed to the weight of Dr. McDuff's opinions

for the same reasons as above. Moreover, with respect to Defendant's argument that the Alexion projections were not made for valuation purposes, Plaintiff has pointed to evidence [*see* Doc. 335-1 ¶ 91 (citation omitted)] showing that Alexion used the September 2021 Forecast to acquire Defendant, including testimony from Bilgehan Dag, Alexion's former senior director [*See* Doc. 401 p. 17 (citing Doc. 403-3 p. 22 SEALED)]. Specifically, Dr. McDuff "note[s] a memo sent from Alexion's CEO to AstraZeneca's CEO and CFO relating to the 'decision to exercise the option to acquire all remaining equity of [Defendant] for CAEL-101" [Doc. 335-1 ¶ 91 (citation omitted)]. Defendant points to Alexion witnesses' testimony, Matthew Stout and Bilgehan Dag, to argue that the data constantly changes, assumes the product's success, that there are various data points that are unknown, and so forth [*see* Doc. 438 pp. 13–14]. The Court finds this challenge can be addressed through cross examination. Similarly, whether Alexion's projections are a best-case scenario is an issue to be presented for the jury; it does not render Dr. McDuff's opinions unreliable. *Navarro*, 2021 WL 868586, at *6 (finding the defendant's attack on the underlying data "at least based on what is currently known[] is not grounds to exclude [the expert's] damages calculations[,]" but noting that "if trial testimony shows that the [underlying data] amounts to 'pulling data out of thin air,' that could change").

But Defendant argues, "In reality, CAEL-101 is still in clinical trials and could fail at any time for a multitude of reasons" [Doc. 438 p. 14]. "[The] [p]laintiffs bear the burden of proving damages and may not recover if their entitlement to damages is based upon speculation or conjecture." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 401 (6th Cir. 2013). And while "[d]amages cannot be speculative, . . . this only means that the *fact* of damages, not their amount, cannot be uncertain." *Pfahler v. Nat'l Latex Products Co.*, 517 F.3d 816, 837 (6th Cir. 2007). During Dr. McDuff's deposition, the following exchange occurred:

Q. Do you agree that a company's own projections in situations involving a new product with relatively little sales history creates uncertain numbers?

A. There is some uncertainty with these numbers. That's why there is a net present value calculation with a discount factor. That economically takes into account the uncertainty. So I would say there is inherent uncertainty, and that's what I have accounted for it.

[Doc. 428-19 pp. 33–34]. Dr. McDuff notes in his supplemental report, "[It] is widely recognized in the field of economics and finance that future payment streams, even those subject to risk, have value. Using discounted cash flow models is a common practice used in the pharmaceutical industry and published literature to assess the risk-adjusted profitability of a potential investment" [Doc. 503-5 ¶ 49 (citation omitted)]. Based on the above, Dr. McDuff considered the uncertainty and accounted for it. And as Plaintiff noted, "if the jury finds it more appropriate, it could instead award an unjust enrichment running royalty rate of 5.12% (plus any saved expenses); such damages would be payable only after CAEL-101 generates sales" [Doc. 401 p. 13]. Any argument regarding the potential that CAEL-101 will not be approved can be presented to the jury. *See Sabre GLBL, Inc v. Shan*, 779 F. App'x 843, 852 (3d Cir. 2019) (finding that the expert's valuation of the defendant's company, which was based "on what an actual outside investor was willing to pay for a 20 percent interest in the company[,]" was not speculative); *see also InfoSpan, Inc. v. Emirates NBD Bank PJSC*, No. SACV111062, 2016 WL 8849699, at *14 (C.D. Cal. June 8, 2016) ("In assessing [the expert's] opinion, the jury will be free to take into account the status of the SpanCash. The jury will certainly be entitled to consider whether the trade secret package should be treated as a start-up business, and thus employ a greater degree of skepticism in assessing any damage claim."); *see generally Coda Dev. s.r.o. v. Goodyear Tire & Rubber Co.*, 565 F. Supp. 3d 978, 1003 (N.D. Ohio 2021) (denying summary judgment on the question of damages, stating that

"[i]f a jury decides [the defendant misappropriated the plaintiff's trade secrets], then the question remains whether those trade secrets had any value, notwithstanding [the defendant's] admitted inability to capitalize on them").

### 2. Dr. McDuff's Ranges of Damages

Defendant argues that the "speculative nature of Dr. McDuff's opinions is obvious from his ultimate conclusions" [Doc. 331-1 p. 15]. Defendant states that Dr. McDuff provided lump sum ranges on damages for Plaintiff's breach of contract claim and on the misappropriation claim [*Id.*]. Dr. McDuff's damages ranges, Defendant argues, are too excessive rendering them speculative [*Id.* at 15–16].

Plaintiff responds that "Mr. McDuff does not opine that the jury must award [Plaintiff] lump sum damages for the breach of contract claim or the trade secret misappropriation claim" [Doc. 401 p. 22]. According to Plaintiff, "[he] provides damages models for each of these claims that calculate damages as either lump sum payments or royalty payments, depending on what the jury determines is the most appropriate compensation mechanism" [*Id.*]. For example, Plaintiff states that Dr. McDuff offers two approaches for the jury to consider on the breach of contract claim: the market approach (i.e., the licensing model) or the cost approach [*Id.*]. Similarly, with respect to the trade secret misappropriation claim, Plaintiff argues that Dr. McDuff utilized the head start damages model, and "the jury will determine how much time [Defendant] saved by using the [Plaintiff's] trade secrets it finds [Defendant] misappropriated based on the evidence" [*Id.* at 23].

