UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNIVERSITY OF TENNESSEE RESEARCH FOUNDATION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 3:19-CV-508-CEA-DCP ) |
| CAELUM BIOSCIENCES, INC., | ) ) ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Plaintiff's *Daubert* Motion to Exclude the Testimony of Neil J. Beaton [Doc. 336]. Defendant responded in opposition to the motion [Doc. 398], and Plaintiff filed a reply [Doc. 480-5]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a). For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** the motion [**Doc. 336**].

I.  BACKGROUND

"This case largely concerns the ownership and development of the 11-1F4 antibody and related research materials" [Doc. 259 pp. 2–3 (citing Doc. 61 p. 1)]. According to the allegations in the Second Amended Complaint ("Amended Complaint"), Dr. Alan Solomon ("Dr. Solomon") with the University of Tennessee ("UT") developed the 11-1F4 antibody ("Antibody"), and the "ownership of the [A]ntibody materials and associated materials are held by [Plaintiff]" [Doc. 61 ¶ 1]. The Antibody is effective in treating amyloidosis [*Id.* ¶ 3]. "In 2009, Dr. Solomon applied for and received two different orphan drug designations for two indications of the 11-1F4

[A]ntibody ('the 11-1F4 Orphan Drug Designations')" [*Id*. ¶ 72]. According to the allegations, Defendant Caelum Biosciences, Inc. ("Defendant" or "Caelum") "was founded to advance the clinical development research from [Dr.] Solomon" [*Id*. ¶ 1]. Plaintiff University of Tennessee Research Foundation ("Plaintiff" or "UTRF") alleges that Defendant's "sole focus and mission . . . is to commercialize the [Antibody] technology, which it has renamed to CAEL-101" [*Id*. ¶ 31].

Plaintiff entered into several different agreements relating to the Antibody [*Id*. ¶ 28]. "In 2011, [UT] and the National Cancer Institute ('NCI') entered into a Material Transfer Agreement pursuant to the NCI's Experimental Therapeutics Program ("NExT")" [*Id*. ¶ 79]. In 2013, Plaintiff entered an Inter-Institutional Agreement ("IIA") with former party, The Trustees of Columbia University in the City of New York ("Columbia" or "Columbia University"), allowing it to work on clinical trials with respect to the Antibody [*Id*. ¶¶ 47–48, 85–86]. On March 14, 2017, Defendant "entered into a Confidentiality Agreement with [Plaintiff] and [UT] so that the parties could exchange information in connection with a potential sponsored research agreement involving [Plaintiff's] 11-1F4 technology" [*Id*. ¶ 104]. These agreements, Plaintiff alleges, did not transfer certain rights, including the know-how of the Antibody [*Id*. ¶¶ 79, 86, 110].[1]

According to Plaintiff, in 2017, Defendant "began publishing press releases containing false statements regarding the ownership of the 11-1F4 technology, [made] false disclosures on its website, and . . . [made] false disclosures with the U.S. Food and Drug Administration claiming that it had licensed the 11-14F4 technology from Columbia University and that [Defendant] was now the owner of the 11-14F4 Orphan Drug Designations" [*Id*. ¶ 102]. Plaintiff concludes:

> On information and belief, [Defendant] has used and continues to utilize 11-1F4 materials that are the property of [Plaintiff], including but not limited to: murine 11-1F4 materials; chimeric 11-1F4 materials; cell clones utilized in the production of chimeric 11-1F4

---

[1] Plaintiff explains that the "know-how" is the "the physical antibody materials, protein sequences, or research data regarding the 11-1F4 antibodies" [Doc. 61 ¶ 86].

2

> antibodies, and ELISA reagents. On information and belief, [Defendant] has also used and continues to utilize [Plaintiff's] research data, clinical trial and laboratory testing protocols, and documentation incorporated into the Investigational New Drug applications for therapies incorporating the 11-1F4 monoclonal antibody. [Defendant's] use of the 11-1F4 property rights and know-how is without written authorization from [Plaintiff] and [Defendant] has not compensated [Plaintiff] for its use of these materials.

[*Id.* ¶ 116].

Based on the above, Plaintiff alleges that Defendant breached the Confidentiality Agreement [*id.* at ¶¶ 125–37]; converted Plaintiff's property [*id.* ¶¶ 138–60]; committed slander of title [*id.* ¶¶ 161–86];[2] interfered with its business relationship with Columbia [*id.* ¶¶ 187–207]; interfered with its business relationship with industry partners [*id.* ¶¶ 208–27]; became unjustly enriched [*id.* ¶¶ 228–37]; and misappropriated trade secrets under the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1701 *et seq.* [*id.* ¶¶ 238–53].