The Court does not find Dr. McDuff's use of wide ranges unreliable. Dr. McDuff provided different damages models for the breach of contract claim and the trade secret misappropriation claim, and his ranges account for what the jury may ultimately find. The Court finds Defendant's

argument not well taken on this basis. *See Wash World Inc. v. Belanger Inc.*, No. 19-C-1562, 2021 WL 2856524, at *4 (E.D. Wis. July 8, 2021) ("Dr. McDuff has provided a range of damages amounts to assist the jury in assessing the appropriate amount of damages based on the value of the patented technology. Dr. McDuff's recommendations are supported by the record; therefore, he may testify about his damages conclusions.").[9]

## B.    Dr. McDuff's Alleged Failure to Apportion the Damages

Defendant argues that Dr. McDuff's opinion is not helpful because it "fails to distinguish between (1) the damages attributable to [Defendant's] alleged breach versus [Defendant's] alleged misappropriation; (2) for breach of contract, the damages attributable to ch11-1F4 versus the Cellca Cell Clones; and (3) for misappropriation, the damages attributable to each individual trade secret" [Doc. 331-1 p. 16].   Defendant further argues that Dr. McDuff also uses "a net present value of the entire CAEL-101 program to support his calculations" rather than "an assigned value to improperly-used materials or 'trade secrets[,]'" which "presumes that the CAEL-101 program would be worthless without each of the Tangible Materials and 'trade secrets' identified in this case" [*Id.*].   "For example," Defendant asserts that "if [Plaintiff] only proves that one Tangible Material was misused and only, say, three 'trade secrets' were misappropriated, Dr. McDuff's opinions are useless" [*Id.*].   On the other hand, Defendant states that if Plaintiff is "successful on all of its claims, his opinions inevitably would lead to double recovery" [*Id.*].

---

[9]      The case that Defendant relies on is inapposite.  In *Westgate Resorts, Ltd. v. Reed Hein & Assocs., LLC*, No. 618CV1088, 2020 WL 11303335, at *4 (M.D. Fla. Oct. 16, 2020), the court noted that the expert's calculation of damages, which were "between $1,953,391 and $5,230,747 for a total spread of $3,277,356[,] [was] simply too great to satisfy this legal requirement that there be a reasonable basis to compute economic damages."  The court reasoned that the expert's study had a 22% error of margin, which was "not sound statistical support for an estimate of [the p]laintiffs' damages." *Id.*

With respect to the breach of contract claim, there are only two Tangible Materials at issue, but Defendant argues that "Dr. McDuff made no attempt to assign any individual values to those materials" [*Id*. at 17]. Likewise, he did not separate the 41 trade secrets at issue, stating that "Dr. McDuff could not explain how much time and money was saved if [Defendant] is found to have improperly used one Tangible Material or misappropriated fewer than 41 of the alleged 'trade secrets'" [*Id*. at 18]. In addition, Defendant argues, "Dr. McDuff's hypothetical license model for both of [Plaintiff's] claims is unhelpful and inadmissible for the same reason" [*Id*. at 19]. Defendant states that Dr. McDuff provided an opinion on a lump sum for a license on the Tangible Materials and/or the trade secrets, but "his calculations completely ignore the fact that Columbia licensed various other significantly valuable materials and information to [Defendant] under the License" [*Id*.]. Defendant states, "But even if Dr. McDuff's calculations represent the value of the Tangible Materials or the 'trade secrets'—they cannot represent both" [*Id*.].

With respect to the misappropriation claim, Plaintiff reiterates that Defendant "fundamentally misunderstands Dr. McDuff's head start damages model," which "provides a way for the jury to determine the amount by which [Defendant] benefited from the use of [Plaintiff's] trade secrets (an/or Tangible Materials) [Doc. 401 p. 24]. It states:

> Taking Caelum's example, if the jury found that one Tangible Material (*e.g.*, ch11-1F4) was used and its use saved Caelum a year in developing CAEL-101, and that three trade secrets (*e.g.*, portions of the Phase I clinical trial protocol, an ELISA protocol, and a preclinical study) were misappropriated and their use collectively saved Caelum a second year in developing CAEL-101, then the jury would award breach of contract damages for use of the Tangible Material [redacted] of plus saved expenses and the jury would award trade secret misappropriation damages of [redacted] plus saved expenses for misappropriation of the three trade secrets. In this way, Dr. McDuff's damages model will be appropriately tailored to the jury's factual findings with respect to individual Tangible Materials and trade secrets.

23

[*Id.* (citing Doc. 335-1, Figures 34 and 30)]. Plaintiff asserts that "even assuming, arguendo, that apportionment is required," this goes to the weight of the opinion [*Id.* at 25 (citation omitted)]. With respect to Defendant's argument regarding Dr. McDuff's hypothetical license models, Plaintiff asserts that it is a "rehashing of the arguments made by Dr. Beaton," which "presents a classic battle of the experts" [*Id.*].