Plaintiff also seeks declaratory judgments. First, it seeks a declaratory judgment that it owns "all right, title, and interest in [certain] tangible materials, know-how, and confidential research data originating or obtained from a laboratory of [UT]" [*Id.* ¶ 255]. In addition, Plaintiff seeks a declaration that it "owns the exclusive rights to utilize for commercial, for-profit purposes [certain] materials and information generated by the [NCI]" [*Id.* ¶ 262]. Further, it seeks a declaratory judgment that it owns the 11-1F4 Orphan Drug Designations [*Id.* ¶¶ 270–77].

Relevant to the instant matter, Defendant retained Neil J. Beaton, a certified public accountant, as its damages expert [Doc. 503-6 ¶ 2]. Specifically, Defendant asked Mr. Beaton "to evaluate what, if any damages, [Plaintiff] has incurred in this case and to evaluate the conclusions

---

[2] Plaintiff defines the slandered property as "(1) the chimeric 11-1F4 antibody, (2) cell clones utilized in production of the chimeric 11-1F4 antibody, and (3) the 11-1F4 Orphan Drug Designations (collectively, the '11-1F4 Slandered Property')" [Doc. 61 ¶ 162].

3

set forth in set forth in [DeForest] McDuff[']s Report" [*Id*. ¶ 5].[3] Mr. Beaton summarizes his opinions as follows:

> 9. My review of the record did not show any evidence that Caelum directly obtained, much less misappropriated, any confidential or proprietary information directly from UT or UTRF, or any of its employees.
>
> 10. Based upon my review of the allegations and evidentiary record, the UTRF Assets were allegedly provided to Columbia University ("Columbia") on September 9, 2013, when the University of Tennessee's ("UT") Dr. Alan Solomon caused the transfer of Investigational New Drug ("IND") 117,316, including underlying preclinical studies and information that UTRF now claims to be proprietary, to Columbia's Dr. Suzanne Lentzsch; and on June 9, 2016, when Dr. Solomon caused the transfer of orphan-drug designations ("ODD") #09-2903 (use of monoclonal antibody 11-1F4 as a therapeutic agent in amyloidosis) and #09-2937 (use of monoclonal antibody 11-1F4 as a radioimmunoimaging agent for amyloidosis) to Dr. Lentzsch.
>
> 11. It is further alleged that on December 16, 2013, Columbia and UTRF subsequently entered into an inter-institutional agreement ("IIA"), and then an amendment terminating such IIA on June 12, 2017.
>
> 12. It appears that UTRF alleges that such UTRF Assets were provided to, or made available to, Caelum, by virtue of an Exclusive License Agreement (the "Exclusive Agreement") between Caelum and the Trustees of Columbia University, dated January 1, 2017.
>
> 13. Thus, if UTRF is successful in proving that the UTRF Assets were misappropriated, the time of misappropriation should be measured as of 2013, when UT's Dr. Solomon caused the transfer of such UTRF Assets to Columbia, allegedly without UTRF's authorization or without compensation.
>
> 14. If measured properly and based upon both written contracts between UTRF and Columbia, UTRF's Assets were of

---

[3] Deforest McDuff is Plaintiff's expert witness on damages [Doc. 503-6 ¶ 5].

4

Case 3:19-cv-00508-CEA-DCP   Document 532   Filed 07/11/24   Page 4 of 20   PageID #: 31480

15. Further, UTRF's Assets were still of nominal value as of December 16, 2013 when UTRF entered into the IIA and June 12, 2017 when the parties terminated the IIA, without UTRF obtaining any compensation for the assets transferred to Columbia. Quite the opposite, in terminating the IIA, UTRF released Columbia for any and all liability or claims. Based on this record, it appears that neither UTRF nor Columbia ascribed significant value to UTRF's Assets.

16. It is my further opinion, that if measured properly, UTRF's Assets were of nominal value as of January 1, 2017, the date Caelum signed the Exclusive License with Columbia and was granted the right to develop chimeric 11-1F4.

17. Based on the Exclusive Agreement, the maximum that Caelum would owe UTRF for the alleged misappropriation, assuming UTRF's allegations are adjudicated in its favor, is a portion of the $371,600 that was paid to Columbia.