Defendant replies that "it is clear from its opposition that [Plaintiff] is not laying claim to CAEL-101 in its entirety; instead, it claims rights to specific 'trade secrets' and specific 'assets'" [Doc. 438 p. 8]. It argues that "Dr. McDuff admitted [during his deposition] he was not offering a specific opinion about each 'trade secret' or its value" [*Id.* (citation omitted)]. Defendant states that "[b]ecause CAEL-101 or its formulation is not the trade secret at issue, it is more important that any damages expert specifically identify and value the underlying trade secrets—not the entire development program as a whole, or the finished drug product" [*Id.*]. While Plaintiff argues that Dr. McDuff was not required to value the trade secrets or assets because he offered an opinion on the value of the amount of time Defendant saved developing CAEL-101, Defendant claims that "the assumed time and expenses saved that Dr. McDuff parrots from others are wholly unreliable and should be excluded" [*Id.* at 9]. Regardless, Defendant asserts, this does not relieve Dr. McDuff from tying his calculations to the trade secrets or assets at issue [*Id.*].

The Court does not find Defendant's arguments constitute grounds to exclude Dr. McDuff's opinions. First, Defendant argues that Dr. McDuff did not apportion damages attributable to the 11-1F4 chimeric version verses the cell clones—the two items subject to Plaintiff's breach of contract claim. During Dr. McDuff's deposition, the following exchanged occurred

Q.      Okay. And did you assign a particular damages number to the misapprop- -- excuse me, the breach associated with the 11-1F4 chimeric as opposed to the cell clones?

A.      I did not break down the breach of contract damages between those two, yet I would point out that it may be that the factual predicates to the breach of contract damages do depend – or may depend -- on which subset or all of the tangible materials are found to be relevant for the violation of the breach of contract. Yet that determination would be outside the scope of my opinions, but they could impact the ultimate damages amount.

Q.      How could they impact the ultimate damages amount?

A.      So, for example, if some tangible materials were determined to be relevant for the breach of contract and other tangible materials were determined not to be relevant for the breach of contract, my understanding is that the evidence presented at trial would show that the relevant tangible materials would result in a certain saved time duration and certain saved expenses, and those are inputs to my damages analysis. And so to the extent that certain tangible materials are driving that time duration or saved expenses, that would be taken into account. The scope of what is relevant to the breach is taken into account by those factual inputs to my economic analysis.

[Doc. 428-19 pp. 9–10]. In other words, Dr. McDuff states that his calculations can be modified depending on the jury verdict. To the extent they cannot, however, the Court does not find this is fatal to his opinion at this time because it can be addressed by cross examination and jury instructions.[10]

---

[10]     Should the posture of this case change, however, and Dr. McDuff's model cannot actually separate between the breach of the 11-1F4 chimeric version verses the cell clones, this decision may be revisited by an appropriate motion. *See Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275-, 2011 WL 6748518, at *17 (E.D.N.C. Dec. 22, 2011) ("Alternatively, [the expert] admitted that he assumed that [the defendant] was liable for all of [the plaintiff's] alleged claims when preparing his report . . . . However, since [the expert] prepared his report, the court granted summary judgment as to [the plaintiff's] claims of intentional interference with contractual relations, intentional interference with prospective economic advantage, unjust enrichment, and rescission or reformation. Therefore, [the expert's] damages calculations are based on an assumption regarding [the plaintiff's] success on all of its claims that is no longer viable." (internal

With respect to Plaintiff's purported trade secret damages, "damages in a patent or trade secret action would require the plaintiff to apportion its claim for damages." *Ford Motor Co. v. Versata Software, Inc.*, No. 15-11624, 2017 WL 3944392, at *5 (E.D. Mich. Aug. 7, 2017), *report and recommendation adopted*, No. 15-11624, 2017 WL 3913843 (E.D. Mich. Sept. 7, 2017); *see also Vertellus Holdings LLC v. W.R. Grace & Co.-Conn.*, No. CV SAG-18-3298, 2021 WL 3883597, at *16 (D. Md. Aug. 12, 2021) ("Other [c]ourts have cautioned that in quantifying damages in one lump sum for all claims, plaintiffs assume risk that the damages calculation could be excluded in its entirety if they are unsuccessful in proving all of their claims." (collecting cases)); *Ford Motor Co. v. Versata Software, Inc.*, No. 15-11624, 2018 WL 10733561, at *11 (E.D. Mich. July 9, 2018) (excluding the defendant's damages experts because they "fail[ed] to calculate damages on a trade-secret-by-trade-secret basis" and instead used an "all-or-nothing damages calculation"); *MSC Software Corp. v. Altair Eng'g, Inc.*, No. CV 07-12807, 2015 WL 13273227, at *4 (E.D. Mich. Nov. 9, 2015) (explaining that damages generally "must be confined or apportioned to the value or contribution made by the misappropriated features contained within [that] multi-component product" (citing *Univ. Computing Co.*, 504 F.2d at 535–36), *supplemented*, No. CV 07-12807, 2015 WL 13359781 (E.D. Mich. Nov. 22, 2015)).[11] A plaintiff may recover

_____

citation omitted)); *Pharmanetics, Inc. v. Aventis Pharms., Inc.*, No. 5:03-CV-817-, 2005 WL 6000369, at *10 (E.D. N.C. May 4, 2005) ("This assumption, that defendant is liable for the actions alleged in all of plaintiff's causes of action, is no longer viable at this stage of the case. . . As [the expert's] damages model is premised upon [the] plaintiff's success on all of its causes of action, and does not allow, even in the alternative, for an adjustment of damages to account for those claims no longer remaining, it is not a reliable measure of damages."), *aff'd*, 182 F. App'x 267 (4th Cir. 2006).