18. As explained below, the damages calculations in the McDuff Report are largely unsupported, based on faulty assumptions, lacking evidentiary support, and tremendously overstated. The McDuff Report miscalculates and misconstrues the value of Caelum's equity based on speculative forecasts rather than contemporaneous documents. A majority of the damages set forth in the McDuff Report are based on forecasts that were prepared by Alexion well after January 1, 2017 and for purposes of resource assessment rather than valuation, which is discussed in more detail below. Accordingly, Dr. McDuff's analysis is inappropriate and results in unrealistic damage amounts.

[*Id*. ¶¶ 9–18 (footnotes omitted)].

Plaintiff seeks to exclude Mr. Beaton from testifying as follows: "(1) the release between [Plaintiff] and Columbia University 'shows that [Plaintiff] did not regard the UTRF Assets . . . as having any value'; (2) 'the evidence shows that [Plaintiff] itself placed little or no value on the UTRF Assets'; (3) 'the alleged trade secrets [Plaintiff] has identified in this case are generally

5

known in the industry and/or are readily ascertainable,' making damages unavailable; and/or (4) opining that [Plaintiff] only is entitled to damages of $371,600 if it prevails against [Defendant] in this lawsuit" [Doc. 337 p. 5]. With respect to the first three challenged opinions, Plaintiff argues that his testimony is not helpful to the jury [*Id*. at 7–11]. In addition, Plaintiff argues that the fourth challenged opinion—Mr. Beaton's damages calculation—is unreliable [*Id*. at 11–13].

Defendant responds that Mr. Beaton's opinions are based on the facts in this case, which is proper expert testimony [Doc. 398 pp. 11–13]. It further argues that Mr. Beaton's damages calculation is reliable [*Id*. at 13–17].

Plaintiff filed a reply maintaining that Mr. Beaton's opinions regarding the value of the trade secrets is not helpful to the jury [Doc. 480-5 pp. 6–11]. It asserts that Mr. Beaton's damages calculation is unreliable, confusing, and unhelpful to the jury [*Id*. at 11–14].

## II. STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579, 589 (1993)). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert's opinion reflects a reliable application of the
> principles and methods to the facts of the case.

Fed. R. Evid. 702.[4] The Supreme Court of the United States stated in *Daubert* that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589.

The factors relevant in evaluating the reliability of the testimony include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593–94), *aff'd*, 89 F. App'x 927 (6th Cir. 2003). The inquiry is "a flexible one," and these factors do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 138–39 (citing *Daubert*, 509 U.S. at 593); *see also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999) (explaining that these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted").

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cnty.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138–39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will

---

[4] Rule 702 was amended on December 1, 2023, but the changes to the rule are not substantive. *Nash-Perry v. City of Bakersfield*, No. 118CV01512JLTCDB, 2023 WL 8261305, at *13 (E.D. Cal. Nov. 29, 2023). Rather, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000--requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." Fed. R. Evid. 702 advisory committee's note to 2023 amendments.

7

ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002), *aff'd*, 89 F. App'x 927 (6th Cir. 2003) (quoting *Daubert*, 509 U.S. at 593–94). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n.10.

"District courts generally have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Madej v. Maiden*, 951 F.3d 364, 374 (6th Cir. 2020) (quoting *Kumho Tire*, 526 U.S. at 152). Decisions by the district court are thus reviewed for an abuse of discretion. *See id.* (citing *Kumho Tire*, 526 U.S. at 142). "This deferential standard makes sense because *Daubert* establishes a 'flexible' test that considers many indicia of reliability[,]" and relevance will depend "on the particular science and the particular scientist before the court." *Id.* (citing *Kumho Tire*, 526 U.S. at 150).

### III. ANALYSIS

The Court finds that Mr. Beaton's opinions regarding the value or lack thereof of Plaintiff's trade secrets not helpful to the jury. At this time, the Court finds Mr. Beaton's damages calculation reliable and helpful.