[11]     As the Fifth Circuit Court of Appeals noted, "It seems generally accepted that 'the proper measure of damages in the case of a trade secret appropriation is to be determined by reference to the analogous line of cases involving patent infringement, just as patent infringement cases are used by analogy to determine the damages for copy-right infringement.'" *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d at 535 (quoting *Int'l Indus., Inc. v. Warren Petroleum Corp.*, 248 F.2d 696, 699 (3d Cir. 1957)); *see also Vitro Corp. of Am. v. Hall Chem. Co.*, 292 F.2d 678,

damages on the entire product if the trade secrets "constitute the basis for customers' demand or

are . . . such importance that the [t]rade secrets substantially create the value of the entire product."

*MSC Software Corp.*, 2015 WL 13273227, at \*7 (the jury instructions).

With respect to the trade secrets, during Dr. McDuff's deposition, he states:

> Q.     Did you make any effort to assign specific values to specific
>        trade secrets in this case?
>
> A.     I have not separated them out in my economic analysis, yet
>        they are and will be considered when there is a determination
>        of what set of trade secrets that are in the case mapped to a
>        certain time delay or certain saved expenses. So in a way,
>        separating it by trade secrets – individual trade secrets is
>        outside the scope of my economic opinions but is
>        incorporated inherently based on the inputs to my economic
>        opinions.
>
> Q.     How is it – how are the individual trade secrets incorporated
>        inherently based on the inputs to your economic opinions?
>
> A.     Let's say as an example there are 40 trade secrets in the case
>        and for some reason or other at trial only ten trade secrets are
>        presented. Those ten trade secrets, the trier of fact will
>        determine how those trade secrets result in a time savings for
>        [Defendant] and a saved expense for [Defendant]. That will
>        be determined by the trier of fact. And that will be specific
>        to the trade secrets that are alleged at trial, whatever subset
>        those are.
>
>        And whatever the trier of fact determines for the length of
>        time duration and the saved expense amount, I will take
>        those and explain to the jury how those inputs result in a
>        damages number. And that's how the damages amount that
>        the jury can award can consider individual or groups of trade
>        secrets, whatever those are.

---

682 (6th Cir. 1961) ("There, we had held that the discoverer of a secret suffers damages to the
same extent as does the inventor of a patent which had been infringed." (citing *A. O. Smith
Corporation v. Petroleum Iron Works Company*, 73 F.2d 531, 531 (6th Cir. 1934)).

[Doc. 328-19 pp. 28–29]. In other words, Dr. McDuff "links damages to specific time savings and costs associated with the individual trade secrets" [Doc. 401 p. 26]. The Court therefore finds Defendant's apportionment argument not well taken. *Cf. Ford Motor Co.*, 2018 WL 10733561, at *10 ("Yet, [the expert] did not make any effort to separate the cost savings that [the defendant] allegedly obtained through its use of the trade secrets from the cost savings that [the defendant] achieved through its alleged misappropriation and/or infringement of [the] plaintiff's other intellectual property. Instead, he opined that [the defendant] saved [a certain amount] per year from its use of the software *as a whole.* [The expert's] failure to apportion damages renders his analysis inadmissible at trial").

Defendant also criticizes Dr. McDuff's licensing models because they purportedly do not account for the other items Columbia licensed to Defendant. Dr. McDuff's licensing models are based on the 2017 Columbia/Caelum Agreement [Doc. 335-1 ¶¶ 135, 159]. He assigns the same running royalty percentage for the trade secrets [*id*. ¶ 135], and the Tangible Materials [*id*. at ¶ 167]. Mr. Beaton, Defendant's expert states, "The fair market value of the UTRF Assets can only be a portion of Columbia's compensation that does not compensate [Plaintiff] for intellectual property that it does not own or work that it cannot, or did not, perform. This does not amount to the entire equivalent of Columbia's compensation, as suggested in the McDuff Report. Thus, the calculations performed by Dr. McDuff using the Licensing Models are inappropriately high" [Doc. 503-6 ¶ 55]. Dr. McDuff's calculations, however, state that they are only for the trade secrets and/or the Tangible Materials [*See* Doc. 335-1 ¶¶ 135, 167]. To the extent, however, he did not consider that the 2017 Columbia/Caelum License accounted for other items, Defendant may address this challenge by cross examination. *See Univ. of Pittsburgh v. Townsend*, No. 304-CV-291, 2007 WL 1002317, at *25 (E.D. Tenn. Mar. 30, 2007) ("To the extent that the defendants

challenge [the expert's] factual assumptions and argue that individual components of the [intellectual property] bundle do not exist, are not owned by the University, or are otherwise overvalued, these arguments must be reserved for the trier of fact and go to the weight the trier of fact may give to such evidence."). The Court therefore will not exclude Dr. McDuff's opinions on these grounds.