#### A. Mr. Beaton's Opinions Regarding Plaintiff's Purported Trade Secrets

Plaintiff argues that "courts routinely exclude so-called expert testimony that simply summarizes produced documents and communications between the parties and/or other evidence in the evidentiary record" [Doc. 337 p. 8 (citation omitted)]. Plaintiff states that such testimony is not helpful because it is not within Mr. Beaton's expertise as an economist [*Id.* (citation omitted)]. It argues that Mr. Beaton's opinion that Plaintiff believed its trade secrets have no value comes from the Court's order dismissing Columbia pursuant to Plaintiff's agreement [*Id.* at 9 (citation omitted)]. With respect to his opinion that Plaintiff placed little or no value on the UTRF Assets,

Plaintiff asserts that Mr. Beaton's "opinion is nothing more than his interpretation of what the evidence supposedly shows" [*Id*.]. Finally, with respect to his opinions that Plaintiff's trade secrets are generally known or readily ascertainable, Plaintiff states that Mr. Beaton allegedly relied on other experts for this conclusion, but he admitted at his deposition this opinion was received from defense counsel [*Id*. at 10].

Defendant responds that Mr. Beaton's opinion that Plaintiff has incurred little if any damage is not solely based on the Court's order dismissing Columbia from this case, but instead he "bases his opinions on a long list of facts showing that [Plaintiff] itself placed little or no value on the allegedly misappropriated assets" [Doc. 398 p. 11 (citation omitted)]. In addition, Defendant argues that "[t]here is nothing objectionable about Mr. Beaton's reliance on other expert witnesses" [*Id*. at 13].

Plaintiff replies that "[Defendant] does not even respond to [Plaintiff's] argument that testimony from a damages expert that simply summarizes and/or interprets the evidentiary record to draw a conclusion that the opposing party suffered no damages is excluded as unhelpful because it is not 'rooted in' the expert's 'expertise as an economist'" [Doc. 480-5 p. 6 (citation omitted)]. Plaintiff maintains that "Mr. Beaton's interpretation of what the evidence supposedly shows . . . is completely improper" [*Id*. at 7 (citation omitted)]. Plaintiff argues that "[Defendant] fails to articulate how Mr. Beaton's supposed opinion that a rational economic actor would not give away assets for free . . . if it believed that assets had value is not an expert opinion, or an opinion at all" [*Id*. at 9]. According to Plaintiff, Mr. Beaton's opinions are within the purview of a layperson, and therefore, not helpful to the jury [*Id*.].

Rule 26 requires that expert reports contain "a complete statement of all opinions that the witness will express and the basis and reasons for them" and "the facts or data considered by the

witness in forming them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i)—(ii). Even so, "[e]xpert testimony which 'merely regurgitates factual information that is better presented directly to the jury rather than through the testimony of an expert witness' should be excluded." *Burton v. Ethicon Inc.*, No. CV 5:20-280, 2020 WL 5809992, at *5 (E.D. Ky. Sept. 29, 2020) (quoting *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 608 (S.D. W. Va. 2013)). "A history without any expert analysis or other application of the expert's expertise is simply a factual narrative that 'should be presented to the jury directly.'" *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, 546 F. Supp. 3d 666, 677 (S.D. Ohio 2021) (quoting *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010)). "Expert testimony that relies on expert knowledge and experience to contextualize, analyze, and interpret historical facts is admissible, however." *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, No. 2:18-CV-01509, 2021 WL 3617152, at *6 (S.D. Ohio Aug. 16, 2021) (citation omitted).

Specifically, Plaintiff points to paragraphs 36, 44, and 45 of Mr. Beaton's expert report. These paragraphs provide as follows:

> 36. This broad release of "all claims and liability" shows that UTRF itself did not regard the UTRF Assets as of June 12, 2017 as having any value.
>
> 44. Since UTRF essentially abandoned the UTRF Assets and Dr. Solomon transferred the IND for nothing in return, the evidence shows that UTRF itself placed little or no value on the UTRF Assets.
>
> 45. As I understand is detailed in other reports being served by Caelum, the alleged trade secrets UTRF has identified in this case are generally known in the industry and/or are readily ascertainable from publications, presentations, ATCC deposits, patents, and/or other proper means such that no real economic value would be obtained from their disclosure. Thus, it is my understanding that UTRF cannot recover damages for its trade secret misappropriation claim.