### C.    Dr. McDuff's Licensing Models

Defendant argues that the licensing models for the trade secret and the breach of contract claims are unreliable [Doc. 331-1 p. 19]. With respect to the breach of contract claim, Defendant argues that Dr. McDuff provided an opinion on the fair price that Defendant would have paid, but he derived the "lion's share" of that figure from "Dr. McDuff's application of a [redacted] running royalty rate against . . . hypothetical, unrealized revenue" [Doc. 331-1 p. 20 (emphasis omitted)]. Similarly, Defendant argues that Dr. McDuff provided a fair price that it would have paid to license the identified trade secrets, but he derived the "lion's share" of this figure using "running royalty rates . . . against  . . . hypothetical, unrealized revenue" [*Id.* (emphasis omitted)]. These methods are unreliable, Defendant asserts, because "[Dr.] McDuff claims that [Defendant] would have provided [Plaintiff] with the same royalty rates set forth in the 2017 [Columbia/Caelum] Agreement" [*Id.*]. But Defendant states that that agreement, "covered the entire CAEL-101 program, not just the Two Tangible Materials and the allegedly misappropriated trade secrets" [*Id.* at 21]. In addition, Defendant argues that "Dr. McDuff artificially inflates his damages calculations by converting those . . . running royalty rates to a lump-sum payment using wholly speculative financial projections that stretch out as far as 2038" [*Id.*]. Defendant claims "there is no evidence whatsoever that [it] would ever have agreed to anything other than running royalties (as it did with Columbia) that are only triggered by actual (not hypothetical) revenue" [*Id.*

(emphasis omitted)].  Because CAEL-101 has not been approved by the FDA and has had no sales, Defendant argues that Dr. McDuff's calculations should be excluded [*Id.*].

With respect to Defendant's argument that the 2017 Columbia/Caelum Agreement covers the entire CAEL-101 program and not just the two Tangible Materials and trade secrets, Plaintiff argues it is "just [a] regurgitat[ion] [of the] same apportionment argument" [Doc. 401 p. 27]. Plaintiff states that Dr. McDuff explained why the 2017 Columbia/Caelum Agreement was reliable evidence of what Defendant would have paid [*Id.* (citation omitted)].  Defendant's argument that it "would not have agreed to anything other than running royalties[,]" Plaintiff argues, is "contradicted by the evidence" and a question for the jury [*Id.* at 27–28 (citation omitted)]. Plaintiff adds that Dr. McDuff's reliance on the Alexion forecasts is sound [*Id.* at 28].

Defendant argues that "[i]t is well established that the measure of such damages is a running royalty and not a lump sum" [Doc. 438 p. 18].  It states that "a lump-sum royalty . . . requires knowledge of some actual sales or frequency of future consumer use in order to make a calculation" [*Id.* (citation omitted)].  Defendant asserts that "[Plaintiff] fails to identify any authority . . . to support Dr. McDuff's opinion than an upfront lump-sum royalty payment is appropriate where there is no sales history from which to reliably calculate the amount [Plaintiff] might expect to make in a hypothetical royalty negotiation with [Defendant]" [*Id.*].  In addition, Defendant states that Dr. McDuff's opinion relies on the Alexion projections, which are speculative [*Id.* at 19].  Further, Defendant argues that "there is no evidence to suggest that the running royalty reflected in the Columbia Licensee, or the amounts agreed to by Alexion in the DOSPA, are evidence of the amount [Defendant] would pay to [Plaintiff] as an upfront lump-sum royalty" [*Id.* (citation and emphasis omitted)].  Defendant argues that "[t]he Columbia License does not support Dr. McDuff's opinions" and that "Alexion's agreement to make lump-sum

payments under the DOSPA in order to acquire 100% equity in [Defendant] is not evidence that [Defendant] would have agreed to pay [Plaintiff] a lump-sum royalty based on revenue projections that did not even exist at the time the hypothetical license would have been negotiated in 2017" [*Id*. at 20].

As mentioned above, TUTSA provides, "In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." Tenn. Code Ann. § 47-25-1704(a); s*ee also Avery Dennison Corp.*, 45 F. App'x at 487 ("Rather, courts seeking to establish a reasonable royalty measure the value of the secret to the defendant at the time that it was misappropriated, regardless of the commercial success of the enterprise."). As noted by the Fifth Circuit Court of Appeals, "a reasonable royalty method provides a means of measuring the benefit to the defendant, which is the appropriate measure of damages where the secret has not been destroyed, where the plaintiff is unable to prove specific injury, and where the defendant has gained no actual profits by which to value the worth to the defendant of what it misappropriated." *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 723 (5th Cir. 2006) (citing *Univ. Computing Co.*, 504 F.2d at 536–37). "But because the precise value of a trade secret may be difficult to determine, "the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place." *Mid-Michigan Computer Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510–11 (6th Cir. 2005) (quoting *Univ. Computing Co.,* 504 F.2d at 539).[12] And if the plaintiff establishes a breach of contract, the plaintiff is entitled to expectation

---

[12]     The Fifth Circuit has articulated certain factors that the trier of fact should consider when determining a reasonable royalty: "the resulting and foreseeable changes in the parties' competitive posture; that prices past purchasers or licensees may have paid; the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret

damages.  *See White*, 2018 WL 1279545, at *4 (explaining the damages flowing from a breach of contract).

Most of Defendant's challenges to the Licensing Models are the same challenges already addressed above.  Further, Dr. McDuff explains why he relies on the 2017 Columbia/Caelum agreement as follows:

- Both Defendants have testified that the terms agreed by the parties pursuant to the 2017 Columbia / Caelum Agreement are generally consistent with – and therefore supportive of – what both Defendants in this matter considered to be reasonable and within the ranges agreed to in comparable transactions.

- Consistent with the 2017 Columbia / Caelum Agreement, Caelum would have been the licensee and the licensed assets would have also been related to the development of the CAEL-101 product.

- Columbia and UTRF would have had similar expectations regarding the product development to be performed by Caelum and their appropriate share of the deal.