10

[Doc. 503-6 ¶¶ 36, 44, & 45].[5]

With respect to the First Opinion, Mr. Beaton explains, "On June 12, 2017, [Plaintiff] and Columbia terminated the UT-Columbia IIA after it learned that Columbia had entered into an agreement with [Defendant]" [Doc. 503-6 ¶ 33]. Mr. Beaton states that the termination letter provided that the parties agreed to "be released from any and all claims and liability" [*Id.* (citation omitted)]. Mr. Beaton states, "In its March 31, 2023, [d]ecision, the Court dismissed Columbia from this case as UTRF 'knowingly and willingly' signed the "Termination Letter' that 'unambiguously' released 'any and all claims' against Columbia" [*Id.* (citation omitted)]. Mr. Beaton understands, through other reports served by Defendant and the Court's order, that "[Plaintiff] agreed to release Columbia from any and all claims and liability after Dr. Solomon had transferred the IND to Dr. Lentezsch, [and] after the . . . [NCI] had agreed to transfer chimeric 11-1F4 research data and materials to Columbia" [*Id.* ¶ 34 (citation omitted)]. He also references Dr. Solomon's transfer of the ODDs to Dr. Lentzsch [*Id.*]. Citing to the Court's decision, he opines, "A party placing significant value on these 'claims and liability'—or the underlying assets—would not release Columbia from such claims and liability without significant compensation from Columbia" [*Id.* ¶ 35]. During his deposition, when asked if he was relying on anything else to render the First Opinion other than the Court's order, Mr. Beaton testified, "No, I'm not. There may be other experts that will be brought in. But I'm not – I won't be providing opinions on that, no" [Doc. 337-3 p. 25]. He states, "My opinion is based upon the March 31, 20[2]3, ruling by the Court" [*Id.* at 25–26]. The following exchange then occurred:

> Q. Okay. And you think the reason [Plaintiff] entered into the release was because they did not value the UTRF assets?

---

[5] For ease of reference, in this section, the Court will refer to these opinions as the First Opinion, Second Opinion, and the Third Opinion.

> Ms. Finger: Objection to form.[6]
>
> The Witness: I didn't say that was the reason. I said that's the result. That's the economic result. When I see the record, when I set forth all of the actions and activities that occurred, that [Plaintiff] had the ability well before, whenever they filed like May 21, when they filed the lawsuit, they did nothing, nothing at all regarding a claim for the value of the UTRF [A]ssets. That tells me that someone didn't have any thought about value until that point in time, which means when they entered into the agreement, they didn't have any thought of value. When they allowed the IND to go, when Dr. Solomon transferred everything in 2013, nothing happened. It's just the weight of the evidence. I'm just a layman's person trying to think of economically if there was value there, I wouldn't' let it go. I don't think a rational economic actor would let that go and release the party that had possession of it from any and all claims if they believed there was value there. That's just my economic opinion.

[*Id*. at 27– 28].

The Court finds that the First and Second Opinions are not within Mr. Beaton's specialized knowledge such that they would assist the trier of fact. *See United States v. Kilpatrick*, 798 F.3d 365, 380 (6th Cir. 2015) ("It is not 'helpful' when a witness, lay or expert, forms conclusions for a jury that the jurors are competent to reach on their own." (citation omitted)). As noted above, Mr. Beaton acknowledged that his First Opinion is based on the Court's order dismissing

---

[6] The Court notes that generic objections to the form of the questions are deemed waived. *Fletcher v. Honeywell Int'l, Inc.*, No. 3:16-CV-302, 2017 WL 775852, at *1 (S.D. Ohio Feb. 28, 2017) ("To the extent that counsel made a generic objection to 'form,' but failed to specify the basis for the objection, the Court also considers those objections to be waived." (citations omitted)); *see also Henderson v. B & B Precast & Pipe, LLC*, No. 4:13-CV-528, 2014 WL 4063673, at *1 (M.D. Ga. Aug. 14, 2014) ("[I]f a question is propounded in an improper form, the objection should be stated concisely on the record during the deposition in a manner that provides the questioner with a reasonable opportunity to correct the form of the question. Failure to do so waives the objection. Simply stating 'objection to form' does not necessarily preserve the objection.").

Columbia.  And his Second Opinion is based on his interpretation of the facts of the case, including Dr. Solomon transferring the IND without compensation.  *See Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512, 2017 WL 1319553, at *9 (E.D. Tex. Apr. 10, 2017) ("More generally, denominating a witness as an expert does not give that witness leave to simply read materials such as exhibits and depositions in the case and then testify as to their contents. Such evidence is not helpful to the jury 'where the jury can easily reach reliable conclusions based on common sense, common experience, and the jury's own perceptions, or . . . where there is other evidence or other means to put the jury in a position to accurately decide the facts.'" (quoting Charles Alan Wright and Victor Gold, *Federal Practice & Procedure* § 6265.2, at 267–68 (2016)); *Univ. of Pittsburgh v. Townsend*, No. 304-CV-291, 2007 WL 1002317, at *15 (E.D. Tenn. Mar. 30, 2007) ("The Court fails to see how Dr. Lewellen's specialized knowledge informs this conclusion, nor does the Court see how Dr. Lewellen's specialized knowledge renders his interpretation of these documents any more persuasive than a lay person's interpretation.").