- Columbia and UTRF would have had similar approaches to licensing in this situation given their respective contributions as well as similar licensing policies within the technology licensing divisions of the respective universities. For example, consistent with other university licensing, both universities have licensing policies with dual goals of promoting the public benefit while also rewarding and incentivizing innovation at the university.

- The IIA provides additional support that Columbia and UTRF perceived themselves as equal partners and agreed to split any consideration generated from the 11-1F4 antibody 50/50 between the parties.  I note that, as testified by Ms. Weinberger, the 2017 Columbia / Caelum Agreement

---

to the plaintiff's business; the nature and extent of the use the defendant intended for the secret; and finally whatever other unique factors in the particular case which might have affected the parties' agreement, such as the ready availability of alternative processes." *Univ. Computing Co.*, 504 F.2d at 539.

excluded rights to any assets developed by UT or UTRF. Therefore, the value derived above by reference to the 2017 Columbia / Caelum Agreement would represent Columbia's 50% share based on what Columbia and UTRF would have agreed to under an amended IIA.

- The economic value of the improperly used materials and information to Caelum is greater than the licensing share of value for any duration calculated herein that is at least 1 year of faster time to market. Thus, any determination by the trier of fact that the impact of the improperly used materials and information is at least as large as this supports an apportioned economic value to Caelum that exceeds the licensing amount and is thus economically justified.

[Doc. 335-1 ¶ 113 (footnote omitted)]. To the extent Defendant disagrees that the 2017 Columbia/Caelum Agreement is reflective of what the parties would have agreed to, it may present this argument to the jury.

Defendant also challenges Dr. McDuff's conversion of the running royalty into a lump sum. Dr. McDuff explains as follows:

As the lump-sum values and running royalty rates presented above are economically equivalent to each other, an alternative approach to concluding a damages value is to structure it as a combination of a lump-sum payment and a running royalty. This approach provides flexibility in determining the most appropriate way to compensate UTRF for the damages incurred. As an illustrative example, if the finder of fact awards $70 million for the trade secret misappropriation based on the license model, the damages could be structured as a 25% lump-sum payment ($17 million) and 75% as a running royalty ($2.70\% \times 75\% = 2.05\%$), 50% lump-sum payment ($35 million) and 50% as a running royalty ($2.70\% \times 50\% = 1.35\%$), or any other share.

[Doc. 503-5 p. 4 n.4]. The Court finds Defendant's challenge on this ground is also for the jury.

*See InfoSpan, Inc.*, 2016 WL 8849699, at *13 ("[The defendant] argues that a lump sum sale is not a royalty. But [the expert] establishes that a lump sum can represent a properly discounted royalty stream, and that lump sums for transfer of intellectual property are common. A lump sum payment

33

is simply a paid up royalty. The discounted cash flow approach which [the expert] used is a well-recognized valuation methodology." (citations omitted)).

### D. Dr. McDuff's Underlying Assumptions on His Head Start Damages Model

Defendant asserts that Dr. McDuff's head start method "fails to present a reliable and helpful basis for the jury to calculate damages for either of [Plaintiff's] remaining claims" [Doc. 331-1 p. 22]. First, Defendant states that Dr. McDuff assumes that it saved one to five years in its timeline, but there is no evidence to support such a timeline [*Id*. at 23]. In fact, Defendant argues that "[t]here are a number of other factors that could delay (and realistically have delayed) the development process of CAEL-101" [*Id*.]. Second, Defendant argues he adopted Dr. Wall's estimates of what Defendant saved—that is, $10–20 million (breach of contract) and $1–5 million (misappropriation) in expenses[,]" which are "guesstimates invented out of thin air" [*Id*. at 23].

Plaintiff responds that Dr. McDuff is not a liability expert, and he did not opine that the delay was one to five years [Doc. 401 p. 29]. It asserts that regardless, there is evidence in the record to support a delay [*Id*. (footnote omitted)]. With respect to Defendant's argument that he relied on Dr. Wall's estimates, Plaintiff states, "As Dr. McDuff explained, in rendering his opinion regarding head start damages, he made no determination as to the amount of expenses saved by [Defendant]; Dr. McDuff therefore never adopted Dr. Wall's estimates of [Defendant's] saved expenses" [*Id*. (citation omitted)]. Plaintiff explains, "Instead, the total unjust enrichment or breach of contract damages would be the value of [Plaintiff's] trade secrets or the Tangible Materials, values which are provided in Dr. McDuff's head start models depending on the amount of time saved, 'plus the value of the saved expenses awarded by the trier of fact'" [*Id*. at 29–30 (citation and emphasis omitted)]. In other words, Plaintiff states that "Dr. McDuff's head start damages opinions do not depend on the information Dr. Wall communicated" [*Id*.].

In its reply, Defendant argues that "there is no evidence in the record to support the arbitrary 1–5 year period that [Plaintiff's] counsel concocted independently" [Doc. 438 p. 21]. With respect to expenses, Defendant asserts that Dr. McDuff does not have an opinion but used Dr. Wall's estimates as placeholders [*Id.*]. Defendant submits that Dr. Wall, however, does not have any firsthand knowledge regarding the expenses, rendering any testimony on saved expenses hypothetical [*Id.* at 22].