For his Third Opinion, Mr. Beaton states that his understanding is that Plaintiff cannot recover damages because other experts have opined that Plaintiff's purported trade secrets are generally known in the industry and/or are readily ascertainable [Doc. 503-6 ¶ 45].  Plaintiff argues that this testimony is not helpful [*see* Doc. 337 pp. 7–10] but additionally, it asserts that the "rules do not permit an expert to rely on opinions developed by another expert for purpose of litigation without independent verification of the underlying expert's work" [*Id.* at 10 (citation omitted)]. And here, according to Plaintiff, Mr. Beaton acknowledged at his deposition that he did not read the other expert's report [*Id.* (citation omitted)].  Defendant responds that Mr. Beaton may rely on another expert's opinion [*Id.* at 12 (citation omitted)].

13

During Mr. Beaton's deposition, the following exchanged occurred:

> Q. What is the basis for your opinion that the information is generally known or readily ascertainable?
>
> A. That would be the information I received from counsel regarding other experts that will be testifying as to the trade secrets.
>
> Q. So is it fair to characterize this opinion as your statement that trade secrets that are not trade secrets lack economic value?
>
> A. Trade secrets that are not trade secrets lack economic value. I guess that would be true.

[Doc. 337-3 pp. 42–43].

Experts are permitted to rely on another expert's opinion "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." *Kush Enterprises, LLC v. Massachusetts Bay Ins. Co.*, No. 3:18-CV-492, 2021 WL 3007263, at *8 (E.D. Tenn. July 15, 2021) (quoting Fed. R. Evid. 703) (alteration in original). While Plaintiff takes issue that Mr. Beaton received the other expert's opinion via defense counsel, there is no dispute that another expert opined that Plaintiff's purported trade secrets are generally known and/or readily ascertainable.[7] Even so, the Court finds Mr. Beaton's testimony on this issue not helpful to the jury. Mr. Beaton is essentially stating that if there are no trade secrets, Plaintiff's damages are zero. But the jury need not hear from an economist to reach that conclusion. *Ford Motor Co. v. InterMotive, Inc.*, No. 4:17-CV-11584, 2022 WL 4596306, at *5 (E.D. Mich. Sept. 30, 2022) ("This type of conjecture claiming 'if there was no violation, there are no damages' does not require expert testimony; it is a rhetorical argument to make to the jury."), *clarified on denial of*

---

[7] Defendant's expert Kurt Gehlsen rendered an opinion that Plaintiff's purported trade secrets are generally known and/or readily ascertainable [*See* Doc. 337 p. 11]. The Court has limited Dr. Gehlsen's testimony in this regard [*See* Doc. 530].

*reconsideration*, No. 417CV1158, 2023 WL 1423980 (E.D. Mich. Jan. 31, 2023). The Court therefore finds Plaintiff's arguments well taken on this ground.

B. **The Reliability of Mr. Beaton's Opinions**

Plaintiff challenges Mr. Beaton's alternative opinion that should Plaintiff prevail on its claims, it is entitled to only $371,600 [Doc. 337 p. 11]. It argues that "Mr. Beaton's conclusion is based on incorrect facts and lumps together [Plaintiff's] breach of contract and trade secret misappropriation claims," rendering his opinion unreliable [*Id*. at 11–12]. The Court will address these in turn.[8]

First, Plaintiff states that in its Amended Complaint, it alleges that Defendant breached the Confidentiality Agreement executed on March 14, 2017, but in assessing damages on the breach of contract claim, Mr. Beaton used a date of January 1, 2017—more than two months before the contract existed [*Id*. at 12]. Plaintiff states that his reliance on January 1, 2017, to calculate damages is unreliable [*Id*. at 12–13].