An expert may rely on assumptions "as long as the proponent of the opinion testimony can fill in the gaps." *Hayes Outdoor Media, LLC v. S. Tr. Ins. Co.*, 574 F. Supp. 3d 565, 570 (W.D. Tenn. 2021) (citing *Williams v. Illinois*, 567 U.S. 50, 57 (2012) ("Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert.")). Dr. McDuff did not provide an opinion that Defendant saved one to five years [*See* Doc. 335-1 ¶¶ 126, 156 ("Rather than selecting a specific time duration, I have been instructed by [c]ounsel for Plaintiff to provide calculations based on 1[-]year increments from 1 year to 5 years, for a total of 5 possible delay periods.")]. Instead, on the trade secret misappropriation and the breach of contract claims, Plaintiff's counsel instructed Dr. McDuff to provide calculations from one to five years [*Id.*]. And here, Plaintiff pointed to evidence [*see* Doc. 401 p. 13 n.1] to fill in the gaps for the alleged delay. In addition, with respect to saved expenses, Dr. McDuff did not provide an opinion on saved expenses [Doc. 335-1 ¶ 129 ("As the results shown above do not include the saved expenses associated with the development of the UTRF Trade Secrets, the saved expenses determined by the trier of fact should be added to the results . . ."); *see also id.* ¶ 158 ("As such, the saved expenses determined by the trier of fact should be added to the results . . .")]. While he talked to Dr. Wall about the avoided expenses and utilized his

35

estimates, he only did so for illustrative purposes [*Id*.]. In other words, he simply provided the jury a formula. As Plaintiff states in its brief, "Even assuming . . . the jury ultimately determined there were no saved expenses, that the saved expenses were minimal, or that the saved expenses were greater than those used as placeholders in Dr. McDuff's report, that would have no effect on Dr. McDuff's head start damages model" [Doc. 401 p. 14]. Accordingly, the Court finds Defendant's arguments are not grounds for excluding Dr. McDuff's opinions.

### E. The Dates Dr. McDuff Relies on in Calculating Damages

Defendant argues that Dr. McDuff does not use the proper date in either approach with respect to his opinions on Plaintiff's breach of contract claim and that he did not value damages at the time of the alleged misappropriation [Doc. 331-1 pp. 25–28].

#### 1. The Date of the Alleged Breach

Defendant states that "Dr. McDuff calculates the value of the Tangible Materials, . . . as of January 1, 2020[,]" but this date, it argues, is arbitrary for three reasons [*Id*. at 26–27]. Defendant submits, "[f]irst, there is no evidence in the record that [Defendant] received any of the ch-1F4 antibody and/or the Cellca Cell Clones from UT or [Plaintiff] at any time, let alone between March 2017 and January 2020" [*Id*. at 26 (footnote omitted)]. According to Defendant, "[t]he only instances connecting [it] to tangible ch11-1F4 . . . are the National Cancer Institute's . . . shipment of a reference standard sample to [Defendant's] contractors in July 2019 and December 2019" [*Id*. at 27]. Further, Defendant states that "there is no evidence in the record establishing that [it] received the Cellca Cell Clones from anyone [*Id*.]. Therefore, Defendant argues, "[t]here is no reliable basis for Dr. McDuff's conclusion that [Defendant] breached the 2017 Confidentiality Agreement on January 1, 2020[,] or that the parties would have negotiated compensation for [Defendant's] use of the Tangible Materials on that date" [*Id*.]. According to Defendant, "[t]his is

36

critical because, if the time of the breach predates December 2019, there is no basis for Dr. McDuff's reliance on the 2019 financial projection" [*Id*.].

Plaintiff responds that "Mr. McDuff is a damages expert and he is permitted to rely on "factual assertions of counsel" [Doc. 401 p. 30 (citation omitted)]. Defendant replies that Plaintiff has not offered any evidence of this date [Doc. 438 pp. 12–13].

Dr. McDuff opines that "[t]he first step in determining [Plaintiff's] breach of contract damages is to determine the date of the alleged breach" [Doc. 335-1 ¶ 148]. He references that Plaintiff and Defendant "were collaborating through at least November 2019 under the 2019 UT/Caelum Research Agreement[,]" and that "to the best of [Plaintiff's] knowledge[,] the breach occurred on or around January 1, 2020" [*Id*.]. In his rebuttal report, when addressing Defendant's expert's opinion, he states:

> Not only can the breach of the 2017 UTRF / UT / Caelum Confidentiality Agreement not have occurred earlier than March 14, 2017, when it was entered, but there is evidence that the breach occurred substantially later. For instance, Caelum extended its collaboration with UT into 2019, when the parties entered into the 2019 UT / Caelum Research Agreement, in which Caelum agreed to sponsor a research project related to the statement of work titled "Preclinical Evaluation of Amyloid Binding and Opsonization Using the Chimeric 11-1F4 Antibody (CAEL101)," with Dr. Jonathan Wall as the principal investigator. In addition, Dr. Susan Sobolov, the former Caelum Chief Operating Officer, testified to a meeting she attended with Michael Spector, Caelum's former Chief Executive Officer, and Dr. Wall at the University of Tennessee on November 7th and 8th of 2019. As UTRF and Caelum appeared to be collaborating through at least November 2019 under the 2019 UT / Caelum Research Agreement, it is reasonable to conclude, as I have, that the breach of the 2017 UTRF / UT / Caelum Confidentiality Agreement occurred thereafter, on or around January 1, 2020.