Defendant responds that Mr. Beaton evaluated the UTRF Assets using the date of January 1, 2017, because this is when the 2017 Caelum/Columbia Agreement was executed [Doc. 398 p. 16]. While Plaintiff contends that the date should be sometime after the Confidentiality Agreement, Defendant asserts "that there is absolutely no evidence that [Plaintiff] provided [Defendant] with any of the trade secrets or the UTRF Assets after the March 2017 [Confidentiality] Agreement was signed" [*Id*. (citation omitted)]. Defendant argues that Plaintiff's Rule 30(b)(6) witness could not recall "whether anything was . . . transferred" [*Id*. (citation omitted)]. "Acknowledging this clear record," Defendant asserts, "Mr. Beaton values the UTRF

---

[8] Defendant argues in its response that Mr. Beaton's apportionment analysis is reliable [Doc. 398 pp. 14–15]. Plaintiff does not challenge his apportionment analysis [Doc. 480-5 p. 14].

15

Assets on or around the execution date of the 2017 Caelum/Columbia Agreement because that is when Columbia provided Caelum with access to the 11-1F4 materials" [*Id.*].

Plaintiff replies that Defendant's argument regarding Mr. Beaton's use of January 2017 for the date of the breach is a "merits based argument" but regardless, he is essentially opining that there was no breach, and therefore, no damages [Doc. 480-5 p. 12]. Plaintiff maintains that his incorrect use of the date renders his opinion unreliable [*Id.* at 12–13].

During his deposition, the following exchanged occurred:

> Q. Okay. And do you know when that contract was entered into by the parties?
>
> A. I may get the day wrong, but I believe it's March 14, 2017, or thereabouts.
>
> Q. But your damages are based off of three months before that; correct?
>
> A. Correct. There's no indication in the record that anything's been breached. So I don't know if it's after or before, during. I picked the date that I believe there's an adequate record of transfer of the UTRF assets and it wouldn't have mattered anyway the assets -- the underlying essence of the UTRF assets wouldn't have changed between January 2017 and March 2017 or even Dr. McDuff's January 1, 2020. They didn't change at all during that entire period of time. And, therefore, the value of those assets wouldn't have changed during that entire period. So picking a January 1st, 2017, date seemed the most reasonable given the amount of information I had available in the other record evidence.
>
> Q. Okay. And if I have the same understanding, selecting a date in 2020 wouldn't change matters, would it?
>
> A. It wouldn't change the underlying value of the UTRF assets –
>
> Q. Okay.
>
> A. -- as of that date.

16

[Doc. 337-3 pp. 12–13].

Here, Mr. Beaton explains that choosing a different date would not affect his damages calculation [*Id.*]. In light of his testimony, the Court finds that Plaintiff's challenge is better addressed during cross examination as opposed to excluding his testimony. *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("[A]ny weaknesses in the factual basis of an expert witness' opinion, . . . bear on the weight of the evidence rather than on its admissibility.").

Second, Plaintiff argues that although it has separate claims for breach of contract and trade secret misappropriation, "Mr. Beaton does not provide separate damages opinions for these claims" [Doc. 337 p. 13]. Defendant argues that the 2017 Caelum/Columbia Agreement is the "starting place" and that "whatever [Defendant] received, it received from Columbia in exchange for the compensation set forth in the agreement" [Doc. 398 p. 15]. It concludes that "Mr. Beaton's calculations represented the most to which [Plaintiff] may be entitled under either cause of action" [*Id.*]. Plaintiff maintains that "Mr. Beaton's use of an aggregated damages number without providing any methodology for separately calculating damages for [Plaintiff's] breach of contract and trade secret misappropriation claims is unreliable, confusing[,] and thus unhelpful to the jury" [Doc. 480-5 p. 13].

During Mr. Beaton's testimony, the following exchanged occurred:

> Q. Do you have in your report an opinion on what the damages would be should UTRF succeed on just the breach of contract claim?
>
> A. Again, that was plaintiff's duty. Plaintiffs were supposed to present what they believe the damages are by claim. And, again, Dr. McDuff did by trade secrets and he did by breach of contract. But within the breach of contract are two tangible assets, and he didn't break that down and neither did I. In the trade secret misappropriation claim, there are 41 trade secrets. He didn't even know what the trade secrets were when I was looking to his deposition. So he didn't

17

break those down. And, therefore, in my rebuttal report, I didn't do a specific analysis to rebut the fact that he didn't break those down because that wasn't my job.

Q. Okay. And let me ask to make sure I'm clear, is it your understanding that your engagement in connection with this case is limited to just rebutting Dr. McDuff?

A. No. As you know in the preamble, my first part of my engagement was to value the UTRF assets as I set forth in my report, which I did. The second part was then to rebut Dr. McDuff's report.

Q. Right. And so I guess what I'm asking is if only the breach of contract claim is presented to the jury, what would your opinion be that you would offer to the court as to what UTRF's damages are on that claim should UTRF succeed?

A. As I sit here, I can only say it would be less than 371,604. I don't have a particular number as I sit here.

Q. And there isn't any analysis to get to that lower number contained in your report; correct?

A. That's a correct statement, no particular analysis. One can glean from the entirety of my report that there's zero value. But, again, I'm going on the – I'm assuming liability and assuming adjudicated legality and not based upon the record that shows there wasn't much value there.

Q. Now ask the same questions as to the trade secret claim. If only the misappropriation of trade secrets claim is presented to the jury, is it your opinion that UTRF's damages should prevail are $371,604?

A. Again, no. It would be something less than that. Because the – there's overlap between the two. So I'd have to pull out the overlap. And, again, my understanding is that there are a number of experts -- maybe not a number, there are experts who will be opining that many of those claimed trade secrets are not, in fact, trade secrets. And I just don't have a number. I haven't seen those reports. Dr. McDuff didn't do an analysis. He had this amorphous knowledge, know-how that I set forth in my report. So there's really nothing for me to rebut. And I didn't have the data specific for me to then run a calculation that again plaintiffs should have done.

18

> Q. Okay. And I understand this is a hypothetical, but I guess I'm just trying to understand your opinion on the distinction between the breach of contract claim and damages associated with that and the trade secret claim and the damages associated with that. So with that background, if hypothetically UTRF proceeded to trial on just the trade secrets claim but not the breach of contract claim, and prevailed as to all 41 trade secrets, what is -- in your opinion, what are UTRF's damages?
>
> A. I could only say at this point no more than 371,604 and more probably than not something less than that because of the overlap. There would be one item missing and that would be the chimeric 11-1F4. That is the first tangible asset under the breach of contract. That would be the only one out because the cell clones, I believe, are incorporated within the 41 trade secrets. So I then have to measure, okay, what's the value of a technology that's 30 years old that has been overcome by current technology and wasn't really necessary, according to my read of the record, for Columbia and Caelum. And there was a hypothetical negotiation, again something less. But I can't give you a definitive number.
>
> Q. Okay. And the analysis that would support something less than 371,604 for just the trade secret claim is not contained in your report; correct?
>
> A. Correct. I don't have a specific one. Again, that was plaintiff's duty to provide that and then I could rebut it. But since they didn't, I did not.

[Doc. 337-3 pp. 35–39].

Based on the above, the Court cannot conclude that Mr. Beaton's opinions are unreliable or unhelpful simply because he performed an aggregate damages calculation. Plaintiff has cited no authority for the proposition that an aggregated damages calculation is inherently unreliable, and to the extent the jury finds Defendant liable on the trade secret misappropriation claim and the breach of contract claim, Mr. Beaton's opinions are helpful. The Court finds cross examination and jury instructions are more appropriate than exclusion on these grounds. Should the posture of

this case change, however, this decision may be revisited by an appropriate motion. *See Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275-, 2011 WL 6748518, at *17 (E.D. N.C. Dec. 22, 2011) ("Alternatively, [the expert] admitted that he assumed that [the defendant] was liable for all of [the plaintiff's] alleged claims when preparing his report. . . . However, since [the expert] prepared his report, the court granted summary judgment as to [the plaintiff's] claims of intentional interference with contractual relations, intentional interference with prospective economic advantage, unjust enrichment, and rescission or reformation. Therefore, [the expert's] damages calculations are based on an assumption regarding [the plaintiff's] success on all of its claims that is no longer viable." (internal citation omitted)); *Pharmanetics, Inc. v. Aventis Pharms., Inc.*, No. 5:03-CV-817-, 2005 WL 6000369, at *10 (E.D. N.C. May 4, 2005) ("This assumption, that defendant is liable for the actions alleged in all of plaintiff's causes of action, is no longer viable at this stage of the case. . . As [the expert's] damages model is premised upon [the] plaintiff's success on all of its causes of action, and does not allow, even in the alternative, for an adjustment of damages to account for those claims no longer remaining, it is not a reliable measure of damages."), *aff'd*, 182 F. App'x 267 (4th Cir. 2006).

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's *Daubert* Motion to Exclude the Testimony of Neil J. Beaton [**Doc. 336**].

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge

20