[Doc. 503-5 ¶ 18 (citations omitted); *see also id*. ¶ 63 ("[R]easonable royalty damages are appropriately measured at the time [Defendant] breached the Confidentiality Agreement, which

was on or around January 1, 2020. As such, any reliance on the December 2019 forecast is appropriate as it reflects the parties' expectation around the time the royalty would have been negotiated.")]

"[A] damages expert is not required to examine every scintilla of evidence in the case to determine whether the underlying misconduct occurred. Instead, he is entitled to rely on the factual assertions of counsel and the corporate representatives in preparing a damages tabulation." *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, No. 3:13-CV-82, 2019 WL 1435934, at *7 (W.D. Ky. Mar. 29, 2019) (citation omitted). Dr. McDuff explains why he utilized a date of January 1, 2020. The Court finds Defendant's challenge is more appropriately addressed by cross examination. *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("[A]ny weaknesses in the factual basis of an expert witness' opinion, . . . bear on the weight of the evidence rather than on its admissibility.").

### 2. The Date of the Alleged Misappropriation

According to Defendant, "Dr. McDuff's assessment of damages for misappropriation of trade secrets 'as of present day' is contrary to law" [Doc. 331-1 p. 28]. This is because, Defendant argues, "[t]rade secret misappropriation damages are calculated at the time the misappropriation took place" [*Id*. (citations omitted)]. Defendant states that "[h]e offers no opinion as to the time of the alleged misappropriation as of present day[,]" which makes his opinion not helpful "because he relied on financial projections that were created years after the alleged misappropriation" [*Id*.].

Plaintiff argues Defendant's interpretation is wrong because "Tennessee law recognizes that damages for trade secret misappropriation can be measured as the defendant's unjust enrichment" [Doc. 401 p. 31]. As such, Plaintiff asserts, "unjust enrichment 'measures damages

based on the benefits, profits, or advantage gained by defendant in the use of the trade secret'" [*Id.* (citation, internal quotation marks, and emphasis omitted)].

Defendant replies that with respect to unjust enrichment, Plaintiff alleges only "the time to market and expense that [Defendant] supposedly saved by relying on [Plaintiff's] 'trade secrets or 'assets'" [Doc. 438 p. 12 (footnote omitted)]. But he failed to provide a date and instead used the date of his report to calculate damages [*Id.* (footnote omitted)].

In Dr. McDuff's surrebuttal report, he critiques Mr. Beaton's valuation date for Plaintiff's misappropriation of trade secrets claim [Doc. 503-5 ¶¶ 20–24]. He concludes, "In summary, Mr. Beaton's valuation dates of 2013 and January 1, 2017[,] are inappropriate for the [m]isappropriation of [t]rade [s]ecrets claim." Rather, as stated in my Opening Report, I understand that unjust enrichment related to the misappropriation of trade secrets should be valued as of the trial date" [*Id.* ¶ 24].

The parties do not dispute that damages for trade secret misappropriation can be measured by the defendant's unjust enrichment. *See* Tenn. Code Ann. § 47-25-1704(a). But Defendant argues that damages should be measured at the time of misappropriation, citing to *Avery Dennison Corp.*, 45 F. App'x at 486 ("If the benefit to the defendant in terms of direct profits is not ascertainable, damages may be awarded based on the value to the defendant of the secret at the time of misappropriation, the value derived from savings because of increased productivity, or the value derived from savings in research costs."). But the Court finds that the jury will decide if the misappropriation occurred, and if so, when the misappropriation occurred. The Court therefore finds that Dr. McDuff's valuation date, and his reliance on the Alexion forecasts, are not fatal to his opinions and may be addressed by cross examination and jury instructions.

### F.    Dr. McDuff's Opinion Regarding Slander of Title or Tortious Interference

Defendant states that Dr. McDuff was not asked to quantify damages for slander of title and tortious interference [Doc. 331-1 p. 29].   According to Defendant, Dr. McDuff offers conclusory opinions about these causes of action [*Id.* at 28–29].  Defendant further states that he does not possess the requisite qualifications on pharmaceutical license negotiations [*Id.* at 29].  Plaintiff does not respond to this argument [*See* Doc. 401].

Dr. McDuff addresses slander of title and tortious interference in the last section of his report [Doc. 335-1 ¶¶ 205–12].  He concludes:

> Caelum and Alexion's own documents demonstrate the substantial commercial potential of AL amyloidosis treatments developed using the UTRF Assets. At this time, I have not been asked to separately quantify the potential damages related to the slander of title and tortious interference claims. Nevertheless, but for the alleged conduct, I am unaware of any reasons why UTRF and Columbia would not have been able to find an alternative partner to assist in the commercialization and further development of the 11-1F4 antibody.

[*Id.* ¶ 212].

Because Plaintiff did not respond to this argument, "that argument is generally deemed to be unopposed and the proposition conceded." *AK v. Behav. Health Sys., Inc.*, 382 F. Supp. 3d 772, 774 (M.D. Tenn. 2019) (citation omitted).  Regardless, the Court agrees that his conclusory opinion is not helpful to the jury, and there is no evidence that he is qualified to render such opinions [*See* Doc. 335-1].  The Court therefore precludes Mr. McDuff's opinions on slander of title and tortious interference.

## IV.    CONCLUSION

For the reasons explained above, the Court **GRANTS IN PART AND DENIES IN PART**

Defendant's Motion to Exclude the Expert Testimony of Dr. DeForest McDuff [**Doc. 331**].

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge